IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Michael D. Van Deelen,<br><br>        Plaintiff,<br><br>v.<br><br>David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP,<br><br>        Defendants. | Civil Action File<br>No. 4:23-cv-3729<br><br><br><br><br>Jury Trial Demanded |

To the Honorable Alia Moses,
Chief United States District Judge:

## PLAINTIFF'S RESPONSE TO DEFENDANTS KIRKLAND & ELLIS LLP AND KIRKLAND & ELLIS INTERNATIONAL LLP'S MOTION FOR SANCTIONS PURSUANT TO RULE 11

Plaintiff Michael D. Van Deelen ("Plaintiff") and Bandas Law Firm ("Plaintiff's counsel") file this response to Defendants Kirkland & Ellis LLP and Kirkland & Ellis International LLP's (collectively, "Kirkland") Motion for Sanctions pursuant to FED. R. CIV. P. 11 (the "Motion") and would respectfully show the Court the following:

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ ii

Introduction and Summary of Argument ................................................................... 1

Legal Standard ......................................................................................................... 4

Argument ................................................................................................................. 6

   I.   Plaintiff and his Counsel did not violate Rule 11(b)(1) because the FAC was not filed for an improper purpose. ........................................................................................ 6

      A.   Plaintiff's filings in the McDermott bankruptcy do not evidence improper purpose...... 8

      B.   Kirkland's misleading ad hominem attacks on counsel and Plaintiff in unrelated matters are misguided attempts to manufacture improper purpose. ........................... 9

   II.   Plaintiff has not violated Rule 11(b)(2) because Plaintiff's RICO claims are warranted under existing law. ......................................................................................... 11

      A.   The Enterprise existed for a separate purpose. ............................................. 12

      B.   The Enterprise functioned as a continuing unit. ........................................... 14

      C.   Kirkland participated in the operation and management of the Enterprise. ............... 15

      D.   Plaintiff properly alleged Kirkland's agreement to the RICO conspiracy. ................. 16

      E.   Fifth Circuit precedent does not support imposing sanctions even if Plaintiff's RICO claims against Kirkland were defective. ....................................................... 17

   III.   Plaintiff has not violated Rule 11(b)(3) because the currently available evidence and reasonable inferences drawn therefrom provide a sufficient basis for Plaintiff's factual allegations against Kirkland. ..................................................................... 18

      A.   Plaintiff's vigorous pre-filing investigation supplied evidentiary support for Plaintiff's factual contentions underlying the RICO claims. ................................... 19

          1.   Plaintiff's counsel conducted a reasonable investigation. ........................... 19

          2.   The timing of Freeman joining Jackson Walker allows for a reasonable inference that Kirkland knew about and exploited the Jones-Freeman Relationship.......... 20

          3.   Reliable reporting revealed Kirkland was "long aware" of the Jones-Freeman Relationship. ................................................................................... 24

          4.   Kirkland's continued failure to disclose the Jones-Freeman Relationship supplies further evidence from which it could be reasonably inferred that Kirkland knew of and exploited the Jones-Freeman Relationship................................... 26

      B.   At this early stage of litigation, further discovery is necessary..................... 29

Conclusion and Prayer........................................................................................... 30

Certificate of Service ............................................................................................ 31

## TABLE OF AUTHORITIES

### CASES

*Allstate Ins. Co. v. Benhamou*,
    190 F.Supp.3d 631 (S.D. Tex. 2016)..........................................................................13, 14, 15

*Boyle v. United States*,
    556 U.S. 938 (2009) ....................................................................................................12, 14, 15

*Broussard v. Omni Hotels Corp. et al.*,
    2019 WL 4309574 (Tex. App.—Corpus Christi Sept. 12, 2019, no pet.)................................10

*Butters v. Noyola*,
    No. 13-07-00713-CV, 2008 WL 3984168
    (Tex. App.—Corpus Christi-Edinburg, Aug. 29, 2008, no pet.)...............................................11

*Calcasieu Marine Nat. Bank v. Grant*,
    943 F.2d 1453 (5th Cir.1991) ...................................................................................................14

*Cavazos v. Stryker Sales Corp.*,
    658 S.W.3d 749 (Tex. App.—Corpus Christi Nov. 3, 2022, no pet.) .......................................10

*Centocor, Inc. v. Hamilton*,
    372 S.W.3d 140 (Tex. 2012) .....................................................................................................10

*Chambers, et al. v. Whirlpool Corp.*,
    980 F.3d 645 (9th Cir. Nov. 10, 2020) ......................................................................................10

*Chapman & Cole v. Itel Container Int'l B.V.*,
    865 F.2d 676 (5th Cir. 1989) .....................................................................................................25

*Childs v. State Farm Mut. Auto. Ins. Co.*,
    29 F.3d 1018 (5th Cir. 1994) .......................................................................................................5

*City of San Antonio v. Peralta*,
    476 S.W.3d 653 (Tex. App.—San Antonio 2015, no pet.) ......................................................10

Crowe v. Henry,
    43 F.3d 198 (5th Cir. 1995) ................................................................................................14, 15

*Dell Inc. v. Mishra*,
    No. A-16-CV-00641-SS, 2018 WL 3717119 (W.D. Tex. Aug. 3, 2018) .................................15

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) .....................................................................................................10

*Diamond Consortium, inc. v. Manookian,*
   No. 4:16-CV-00094, 2017 WL 1495091 (E.D. Tex. April 26, 2017) ......................................13

*Elliot v.* Foufas,
   867 F.2d 877 (S.D. Tex. 2016) ..........................................................................................12, 14

*Eubank v. Pella Corp.,*
   753 F.3d 718 (7th Cir. 2014) .......................................................................................................10

*F.D.I.C. v. Maxxam, Inc.,*
   523 F.3d 566 (5th Cir. 2008) ........................................................................................................6

*Fernandez-Lopez v. Hernandez,*
   No. DR-19-CV-46-AM/CW, 2020 WL 9396487 (W.D. Tex. Nov. 20, 2020) ........................13

*Guerrero v. Bexar Cnty. Civil Serv. Comm'n,*
   No. 04-12-00523-CV, 2012 WL 6728260 (Tex. App.—San Antonio Dec. 28, 2012) ............10

*In re 4E Brands Northamerica LLC,*
   No. 22-500009, Dkt. #645 at 10 n.6 (Feb. 29, 2024) ..............................................................29

*In re Baby Products Antitrust Litig.,*
   708 F.3d 163 (3d Cir. 2013) .......................................................................................................10

In re Burzynski,
   989 F.2d 733 (5th Cir.1993) .......................................................................................................11

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
   No. 06-MD-1775 (JG)(VVP), 2010 WL 1049269 (E.D.N.Y. Mar. 22, 2010)..........................9

*In re Cathode Ray Tube Antitrust Litig.,*
   281 F.R.D. 531 (N.D. Cal. 2012) ...............................................................................................10

*In re Columbia Valley Healthcare Sys., L.P.,*
   320 S.W.3d 819 (Tex. 2010) ......................................................................................................11

*In re Lumber Liquidators,*
   2020 WL 1140842 (4th Cir. Mar. 10, 2020) .............................................................................10

*In re Mastercard Int'l Inc.,*
   313 F.3d 257 (5th Cir. 2002) .....................................................................................................11

*In re Optical Disk Drive Prod. Antitrust Litig.,*
   804 Fed. App'x. 443 (9th Cir. 2020) ..........................................................................................10

*In re Optical Disk Drive Prod. Antitrust Litig.*,
   959 F.3d 922 (9th Cir. 2020) ...................................................................................10

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   No. 21-16291, 2022 U.S. App. LEXIS 15571 (9th Cir. 2022) ................................10

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   12-4671-CV, 2016 WL 3563719 (2d Cir. June 30, 2016) ......................................10

*In re Syngenta*,
   2:14-MD-02591, Dkt. #4318 at 8–9; #4278 at 3 (D. Kan. Jan. 6, 2020) .................11

*In re Westmoreland Coal Co.*,
   No. 18-35672 (Nov. 13, 2023) .................................................................................22

*JCW Elecs., Inc. v. Garza*,
   257 S.W.3d 701 (Tex. 2008) ...................................................................................11

*Katerra Inc.*,
   No. 21-31861 (Jun. 25, 2021) ..................................................................................27

*Kraemer v. Grant Cnty.*,
   892 F.2d 686 (7th Cir. 1990) ...................................................................................19

*Krim v. Banctexas Group*,
   99 F.3d 775 (5th Cir. 1996) .....................................................................................19

*Litwin v. iRenew Bio Energy Sols., LLC*,
   172 Cal. Rptr. 3d 328 (Cal. App. 2d Dist. 2014), *as modified*, (May 29, 2014) ......10

*Manax v. McNamara*,
   660 F. Supp. 657 (W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988) ...............14

*Mena v. Lenz*,
   349 S.W.3d 650 (Tex. App.—Corpus Christi Jun. 16, 2011, no pet.) .....................11

*Military Highway Water Supply Corp. v. Morin*,
   156 S.W.3d 569 (Tex. 2005) ...................................................................................11

*Nat'l Assoc. of Govt. Employees, Inc. v. Nat'l Federation of Federal Employees*,
   844 F.2d 216 (5th Cir. 1988) .....................................................................................7

*Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*,
   868 F.2d 740 (5th Cir. 1989) ...................................................................................14

*Old Time Enters., Inc. v. Int'l Coffee Corp.,*
    862 F.2d 1213 (5th Cir. 1989) ................................................. 12

*Raines v. City of Starkville,*
    No. 188-CV-319-SO, 1996 WL 33370638 (N.D. Miss. March 8, 1996) ................................. 17

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ............................................................... 15, 16

*Salinas v. World Houseware Producing* Co.,
    34 N.Y.3d 925 (Sept. 12, 2019) ................................................ 10

*Schaffer v. Nationwide Mut. Ins. Co.,*
    No. 13-11-00503-CV, 2013 WL 2146833 (Tex. App.—Corpus Christi May 16, 2013) ......... 10

*Seadrill Limited,*
    No. 21-30427 (Mar. 8, 2021) ................................................... 27

*Seadrill New Finance Limited,*
    No. 22-90001 (Feb. 8, 2022) ................................................... 27

*Shaffer v. Williams,*
    794 F.2d 1030 (5th Cir.1986) ................................................. 14

*Smith v. Our Lady of the Lake Hosp., Inc.,*
    960 F.2d 439 (5th Cir. 1992) .......................................... 19, 20, 29

*Snow Ingredients, Inc. v. Snowizard, Inc.,*
    833 F.3d 512 (5th Cir. 2016) ........................................... 12, 17, 18

*St. Germain et al. v. Howard et al.,*
    556 F.3d 261 (5th Cir. 2009) ................................................. 18

*Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,*
    975 F.2d 1134 (5th Cir.1992) ................................................ 12

*Thomas v. Capital Sec. Servs., Inc.,*
    812 F.2d 984 (5th Cir. 1987) ............................................... 5, 6

*U.S. v. Jones,*
    873 F.3d 482 (5th Cir. 2017) ................................................. 17

*United States v. Elliott,*
    571 F.2d 880 (5th Cir. 1978) ................................................. 17

*United States v. Turkette,*
    452 U.S. 576 (1981) ...........................................................................................12

*Walker v. Beaumont Independent School District,*
    938 F.3d 724 (5th Cir. 2019) .....................................................................13, 15

*Walker v. City of Bogalusa,*
    168 F.3d 237 (5th Cir. 1999) ............................................................................5

*Whitehead v. Food Max of Miss.,*
    332 F.3d 796 (5th Cir. 2003) .........................................................................5, 6

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,*
    90 F.3d 118 (5th Cir.1996) .............................................................................11

### STATUTES

11 U.S.C. § 101(14) ..............................................................................................27

18 U.S.C. § 1962(c) .........................................................................................1, 11

18 U.S.C. § 1962(d) ...............................................................................................1

### OTHER AUTHORITIES

Column, Affairs of State, A Pathway to State Bankruptcy, 30-8 ABIJ 12 (Oct. 2011) ...............21

Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Continue Debtor-Side Dominance in
    Strong Q3 for Big Bankruptcy (Oct. 25, 2023) ...........................................................22

Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as
    Restructuring Market Heats Up (Aug. 3, 2023) ..........................................................22

General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) ...........................................................23

https://www.jw.com/people/matthew-cavenaugh/ .......................................................................21

Kirkland's Bankruptcy Partnership With Jackson Walker Could be a Sign of Things to Come,
    The American Lawyer, Law.com (Aug. 25, 2020) ....................................................22

Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE
    FINANCIAL TIMES (Nov. 21, 2023) .......................................................23, 24, 26

## <u>Rules</u>

Fed. R. Civ. P. 11 ............................................................................................................passim

Fed. R. Civ. P. 11(b) ....................................................................................................1, 4, 5, 29

Fed. R. Civ. P. 11(b)(1) .....................................................................................................1, 6

Fed. R. Civ. P. 11(b)(2) ..................................................................................................2, 11, 12

Fed. R. Civ. P. 11(b)(3) ..................................................................................................3, 18, 29

Fed. R. Civ. P. 11(c) ......................................................................................................5, 29

Fed. R. Civ. P. 12(b)(6) .......................................................................................................18

**Introduction and Summary of Argument**

Plaintiff's ninety-one (91) page First Amended Complaint ("FAC") sets out in excruciating detail the jaw-dropping judicial scandal involving Ms. Elizabeth Freeman and former Judge David Jones. The pleading and its detail was no small affair; it resulted from many months of pre-suit investigation, research and legal work by Plaintiff's counsel. And as all lawyers are duty bound to do, the FAC alleges every plausible claim on behalf of Plaintiff and then supports those claims with detailed factual allegations. What inferences can reasonably be drawn from those facts is, as the Court might expect, hotly disputed.

Predictably, Kirkland thinks little of Plaintiff's claims and has moved to dismiss all of them. Yet Kirkland seeks sanctions against Plaintiff and its counsel based on the assertion of two "RICO" claims: violation of 18 U.S.C. § 1962(c) (conducting the affairs of an enterprise through a pattern of racketeering activity and 18 U.S.C. § 1962(d) (conspiracy to engage in racketeering). Kirkland's basis for sanctions largely mimics its arguments in support of its Motion to Dismiss, mixed with a healthy dose of umbrage and anger at Plaintiff's counsel.

Kirkland's Motion should be denied. At the outset, if the Court denies Kirkland's Motion to Dismiss Plaintiff's RICO claims, then sanctions are obviously not warranted.  However, even if the Court grants the Motion to Dismiss, sanctions are still not warranted. This is because the assertion of RICO claims – even if they fail as matter of law under a Motion to Dismiss – do not run afoul of the three grounds set out in FED. R. CIV. P. 11(b), which governs the imposition of sanctions.

First, the RICO claims were not asserted for an improper purpose, such as for harassment, undue delay or to increase litigation expense in violation of FED. R. CIV. P. 11(b)(1). The lawsuit addresses an extremely serious matter and there are serious and legitimate questions as to what

role Kirkland and Jackson Walker played in the scandal and what liability might flow from any such participation. Given the underlying conduct of the parties at issue, there are many reasons to assert a RICO claim apart from harassment, including easing of proof on certain issues and the possibility of treble damages.

Moreover, the RICO claims were asserted as part of many other claims, including fraud, breach of fiduciary duty and professional negligence to name but a few. While Kirkland has moved to dismiss those claims, it seeks sanctions only with respect to the RICO claims. But the FAC yields no special harassment or animosity with respect to the RICO claims and indeed many of the facts alleged to support the other claims (which Kirkland is not challenging as frivolous) are used to support the RICO claims. Finally and candidly, a reasonable lawyer looking at what claims might arise from the Freeman-Jones scandal with respect to the two major law firms involved, would likely consider and, if warranted, pursue RICO claims.

Second, the RICO claims are warranted by exiting law and/or non-frivolous arguments for the extension or modification of existing law in violation of FED. R. CIV. P. 11(b)(2). Notably, Kirkland argues that Plaintiff and his counsel have failed to allege credible or sufficient facts so as to establish certain elements of the asserted RICO claims. That is different from arguing that the RICO claims are not allowed under the law. In fact, Kirkland argues no legal infirmity (such as an enterprise can never include a law firm and a judicial officer or the law on predicate acts excludes those alleged here) in this case. To be sure, Kirkland claims that Plaintiff and his counsel do not assert facts sufficient to make out a RICO claim. Plaintiff disputes this but even if the Court disagrees that but that does not mean that alleged claims were not allowed under existing law.[1]

---

[1] Rule 11 does not allow Plaintiff to be sanctioned under this section.

Third, the factual contentions underlying the RICO claims have reasonable evidentiary support and thus the FAC does not violate FED. R. CIV. P. 11(b)(3). The merits of the RICO claims are more fully addressed in Plaintiff's Response to Kirkland's Motion to Dismiss (Dkt. #42). Plaintiff will not repeat those in the same detail here. The question here—and Plaintiff's focus for this response—is not whether the facts alleged in the FAC are right or wrong but whether it was reasonable to allege them based on known evidence, evidence likely available in discovery and the inferences reasonably drawn therefrom.

A key fact issue in the FAC is what the two law firms involved (Jackson Walker and Kirkland & Ellis) *knew* about Freeman and Jones and *when* they knew it. Kirkland admits it knew of the improper relationship between Freeman and Jones (the "Jones-Freeman Relationship") by March 2021 but no sooner. But the known facts and reasonable inferences plausibly cast doubt on that assertion. Moreover, the facts alleged in the FAC reasonably and plausibly suggest that the key players (Jackson Walker, Kirkland, Freeman and Jones) worked *together* to further the joint goal of turning the Southern District of Texas into a bankruptcy powerhouse to everyone's financial benefit. Based on these facts and reasonable inferences, the FAC plausibly alleges RICO claims.

Supporting the denial of Kirkland's Motion is that Plaintiff's counsel conducted a reasonable pre-filing investigation into the law and facts. Following such investigation, Plaintiff determined that there are valid legal claims against Kirkland—underpinned by sufficient evidence—for filing what Plaintiff claims are numerous misleading federal court papers that failed to disclose the inappropriate relationship between former Jones and Freeman. The decision to assert two RICO claims, while perhaps aggressive and creative, is reasonably alleged based on the facts and inferences drawn therefrom.

Finally, it bears remembering that the scandal involved here was uncovered by Plaintiff while he was a *pro se* litigant. Armed with little more than an anonymous letter, he persisted in uncovering the improper relationship between Jones and Freeman despite facing resistance, disbelief and, respectfully submitted, judicial hostility at virtually every turn. That point should not be lost when evaluating the Motion.

Plaintiff has made credible allegations supported by the available evidence and reasonable inferences therefrom. No discovery has taken place and this allows Defendants the unique position of challenging the veracity of the FAC without having to disclose any evidence *except* what it voluntarily elects to do. As a result, while Plaintiff and his counsel are not surprised that Kirkland denies knowledge of the Jones-Freeman Relationship prior to March 2021, those statements are, at this stage, simply denials. Kirkland's Motion therefore should be denied.

## Factual Background

For the underlying procedural history, Plaintiff and his counsel refer the Court to its Response to Kirkland's Motion to Dismiss. Plaintiff also refers the Court to the declaration of Mikell West, which details some of the work counsel did in investigating the facts and claims in this case.  In addition, Plaintiff and his counsel refer the Court to the various facts, arguments and contentions made in Plaintiff's Response to the Motion to Dismiss. Those arguments support the underlying viability of the claims asserted in the FAC.

## Legal Standard

Federal Rule of Civil Procedure 11(b) provides in pertinent part that:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,–

(1) it is not being presented for any improper purpose, such as to harass or to cause

> unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous arguments for the extension, modification, or reversal of existing law or the establishment of new law; [and]
>
> (3) The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. . . [2]

Rule 11 continues by stating that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on an attorney, law firm, or party that violated the rule or is responsible for the violation."[3]

The subparts of Rule 11 "provide independent bases for sanctions."[4] "[V]iolation of either justifies sanctions."[5] An attorney "violates Rule 11 if he fails to conduct a reasonable inquiry into the law and facts underlying his motion, or if he makes a motion to delay, harass or increase the costs of litigation."[6]

"In determining compliance *vel non* with each obligation, the standard under which an attorney is measured is an objective, not subjective, standard of reasonableness under the circumstances."[7] "An attorney's good faith is . . . [not] enough to protect him from Rule 11 sanctions."[8] Finally, "[c]ompliance with an attorney's affirmative duties"— whether it be establishing a sufficient legal basis or eschewing an improper motive—"is measured as of the time that the document is signed."[9]

---

[2] FED. R. CIV. P. 11(b); *Whitehead v. Food Max of Miss.*, 332 F.3d 796, 802 (5th Cir. 2003).

[3] FED. R. CIV. P. 11(c).

[4] *Whitehead*, 332 F.3d at 802.

[5] *Id.*

[6] *Walker v. City of Bogalusa*, 168 F.3d 237, 241 (5th Cir. 1999).

[7] *Whitehead*, 332 F.3d at 802 (internal citations and quotation marks omitted); *see also Thomas v. Capital Sec. Servs., Inc.*, 812 F.2d 984, 988 (5th Cir. 1987) ("Rule 11 compliance is measured generally by an objective standard of attorney performance.").

[8] *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1024 (5th Cir. 1994).

[9] *Id.*

"In deciding whether a reasonable inquiry into the law has been made, "a district court may consider how much time the attorney had to prepare the document; whether the document contains a plausible view of the law; whether the document is filed by an attorney or a *pro se* litigant; and the complexity of the legal and factual issues in question."[10]

Likewise, in deciding whether a filing was made for an improper purpose, a court is to determine whether "it is objectively ascertainable that an attorney submitted a paper to the court for an improper purpose."[11] Because of the objective inquiry, a district court may read an improper motive into a document well-grounded in fact and law only under exceptional circumstances.[12] The key is whether "the improper purpose is objectively ascertainable."[13]

### Argument

### I.      Plaintiff and his Counsel did not violate Rule 11(b)(1) because the FAC was not filed for an improper purpose.

"[G]enerally, district courts do not sanction attorneys who make nonfrivolous representations."[14] They may only do so in the "exceptional" case, "where it is objectively ascertainable that an attorney submitted a paper to the court for an improper purpose."[15]

A claim of improper purpose must "contain an element of causation – that the claim would not have otherwise been pursued[.]"[16] "If a reasonably clear legal justification can be shown for filing of the paper in question, no improper purpose can be found, and sanctions are inappropriate."[17] "Rule 11 focuses on an attorney's obligation **at the time** a pleading, motion, or

---

[10] *Thomas*, 812 F.2d at 988.
[11] *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 580 (5th Cir. 2008).
[12] *Id.*
[13] *Id.* at 580–81.
[14] *MAXXAM*, 523 F.3d at 580–81 (quoting *Whitehead*, 332 F.3d at 802).
[15] *Id.*
[16] *Id.* at 583.
[17] *Id.* at 585 (quoting *Nat'l Assoc. of Govt. Employees, Inc. v. Nat'l Federation of Federal Employees*, 844 F.2d 216, 224 (5th Cir. 1988)).

other paper is signed, and sanctions should not amount to an accumulation of all perceived misconduct, from filing through trial, resulting in a single post-judgment retribution in the form of a massive sanctions award."[18]

According to Kirkland, lack of merit of the RICO claims alone is sufficient to show improper purpose.[19] Plaintiff contends the claims do not lack merit but that alone does not establish improper purpose; otherwise every Motion to Dismiss that is granted would result in sanctions. Here, the objective circumstances do *not* show an improper purpose. First, Plaintiff filed FAC asserting a variety of claims, including RICO. There is no objective basis to argue that the RICO claims alone were asserted – apart from the other claims – solely to harass Kirkland or to otherwise delay the case or increase its cost for Kirkland.

Instead, the FAC addresses important and serious issues. A reasonable lawyer could (and did) conclude that the overlapping relationships and dealings between the parties and the known facts made RICO a plausible claim for these specific facts. Far from a harassing purpose, RICO claims present certain advantages such as proof issues and damages issues that are legitimate bases for asserting a RICO claim. Ultimately, the purpose of asserting the RICO claims is for the legal purpose of recovering civil damages from Defendants' actionable misconduct.[20] Moreover, as detailed in this Response and Plaintiff's Response to Kirkland's Motion to Dismiss, Plaintiff's RICO allegations are factually and legally supportable, which undercuts Kirkland's suggestion of an improper purpose.

---

[18] *Id.* (cleaned up and quotation omitted).
[19] Motion at 17.
[20] *See Nat'l Assoc. of Govt. Employees*, 844 F.2d at 224 ("A plaintiff must file a complaint, however, in order to vindicate his rights in court").

### A. Plaintiff's filings in the McDermott bankruptcy do not evidence improper purpose.

Kirkland contends Plaintiff's filings in the McDermott bankruptcy indicate harassment.[21] Plaintiff's motions in the underlying McDermott bankruptcy do not demonstrate harassment in the filing of the FAC. Contrary to Kirkland's representations, the FAC is not a continuation of his prior challenge to the bankruptcy plan. It is a suit for damages, including mental anguish, and other remedies based on, *inter alia*, a conspiracy and RICO enterprise.

Further, the suggestion that Plaintiff's motion to recuse (and subsequent mandamus) in the adversary proceeding somehow indicates improper purpose or harassment here in the filing of RICO claims in the FAC is bridge too far. The adversary has its own history and trying to impute improper motive with respect to the FAC based on those filings finds no support in the record or law.

Candidly, had Kirkland disclosed what it knew about the Jones-Freeman Relationship, there would have been no need for the recusal motion in the first place. In fact, Kirkland affirmatively advocated against recusal, while continuing not to disclose the relationship, at a time when it admittedly knew about the relationship (though, to be fair, it claims it believed the relationship had ended). The Fifth Circuit already found that had the judge who presided over the motion known about the relationship, "[t]here is a reasonable probability" that "the motion to recuse would have been granted."[22] Thus, Plaintiff's filings cannot reasonably be counted against him.

---

[21] *Id.*
[22] Dkt. #10-1 at 3.

### B. Kirkland's misleading *ad hominem* attacks on counsel and Plaintiff in unrelated matters are misguided attempts to manufacture improper purpose.

In a surprising twist, Kirkland argues that Plaintiff and his counsel's past conduct can be used to *infer* that they likely had an improper purpose here. Now, Kirkland wants it both ways. On the one hand, Kirkland encourages the Court to infer facts and draw legal conclusions regarding Plaintiff and his counsel by pointing to *other* incidents and lawsuits. On the other hand, Kirkland discourages the Court from drawing the same type of reasonable inferences from Kirkland's own conduct in the numerous lawsuits filed in the Southern District of Texas before Jones. Kirkland's anger amounts to a concession that its own past conduct can be used to reasonably infer its motive in this case.

Now for the facts, it is true Plaintiff has been sanctioned in the past. But there is no objective circumstance or evidence to support that his filing here was made for an improper purpose.[23] If not for Plaintiff's efforts, Jones likely would still be on the bench.

Kirkland's vitriol towards Plaintiff's counsel also fails to show improper purpose. Kirkland's attack focuses on the conduct of an attorney—who is not attorney of record in this case—from years ago, in an ***entirely unrelated class action litigation***,[24] provides a one-sided

---

[23] *Cf. In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2010 WL 1049269, at *3 (E.D.N.Y. Mar. 22, 2010) (concluding that evidence of "bad faith or vexatious conduct" in other similar litigations was insufficient to support a finding of such conduct in instant litigation).
[24] Motion at 18–19.

account of the cases,[25] and deems that to be the "litigation history" of Plaintiff's counsel.[26] No court anywhere in the country has "recognized" that Mr. Clore or Mr. West "specialize in 'effort[s] to extort money through strategically vexatious filings,'" as Kirkland suggests.[27] Kirkland plucks a piece of a quote from a 12-year-old opinion, years before counsel joined the firm, and was specific to the unique area of practice involving class action objections.[28]

In fact, Plaintiff's counsel, Mikell West is a successful trial attorney rated as a 2023 and 2024 Texas Rising Star by Super Lawyers and former intern of Judge Emilio Garza at the United States Court of Appeals, Fifth Circuit.[29] Plaintiff's counsel, Robert Clore, is rated AV Preeminent by Martindale-Hubbell and former briefing attorney for the Thirteenth Court of Appeals who has secured countless appellate victories for clients in Texas.[30] Mr. Clore's representation in class

---

[25] Mr. Bandas' clients have had successes in fighting unfair settlements and reducing excessive fee awards in class action settlements. *See, e.g., In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 12-4671-CV, 2016 WL 3563719, at *12 (2d Cir. June 30, 2016) (Mr. Bandas' client was part of an effort in which the court "vacate[d] the district court's certification of the class, reverse[d] approval of the settlement, and remand[ed] for further proceedings not inconsistent with this opinion"); *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)("The judgment [approving the settlement] is reversed and the case remanded for further proceedings"); *Litwin v. iRenew Bio Energy Sols., LLC*, 172 Cal. Rptr. 3d 328, 333 (Cal. App. 2d Dist. 2014), *as modified*, (May 29, 2014) (in a case in which Mr. Bandas represented the objector in the lower court, the "the order granting final approval of the settlement must be reversed"); *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 181-82 (3d Cir. 2013) ("We vacate the District Court's orders approving settlement and the fund allocation plan[;] "[w]e vacate the Court's order awarding attorneys' fees and costs because this award was based on the now-vacated settlement"); *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) ("we reverse the district court's order approving the settlement and dismissing the case, vacate the judgment and award of attorneys' fees, and remand for further proceedings").
[26] *See* Motion at 19.
[27] Motion at 19 (citing *In re Cathode Ray Tube Antitrust Litig.*, 281 F.R.D. 531, 533 n.4 (N.D. Cal. 2012) (citation omitted)).
[28] Motion at 19.
[29] West Declaration ¶ 3.
[30] *Id.*; *See e.g., Cavazos v. Stryker Sales Corp.*, 658 S.W.3d 749, 750 (Tex. App.—Corpus Christi Nov. 3, 2022, no pet.) (reversal in favor of client); *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 21-16291, 2022 U.S. App. LEXIS 15571, at *7 (9th Cir. 2022) (vacatur of fees in favor of client); *In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922 (9th Cir. 2020) and *In re Optical Disk Drive Prod. Antitrust Litig.*, 804 Fed. App'x. 443 (9th Cir. 2020) (vacatur in favor of client); *In re Lumber Liquidators*, 2020 WL 1140842 (4th Cir. Mar. 10, 2020) (reversal in favor of client); *Chambers, et al. v. Whirlpool Corp.*, 980 F.3d 645, 657-669 (9th Cir. Nov. 10, 2020) (reversal in favor of client); *Salinas v. World Houseware Producing* Co., 34 N.Y.3d 925, 926 (Sept. 12, 2019) (reversal in favor of client in the New York high court); *Broussard v. Omni Hotels Corp. et al.*, 2019 WL 4309574 (Tex. App.—Corpus Christi Sept. 12, 2019, no pet.) (reversal in favor of client); *City of San Antonio v. Peralta*, 476 S.W.3d 653, 661 (Tex. App.—San Antonio 2015, no pet.) (affirmance in favor of client); *Schaffer v. Nationwide Mut. Ins. Co.*, No. 13-11-00503-CV, 2013 WL 2146833, at *1 (Tex. App.—Corpus Christi May 16, 2013) (reversal in favor of client); *Guerrero v. Bexar Cnty. Civil Serv. Comm'n*, No. 04-12-00523-CV, 2012 WL 6728260, at *1 (Tex. App.—San Antonio Dec. 28, 2012) (affirmance in favor of client); *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 142–43 (Tex. 2012) (reversal in

actions has netted nearly $30 million to class members nationwide.[31]   Mr. West and Mr. Clore have only lost a **_single_** prior RICO case.[32] This is hardly indicative of a pattern of harassing behavior. Moreover, no motion for sanctions was ever filed, nor did the district court suggest the pleading was in any way frivolous.[33]

All of the above, if credited as Kirkland suggests, only leads to the notion that its *own conduct* in the various bankruptcy proceedings can also be used to infer its knowledge and motive. The FAC more than reasonably draws those same inferences based on Kirkland's conduct and Kirkland cannot now dispute the reasonableness of doing so.

## II.    Plaintiff has not violated Rule 11(b)(2) because Plaintiff's RICO claims are warranted under existing law.

RICO claims under Section 1962 have three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."[34] A RICO claim alleging a violation of Section 1962(c), as here, "also requires that the defendant participate[d] in the operation or management of the enterprise itself."[35] Plaintiff has also asserted a RICO conspiracy claim, which requires Plaintiff to establish "an

---

favor of client in the Texas Supreme Court); *Mena v. Lenz*, 349 S.W.3d 650, 651 (Tex. App.—Corpus Christi Jun. 16, 2011, no pet.) (affirmance in favor of client); *In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 822 (Tex. 2010) (client's petition for writ of mandamus granted in the Texas Supreme Court); *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 702 (Tex. 2008) (reversal in favor of client); *Butters v. Noyola*, No. 13-07-00713-CV, 2008 WL 3984168, at *1 (Tex. App.—Corpus Christi-Edinburg, Aug. 29, 2008, no pet.) (reversal in favor of client); *Military Highway Water Supply Corp. v. Morin*, 156 S.W.3d 569, 570 (Tex. 2005) (reversal in favor of client).

[31] *See e.g.*, *Optical Disk Drive*, 2022 U.S. App. LEXIS 15571, at *7 (securing vacatur of fee award that resulted in $4.38 million class benefit); *Optical Disk*, 959 F.3d 922 and *Optical Disk*, 804 Fed. App'x. at 443. (prevailing in appeal with vacatur of $52.8 million fee award that resulted in $21.8 million class benefit); *In re Syngenta*, 2:14-MD-02591, Dkt. #4318 at 8–9; #4278 at 3, 6–7 (D. Kan. Jan. 6, 2020) (securing a $3 million monetary benefit for a settlement class of corn farmers and supplying nonmonetary benefits).

[32] Neither Mr. West nor Mr. Clore were parties to the *Edelson* matter. The Bandas Law Firm was a defendant represented by counsel, which lodged the counterclaim. There was no finding that the counterclaim was frivolous or improper.

[33] West Declaration ¶ 3.

[34] *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,* 90 F.3d 118, 122 (5th Cir.1996) (quoting *In re Burzynski,* 989 F.2d 733, 741–42 (5th Cir.1993)).

[35] *In re Mastercard Int'l Inc.*, 313 F.3d 257, 261 (5th Cir. 2002) (internal citations omitted).

agreement involving each of the Defendants to commit at least two predicate acts."[36]

According to Kirkland, Plaintiff's claims are foreclosed by Plaintiff's inability to plead facts establishing any of the following three elements: (1) existence of an enterprise; (2) participation in the operation or management of the enterprise; and (3) agreement.[37] Thus, Kirkland claims sanctions are proper under Rule 11(b)(2). However, even if Plaintiff's FAC fell short of the pleading requirements to assert the RICO claims—which it does not—the RICO claims are warranted under existing law, and the imposition of sanctions is therefore not warranted.[38]

### A.  The Enterprise existed for a separate purpose.

Kirkland suggests that Plaintiff has not pleaded facts plausibly showing Kirkland, Jackson Walker, Freeman, and Jones ("the Enterprise") existed for purposes other than to simply commit predicate acts.[39] Contrary to Kirkland's suggestion, Plaintiff has alleged that the Enterprise existed and had a purpose separate and apart from its predicate acts.

Regardless of whether an enterprise is alleged to be a legal entity or an association-in-fact, the enterprise must be an entity separate and apart from the pattern of activity in which it engages.[40] Thus, a plaintiff must plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts.[41] Although proof of one does not necessarily establish the other, "evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'"[42] As the Supreme Court has recognized, "the existence of an association-in-fact [enterprise] is oftentimes more readily proven

---

[36] *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139–40 (5th Cir.1992).
[37] Motion at 13–17.
[38] *Snow Ingredients, Inc. v. Snowizard, Inc.*, 833 F.3d 512, 527 (5th Cir. 2016).
[39] Motion at 13.
[40] *Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1217 (5th Cir. 1989).
[41] *Elliot v. Foufas*, 867 F.2d 877, 881 (S.D. Tex. 2016).
[42] *Boyle v. United States*, 556 U.S. 938, 947 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

by what it does, rather than by abstract analysis of its structure."[43]

The FAC contains multiple allegations capable of establishing that the Enterprise existed for purposes other than to commit the predicate acts, namely, to provide legal services related to bankruptcy proceedings.[44] For example, the FAC describes how Jackson Walker served as local counsel for Kirkland, a leader in large debtor-side representations.[45] The FAC also explains how Jones presided over dozens of cases in which he awarded Jackson Walker and Kirkland attorneys' fees and expenses.[46] These allegations are capable of establishing the Enterprise had a purpose serving legitimate clients and resolving legitimate bankruptcy disputes that was separate from the alleged pattern of racketeering activity.[47]

Kirkland's caselaw to the contrary is distinguishable. For instance, in *Fernandez-Lopez v. Hernandez*, plaintiffs alleged defendants worked together to obtain visas for temporary workers at a landscaping business in Maryland before funneling the workers upon arrival in the US to a separate demolition business in Alabama.[48] The court noted that there were no allegations of shared purpose or activities among the two enterprise members other than those related to the visa fraud.[49] By contrast, here, Plaintiff has alleged a shared purpose outside of the fraudulent activities. Similarly, in *Walker v. Beaumont Independent School District,* the Fifth Circuit affirmed the trial court's finding that an enterprise had not been sufficiently pleaded where the allegations were

---

[43] *Id.* at 951.

[44] *See, e.g.,* FAC ¶¶ 29, 32, 87, 91.

[45] *Id.* ¶ 29

[46] *Id.* ¶ 32.

[47] *See Allstate Ins. Co. v. Benhamou*, 190 F.Supp.3d 631, 651 (S.D. Tex. 2016) (finding pleading containing multiple allegations capable of establishing that the enterprise provided services to a number of legitimate patients was sufficient to show the purported association existed for purposes other than to commit the predicate acts); *Diamond Consortium, inc. v. Manookian,* No. 4:16-CV-00094, 2017 WL 1495091, *4 (E.D. Tex. April 26, 2017) (holding plaintiffs sufficiently separate purpose where member of enterprise referred litigation to other members of the enterprise, including the litigation that formed part of the underlying racketeering activity).

[48] No. DR-19-CV-46-AM/CW, 2020 WL 9396487, at *2–3 (W.D. Tex. Nov. 20, 2020).

[49] *Id.* at *12.

"wholly conclusory and unsupported by the facts."[50] As detailed above, the separate purpose is supported by the facts pleaded in the FAC, rather than conclusory statements. The FAC here, therefore, does not suffer from the deficiencies in Kirkland's cited caselaw.

### B. The Enterprise functioned as a continuing unit.

Kirkland erroneously argues that the absence of allegations regarding a hierarchical or consensual decision-making structure within the enterprise reflects a lack of investigation into the law by Plaintiff.[51]  Not so.

"Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status."[52] To qualify as an enterprise, there must be "continuity of . . . structure and personnel, which links the defendants, and a common or shared purpose."[53] The ongoing-organization element of enterprise status simply requires "longevity sufficient to permit . . . associates to pursue the enterprise's purpose."[54]

The FAC states that the Enterprise have been engaged in the alleged fraud since at least 2018.[55] This allegation is sufficient to satisfy the ongoing-organization element of pleading an association-in-fact enterprise.[56]

Kirkland cites caselaw requiring that Plaintiff demonstrate the decision-making structure of the Enterprise.[57] However, such caselaw pre-dates the Supreme Court's decision in *Boyle v.*

---

[50] 938 F.3d 724, 738 (5th Cir. 2019).

[51] Motion at 14–15.

[52] *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir.1991) (quoting *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 749 (5th Cir. 1989)) (internal quotation marks omitted).

[53] *Id.* (citing *Shaffer v. Williams*, 794 F.2d 1030, 1032–33 (5th Cir.1986)).

[54] *Boyle*, 556 U.S. at 946.

[55] FAC ¶ 85.

[56] *See, e.g.*, *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995) (concluding that ongoing-organization status was adequately pleaded because the association-in-fact enterprise lasted for almost four years and "might have gone on indefinitely."); *Allstate*, 190 F.Supp.3d at 653.

[57] Motion at 14 (first citing *Manax v. McNamara*, 660 F. Supp. 657, 662 (W.D. Tex. 1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988) then citing *Foufas*, 867 F.2d at 881).

*U.S.,* 556 U.S. 948 (2009).[58] In *Boyle,* a RICO defendant argued that the district court erred by failing to instruct the jury that it was required to find that the enterprise had an ascertainable structural hierarchy distinct from the charged predicate acts.[59] In rejecting such a requirement, the Supreme Court recognized:

> An association-in-fact enterprise is simply a continuing unit that functions with a common purpose. ***Such a group need <u>not</u> have a hierarchical structure or a 'chain of command'*** ... members of the group need not have fixed roles.[60]

Thus, after *Boyle,* an enterprise need have a formal hierarchy or means for decision- making.[61]

Here, Plaintiff has alleged that, for at least six years, the members of the Enterprise worked together to provide legitimate legal services to third parties while also increasing the demand, prestige and compensation received for those services through acts of racketeering. This is sufficient to allege the existence of a continuing Enterprise.[62]

### C. Kirkland participated in the operation and management of the Enterprise.

A defendant participates in the conduct of an enterprise's affairs when it has some part in directing those affairs.[63] It is not necessary that the defendant have "primary" responsibility for the enterprise's affairs.[64] Nor is RICO liability limited to those with a formal position in the enterprise.[65] It is only necessary that the defendant have taken some part in directing the

---

[58] *Id.*

[59] 556 U.S. at 945–47.

[60] *Id.* at 948 (emphasis added).

[61] *Walker*, 938 F.3d at 738; *Dell Inc. v. Mishra*, No. A-16-CV-00641-SS, 2018 WL 3717119, at *5 (W.D. Tex. Aug. 3, 2018) ("An association-in-fact enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods−by majority vote, consensus, a show of strength, etc").

[62] *See, e.g., Crowe*, 43 F.3d at 205; *Allstate*, 190 F.Supp.3d at 653.

[63] *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

[64] *Id.*

[65] *Id.*

enterprises' affairs.[66]

Kirkland argues the FAC "merely parrots" the participation requirement without pleading specific facts.[67]   The FAC shows otherwise. Plaintiff pleaded that Kirkland made numerous decisions exhibiting participation in the Enterprise including: associating Jackson Walker and Freeman on cases filed before Jones,[68] deciding to file or allow to be filed pleadings and documents in Jones' court without disclosing the relationship between Jones and Freeman,[69] and assuming the Jones-Freeman Relationship had been cleared by a superior court without investigating or intervening.[70] These acts, taken in furtherance of the Enterprise's purpose, extend far beyond the minimal involvement of defendants that courts have deemed insufficient to meet the participation test.[71]

### D.  Plaintiff properly alleged Kirkland's agreement to the RICO conspiracy.

Kirkland charges that "Plaintiff does not allege that Defendants agreed or otherwise coordinated to conceal the relationship."[72] In truth, Plaintiff has clearly alleged that Defendants agreed to exploit the Jones-Freeman Relationship while concealing the relationship from others:

> Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action— failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[73]

Kirkland may label Plaintiff's allegations of an agreement as conclusory; but the law recognizes

---

[66] *Id.*
[67] Motion at 15.
[68] FAC ¶¶ 32–34.
[69] FAC ¶ 121.
[70] FAC ¶ 71.
[71] *Compare Reves,* 507 U.S. at 176 (concluding participation requirement not met where accountant defendants only reviewed a series of completed transactions and certified the records as fairly portraying the defendants' financial status).
[72] Motion at 16.
[73] FAC ¶ 197.

that agreements to commit illegal acts are rarely proclaimed from the rooftops. As a result, direct evidence of agreement is unnecessary.[74] Instead, "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence[.]"[75] The existence of an agreement, a defendant's guilty knowledge, and the defendant's participation in the RICO conspiracy may each be inferred from the circumstances.[76]

As discussed *infra* III.A., Plaintiff has alleged ample from which one could infer Kirkland's agreement to participate in a scheme to leverage the Jones-Freeman Relationship for financial and reputational benefits. Moreover, questions regarding the extent of Kirkland's knowledge, its motives, and its agreement to participate in the Enterprise are uniquely within Kirkland's control and will be a subject of discovery. The distinguishable cases Kirkland cites acknowledge as much.[77] At this point, it is sufficient that Plaintiff has alleged Kirkland's agreement to the conspiracy and alleged facts from which it can be inferred that Kirkland agreed to conceal and benefit from the Jones-Freeman relationship.

### E. Fifth Circuit precedent does not support imposing sanctions even if Plaintiff's RICO claims against Kirkland were defective.

Even if Plaintiff's pleadings fell short of pleading requirements for civil RICO, Fifth Circuit precedent does not support an imposition of sanctions. In *Snow Ingredients, Inc. v. Snowizard, Inc.*, the Fifth Circuit reviewed a district court's denial of a defendant's motion for sanctions on appeal.[78] Sellers of snowballs brought an action against their competitor and their counsel under civil RICO. In a decade's worth of litigation where "[e]ach party . . . attempted to

---

[74] *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978).

[75] *Id.*

[76] *U.S. v. Jones,* 873 F.3d 482, 489 (5th Cir. 2017).

[77] *See e.g., Raines v. City of Starkville,* No. 188-CV-319-SO, 1996 WL 33370638, *12 (N.D. Miss. March 8, 1996) (awarding sanctions where factual basis for conspiracy was lacking despite the existence of facts that could have been determined with minimal research and without formal discovery tools).

[78] 833 F.3d at 527.

use the courts to freeze the other out of the sno-ball market,"[79] the district court dismissed the plaintiff's claims under Rule 12(b)(6) and denied the defendant's motion for sanctions. In the defendant's motion for sanctions, they alleged the plaintiff's civil RICO claims were legally irredeemable and sanctionable because the plaintiff was unable to plead facts satisfying the pleading requirements for the various predicate criminal acts it alleged.[80] The Fifth Circuit, relying on *St. Germain v. Howard*, concluded that it would not be in keeping with Fifth Circuit precedent to find an abuse of the district court's "significant discretion" to impose sanctions when, in prior cases before the Fifth Circuit, it declined to sanction an attorney who did not even attempt to allege predicate acts in the civil RICO context.[81] Because the plaintiff in *Snow Ingredients* attempted to allege a predicate act, the district court did not abuse its significant discretion by denying the defendant's motion for sanctions.[82] Given the Fifth Circuit's reasoning in *Snow Ingredients*, assuming the Court finds the FAC deficient, the Court should nevertheless exercise its significant discretion and deny Kirkland's request for sanctions.

III. **Plaintiff has not violated Rule 11(b)(3) because the currently available evidence and reasonable inferences drawn therefrom provide a sufficient basis for Plaintiff's factual allegations against Kirkland.**

Kirkland erroneously alleges that Plaintiff's factual allegations against Kirkland underlying the RICO claims are frivolous, in contravention of Rule 11(b)(3).[83] To the contrary, Plaintiff's attorneys conducted a thorough inquiry to confirm the pleadings are well grounded in fact. The evidence so far procured allows for reasonable inferences to support Plaintiff's claims against Kirkland. Moreover, further discovery would uncover additional facts supporting

---

[79] *Id*. at 517
[80] *Id*. at 528.
[81] *Id.* at 529 (citing *St. Germain et al. v. Howard et al.*, 556 F.3d 261 (5th Cir. 2009)).
[82] *Id.*
[83] Motion at 9.

Plaintiff's allegations.

Information supporting RICO claims need not be "conclusive[.]"[84] Rather, it is enough if the information allows "for the attorneys to draw a reasonable inference that some wrongdoing was afoot."[85] Further, courts allow plaintiffs "some leeway" in the context of RICO and other claims where allegations "cannot be ascertained easily from extrinsic evidence[,]" so "long as the lawyer's investigation is otherwise reasonable."[86] In such circumstances, Rule 11 "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case."[87] Such is the case here.

### A. Plaintiff's vigorous pre-filing investigation supplied evidentiary support for Plaintiff's factual contentions underlying the RICO claims.

Kirkland attacks Plaintiff's allegations for relying on unverified hearsay, mischaracterizing evidence, and ignoring allegedly more reliable evidence.[88] According to Kirkland, the cumulative effect is that Plaintiff's allegations merely establish local counsel made a slew of poor decisions.[89] Kirkland's contentions could not be farther from the mark. Plaintiff's counsel dedicated extensive time and resources to determine whether the RICO allegations could be supported by concrete and solid evidence of criminal conduct.[90] Through that investigation, Plaintiff discovered sufficient evidentiary support to draw reasonable inferences that a RICO claim would be viable.

### 1.     Plaintiff's counsel conducted a reasonable investigation.

The time and extent of Plaintiff's counsel pre-file research and investigation undercuts

---

[84] *See Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 445 (5th Cir. 1992).
[85] *Id.* (internal citations omitted).
[86] *Id.* at 446 (noting that "virtually all of the factual materials relevant to proving the RICO [fraud] case were beyond [Plaintiff's] reach, in the hands of the defendants"); *see also Krim v. Banctexas Group*, 99 F.3d 775, 779 (5th Cir. 1996) (same in the context of a securities case).
[87] *Id.* at 447 (finding sanctions improper where investigation revealed questionable motives that required discovery to discern) (quoting *Kraemer v. Grant Cnty.*, 892 F.2d 686, 689 (7th Cir. 1990)).
[88] Motion at 9–12.
[89] *Id.* at 12.
[90] Exhibit 1, Declaration of Mikell West ("West Declaration") ¶ 5.

Kirkland's request for sanctions. Plaintiff's counsel dedicated **hundreds of hours**, over the course of several months, to researching the law and facts of the case against Defendants.[91] Moreover, Plaintiff's investigation included exhaustive review of bankruptcy dockets and real estate records, legal research, meetings with the client, conferences among attorneys, analysis of pleadings filed by the U.S. Trustee, and discussions with members of the media.[92] In reversing an award imposing sanctions, the Fifth Circuit found persuasive that the lawyers and law clerks "devoted over two hundred hours to research of the law and facts of the case, a not insubstantial amount even in a case as complex as this."[93] The Fifth Circuit went so far as to observe that numerous other courts "reversed or refused to impose sanctions where attorneys spent substantially less time on prefiling research."[94]

Moreover, Plaintiff retained the undersigned counsel on October 21, 2023—less than three months before the deadline to file an amended complaint.[95] While Plaintiff's counsel undertook a detailed and extensive investigation, with less than optimal time to pursue all possible avenues, counsel could not be expected to conduct as complete an inquiry as they could have had Plaintiff consulted them earlier.[96]

### 2. The timing of Freeman joining Jackson Walker allows for a reasonable inference that Kirkland knew about and exploited the Jones-Freeman Relationship.

The timing of Freeman joining Jackson Walker, and the ensuing prolific filing of mega-bankruptcy cases in Houston by Jackson Walker and Kirkland, is circumstantial evidence from which a reasonable inference could be drawn that Kirkland knew of the Jones-Freeman

---

[91] *Id.*
[92] *Id.*
[93] *Smith*, 960 F.2d at 447.
[94] *Id.* (collecting cases).
[95] West Declaration ¶¶ 4, 16–17.
[96] *Id.* (finding the fact that counsel "had only two months" from the time of retainer until the time the statute of limitations would expire for certain claims persuasive evidence against imposition of sanctions).

Relationship.

Once Freeman joined Jackson Walker in 2018, the two law firms paired up to file dozens of mega-bankruptcies in the Southern District of Texas. Contrary to Kirkland's allegation that it merely used Jackson Walker in "some of its bankruptcy matters[,]"[97] since 2019, Kirkland filed 46 mega-bankruptcies in the Southern District of Texas.[98] In 42 of those 46 cases, Kirkland selected Jackson Walker as local counsel.[99] Thus, Kirkland used Jackson Walker more than 90% of the time it filed a mega-bankruptcy in the Southern District of Texas. During that time, Jones awarded Kirkland at least $162 million in attorneys' fees.[100]

Other facts support the inferences drawn by the FAC.  For example, since at least 2011, Jackson Walker also had an attorney, Matthew Cavenaugh,[101] who clerked for bankruptcy judges in the Southern District, including Judge Marvin Isgur.[102] But the onslaught of Kirkland and Jackson Walker joint filings followed Freeman's 2018 arrival, not Cavenaugh's in 2011.[103] According to Plaintiff's counsels' research, Kirkland did not file *any* mega-bankruptcies with Jackson Walker as local counsel from January 2006–January 2016.[104] In fact, it did not file any mega-bankruptcies in the Southern District of Texas at all during that period.[105]

Kirkland's attempt to distance itself from Freeman does not support a finding of sanctions. Freeman was an essential part of mega-bankruptcy filings in Houston, involved in 42 cases in

---

[97] Motion at 1.
[98] West Declaration ¶ 6.
[99] *See Id.*
[100] *Id.*; *see also* FAC ¶ 32.
[101] *See* Column, Affairs of State, A Pathway to State Bankruptcy, 30-8 ABIJ 12 (Oct. 2011) (authored by Marvin E. Spouse, III and Matthew Cavenaugh; listing Matthew Cavenaugh as "an associate at Jackson Walker LLP in Houston").
[102] See https://www.jw.com/people/matthew-cavenaugh/ (noting Cavenaugh clerked for two years for Bankruptcy Judges Wesley W. Steen and Marvin Isgur)
[103] West Declaration ¶ 6.
[104] *Id.*
[105] *Id.*

which Kirkland retained Jackson Walker as local counsel.[106] Indeed, while Jackson Walker served

as local counsel for Kirkland, Jackson Walker acknowledged the critical role Freeman played:

> Elizabeth enjoyed quick and substantial success at Jackson Walker. *From the time of her arrival through today [August 2021], Houston has become a favored venue for complex debtor cases*, in the energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. *Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel*, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but *Elizabeth's leadership and contribution were recognized as integral*.[107]

Jackson Walker also marketed Freeman's connection to Jones—apparently advertising how the

relationship could be to their client base's advantage. For instance, when Freeman joined Jackson

Walker, the firm emphasized her former position as "permanent law clerk to the Chief Bankruptcy

Judge for the U.S. Bankruptcy Court for the Southern District of Texas."[108]

The pairing of Kirkland and Jackson Walker in Houston-filed mega-bankruptcy cases was

so pervasive that it caught the attention of the media, both before and after revelation of the

intimate Jones-Freeman Relationship,[109] as Kirkland's own evidence shows. Attached as Exhibit

---

[106] *Id.*

[107] *In re Westmoreland Coal Co.*, No. 18-35672, Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, Dkt. #3362-1 (Nov. 13, 2023) (letter attached to response authored by Jackson Walker partner Pat Cowlishaw) (emphasis added).

[108] Dkt. #10 at 10.

[109] *See e.g.,* Kirkland's Bankruptcy Partnership With Jackson Walker Could be a Sign of Things to Come, The American Lawyer, Law.com (Aug. 25, 2020) (noting Matthew Cavenaugh signing Kirkland's petition for a debtor "wasn't an unusual arrangement for Kirkland and Jackson Walker, which are listed as debtor's counsel on a number of recently high-profile bankruptcies…. The relationship between the world's only $4 billion firm and Jackson Walker, a member of the Am Law 200 and the largest Texas-only firm, shows that two firms can build a working relationship that goes beyond a traditional referral arrangement"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Continue Debtor-Side Dominance in Strong Q3 for Big Bankruptcy (Oct. 25, 2023), accessible at https://www.law.com/americanlawyer/2023/10/25/kirkland-ellis-jackson-walker-continue-debtor-side-dominance-in-strong-q3-for-big-bankruptcy/ (last visited on Mar. 11, 2024) (In 2023, "Jackson Walker bankruptcy partner Matthew Cavenaugh was the most-retained local counsel through Q3 in the country, while Kirkland's Joshua Sussberg led lead counsel retentions"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Dominate Debtor-Side

3 to the Motion is an article suggesting that the uncanny timing of Freeman joining Jackson Walker and the two firms filing mega-bankruptcies prolifically in the Southern District of Texas could be circumstantial evidence that at least some Kirkland's partners knew of the intimate relationship between Jones and Freeman.[110]

Aside from the relationship between Freeman, Jackson Walker, and Kirkland, Jones' efforts to make the Southern District of Texas a bankruptcy hub is further evidence of Kirkland's knowledge of the Jones-Freeman Relationship. On June 29, 2018—little over a month after Freeman joined Jackson Walker—Jones signed an order establishing a "complex advisory" committee of bankruptcy attorneys to streamline bankruptcy proceedings.[111] The head of Kirkland's bankruptcy practice at the time, James Sprayregen, was on the committee.[112]

In sum, there is evidence sufficient to draw a reasonable inference that Kirkland, Jones, Freeman, and Jackson Walker worked together for years, during which time Jones awarded Kirkland $162 million. Given the almost exclusive, and highly lucrative, relationship that Jackson Walker and Kirkland developed once Freeman joined Jackson Walker, reasonable inferences may also be drawn that Kirkland knew and took advantage of the Jones-Freeman Relationship.

---

Bankruptcy as Restructuring Market Heats Up (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtorside-bankruptcy-as-restructuring-market-heats-up/ (last visited Mar. 11, 2024) ("Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm"); Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024) ("Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com").

[110] *See* Dkt. #41-3 (the "tussle between Jackson Walker and the US Trustee also may invite scrutiny about who else knew of the Jones-Freeman Relationship. Kirkland, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large[] cases since 2018, according to data collected by bankruptcydata.com").

[111] General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018).

[112] *Id.*

3. **Reliable reporting revealed Kirkland was "long aware" of the Jones-Freeman Relationship.**

The Financial Times is regarded "as the most credible publication in reporting financial and economic issues" in the world, ahead of both The Economist and the Wall Street Journal.[113] On November 21, 2023, the Financial Times published an in-depth article detailing the nature of the Jones-Freeman Relationship (the "Article") and revealing the extent to which Kirkland knew and benefitted from such relationship.[114] The Financial Times reported that Jackson informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones.[115] Indeed, according to the Financial Times:

> Multiple Kirkland partners told the FT that they were **long aware of the romantic relationship between the pair**, though did not know how advanced it was. The Kirkland lawyers assumed the pair had received clearance from a superior court or decided that it was not Kirkland's place to intervene in Jackson's retention applications.[116]

It is reasonable for Plaintiff to rely on such reporting to draw the inference that Kirkland knew about, but failed to disclose, the Jones-Freeman Relationship well before the nature of the relationship was revealed to the public and Freeman left Jackson Walker.

As part of the investigation, Plaintiff's counsel has since conferred with journalists who reported on the controversy.[117] The author of the Article, Sujeet Indap, stands by every word in the article, and confirmed the Article satisfied the Financial Times' standards for fair and accurate

---

[113] According to the Global Capital Markets Survey, which measures readership habits among senior financial decision makers in the world's largest financial institutions, the Financial Times is considered the most important business read, reaching 36% of the sample population, 11% more than the Wall Street Journal, its main rival. https://web.archive.org/web/20131015044909/http://www.gcmsurvey.com/Media.html (-> urldefense.proofpoint.com). The "Financial Times is one of the world's leading finance news websites, globally recognized for its authority." https://www.alphagamma.eu/finance/best-finance-websites/.

[114] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024).

[115] *Id.*

[116] *Id.*

[117] West Declaration ¶ 11.

reporting.[118] Despite the solid reporting, Kirkland makes numerous attacks on the Article.

First, Kirkland attempts to discredit the Article, characterizing it as "unverified and unattributed hearsay."[119] However, Kirkland does not allege that the partners did not knowingly benefit from the relationship. Kirkland does not allege it would not have been in a position to have this knowledge and take advantage of it. Kirkland does not contend it was misquoted or that its partners did not understand the basic legal concept that their words might be taken as an admission. If Kirkland believes the Financial Times lied when it said multiple partners at Kirkland knew about, and took advantage of, the Jones-Freeman Relationship, then it could have submitted a declaration to that effect. In fact, Kirkland has not requested a retraction any portion of the Article, and there are no plans to amend it in any respect.[120]

Moreover, Kirkland can only cite to *one* opinion from within the Fifth Circuit to attempt to support its argument—*Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676 (5th Cir. 1989)[121]—and its reliance is misplaced. *Chapman* affirmed the decision to impose sanctions where the RICO counterclaim was based *solely* on unverified hearsay.[122] Further, the court still considered the unverified hearsay—a tape recording—in connection with requested sanctions; but it determined the tape, standing on its own, was insufficient.[123] The Article thus provides *some* evidence supporting Plaintiff's RICO claim. And, when considered together with the evidence described herein, demonstrates a sufficient factual basis for Plaintiff's claim.

Second, Kirkland claims that "Plaintiff mischaracterizes" the Article.[124] Such argument is without merit. Kirkland quibbles over Plaintiff's use of the word, "however," before introducing

---

[118] *Id.*
[119] Motion at 9.
[120] West Declaration ¶ 11.
[121] Motion at 9.
[122] 865 F.2d at 685.
[123] *Id.* at 684–85.
[124] Motion at 11.

the Financial Times' reporting that "[m]ultiple Kirkland partners told the [Financial Times] that they were *long aware* of the romantic relationship between the pair, though [they] did not know how advanced it was."[125] In the context of the Article, it was perfectly reasonable to infer that the phrase, "long aware of the relationship," meant Kirkland partners knew about the relationship **before** the March 2021 disclosure.

In fact, this may be the only logical reading considering the phrase immediately follows the sentence, "Jackson Walker said it had informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones."[126] Plaintiff's use of the phrase "Rather than believing the relationship had ended," before the quote from the Article that "[t]he Kirkland lawyers assumed the pair had received clearance from a superior court or decided that it was not Kirkland's place to intervene in Jackson's retention applications" is also a reasonable reading of the Article. Nowhere in the Article does it indicate the Kirkland partners believed the relationship had ended.[127] The only justification offered for the implicit recognition that some disclosure would be required was that Kirkland believed the pair had received some kind of clearance or that it was not their place to intervene.[128]

In short, the Financial Times is a reliable source, which published the Article illuminating Kirkland's joint effort to profit off the Jones-Freeman Relationship. Plaintiff reasonably relied on the Article to draw inferences supporting his RICO claims.

---

[125] Motion at 12.
[126] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024).
[127] *Id.*
[128] *Id.*

4. **Kirkland's continued failure to disclose the Jones-Freeman Relationship supplies further evidence from which it could be reasonably inferred that Kirkland knew of and exploited the Jones-Freeman Relationship**

Kirkland asserts that even if the Article was credible, it does not support Plaintiff's other "inflammatory allegations."[129] Kirkland's assertion fails because it rests on the erroneous assumption that the Article is the ***only*** evidence supporting Plaintiff's claims. Not so.

***First,*** contrary to Kirkland's assertion that Plaintiff lacks evidence to support its claims that Kirkland deliberately concealed the Jones-Freeman Relationship and influenced bankruptcy proceedings for its benefit,[130] the FAC alleges that Kirkland violated various bankruptcy rules Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession,  must show that it is *disinterested* and must disclose all "connections[.]"[131] The FAC alleges that Kirkland filed numerous declarations of disinterestedness without disclosing the Jones-Freeman Relationship or subsequently amending the declarations.[132] Kirkland listed Jones in schedules of bankruptcy judges for whom Kirkland conducted a conflicts search, yet Kirkland never disclosed the Jones-Freeman Relationship.[133] Kirkland's nondisclosure occurred both before ***and after*** the March 2021 date when Kirkland claims Jackson Walker disclosed the relationship to the firm.[134] The FAC further alleges that Kirkland's non-disclosure resulted in Jones

---

[129] Motion at 10.

[130] Motion at 10.

[131] 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest")

[132] See e.g., Dkt. #10 ¶¶ 37, 52 n. 76, 71, 106.

[133] *Seadrill Limited*, No. 21-30427, Dkt. #242 (Mar. 8, 2021) (application to employ Kirkland & Ellis LLP and Kirkland & Ellis International LLP as attorneys for debtors e-filed by Cavenaugh; listing Judge Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none); *Katerra Inc.*, No. 21-31861, Dkt. ##244 & 244-1 (Jun. 25, 2021) (application for retention of Kirkland & Ellis as attorneys for debtors and debtors in possession; listing Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none); *Seadrill New Finance Limited*, No. 22-90001, Dkt. ##92 & 92-1 (Feb. 8, 2022) (Kirkland & Ellis application as counsel for debtors; listing Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none)

[134] *See id.*

improperly presiding over cases and issuing orders awarding Kirkland attorneys' fees, among other favorable orders.[135]

**Second**, in October and November 2022, Plaintiff's counsel asserts that it had multiple communications with former CEO of Bouchard Transportation Company, Morton S. Bouchard, III, in connection with a Chapter 11 bankruptcy before Jones.[136] Mr. Bouchard informed counsel that even though his company was New York based, Kirkland partner, Ryan Bennett, advised him to file in Houston because Jones was a "friend" of Kirkland.[137] It was reasonable for Plaintiff's counsel to infer that Kirkland was communicating clients or potential clients would receive favorable outcomes, and that it was communicating with other clients and potential clients in the same way, as evidenced by the mass of mega-bankruptcy filings in the Southern District of Texas, often involving companies from outside Texas. Therefore, Plaintiff has evidence to support the allegation that Kirkland communicated with clients and potential clients regarding favorable outcomes before Jones, contrary to Kirkland's assertion that no such evidence exists.[138]

To the extent Kirkland claims Plaintiff ignores other, more reliable information that contradicts Plaintiff's narrative,[139] Plaintiff's counsel cannot be sanctioned for choosing not to take the Kirkland's and Jackson Walker's version of events at face value. In fact, Jackson Walker's account (and Kirkland's adoption of it) is already being challenged. According to the U.S. Trustee, in a day-long interview with Freeman, she "stated that her cohabitation with Judge Jones was continuous except during the COVID-19 school closures when she lived with her children at another location. *But she admitted that she never moved out of the home she shared and owned*

---

[135] *See e.g.,* Dkt. #10 ¶¶ 4, 37–38, 45–46, 95, 106, 110, 114.
[136] West Declaration ¶ 12.
[137] *Id.*
[138] Motion at 10.
[139] Motion at 10–11.

*with Judge Jones*."[140] Additionally, according to the U.S. Trustee, Freeman's lawyer urged Jackson Walker, in the spring of 2022, to disclose the relationship in all past cases and in cases going forward.[141] Kirkland's accounts of the story in the press are not "overwhelming evidence disproving" Van Deelen's claims.[142] If they have any persuasive value at all, at most they "suggest that the defendants' culpability [is] an issue of fact, to be established through litigation[.]"[143] Kirkland's dubious version of the underlying this dispute does "not establish the claims [have] no basis in fact."[144] The Court should therefore deny Kirkland's request for sanctions on the basis that Plaintiff's factual allegations lack the necessary factual support.

**B.   At this early stage of litigation, further discovery is necessary.**

Rule 11(c) limits the subject matter of a motion for sanctions to violations of the assurances enumerated in Rule 11(b).[145] This includes only the improper presentation to the Court of "a pleading, written motion, or other paper" through "signing, filing, submitting, or later advocating it" when one of four circumstances are not true "after an inquiry reasonable under the circumstances."[146] Where there has not been a reasonable opportunity for further investigation or discovery, courts may deny the Rule 11 sanctions motions because sanctions are an extraordinary remedy.[147]

Here, zero discovery has occurred.[148] Were the Court to provide a reasonable opportunity for further discovery, the factual contentions would find additional evidentiary support. For example, discovery could reveal the full extent of the Jones-Freeman Relationship, Kirkland's

---

[140] *In re 4E Brands Northamerica LLC*, No. 22-500009, Dkt. #645 at 10 n.6 (Feb. 29, 2024) (emphasis added).
[141] *Id.* at 13.
[142] Motion at 1.
[143] *Smith*, 960 F.2d at 446.
[144] *Id.*
[145] FED. R. CIV. P. 11(c).
[146] *Id.*
[147] FED. R. CIV. P. 11(b)(3).
[148] West Declaration ¶ 18.

knowledge of the Jones-Freeman Relationship, the extent to which Kirkland took advantage of the Jones-Freeman Relationship, and more. Therefore, the Court should deny Kirkland's request for sanctions on the basis that Plaintiff's factual allegations lack the necessary evidentiary support.

### Conclusion and Prayer

Plaintiff Michael Van Deelen respectfully requests that the Court deny Defendants Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Motion for Sanctions pursuant to FED. R. CIV. P. 11 and grant him all other and further relief to which he is justly entitled.

**Dated May 8, 2024**

Respectfully submitted,

By:   /s/ *Jeffrey M. Tillotson*
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
802 Carancahua Street, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

*Attorneys for Plaintiff Michael Van Deelen*

Jeffrey M. Tillotson
Texas Bar No. 20039200
jtillotson@tillotsonlaw.com
TILLOTSON JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
(214) 382-3041 Telephone
(214) 292-6564 Facsimilie

*Attorney for Plaintiff Michael Van Deelen and his counsel the Bandas Law Firm*

## <u>Certificate of Service</u>

I hereby certify that, on May 8, 2024, a true and correct copy of this document was served on the following counsel of record via the Court's CM/ECF system and by e-mail in compliance with the Federal Rules of Civil Procedure and Southern District of Texas Local Rule 5.3:

BECK REDDEN LLP
David J. Beck
dbeck@beckredden.com
Jacqueline M. Furlow
jfurlow@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

HUESTON HENNIGAN LLP
John Hueston (*pending Pro Hac Vice*)
jhueston@hueston.com
Michael Todisco (*pending Pro Hac Vice*)
mtodisco@hueston.com
Karen Ding (*pending Pro Hac Vice*)
kding@hueston.com
523 West 6th St., Unit 400
Los Angeles, CA 90014

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson