IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Michael D. Van Deelen, | Civil Action File |
| | No. 4:23-cv-3729 |
| Plaintiff, | |
| | |
| v. | |
| | Jury Trial Demanded |
| David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP, | |
| | |
| Defendants. | |

To the Honorable Alia Moses,
Chief United States District Judge:

### PLAINTIFF'S RESPONSE TO DEFENDANT JACKSON WALKER LLP'S MOTION TO DISMISS

Plaintiff Michael D. Van Deelen files this response to Defendant Jackson Walker LLP's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and would respectfully show the Court the following:

# I.

## INTRODUCTION

From reading Jackson Walker's response, one might never know it was recently caught in a web of lies involving its former key restructuring partner Elizabeth Freeman[1] and Chief Bankruptcy Judge David Jones. Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were living together and having an intimate relationship.[2]

Jackson Walker paints this case as just the latest episode in Michael Van Deelen's checkered past as a pro se litigant. But here, Mr. Van Deelen got it *right*. If not for his audacity in moving for recusal, Jones would still be on the bench, Jackson Walker and Freeman would still be collecting millions in illicit fees through her romantic relationship with Jones, as would Kirkland & Ellis.[3]

At all times for purposes of this litigation, Jackson Walker knew about the intimate, live-in relationship between Freeman and Jones. As a partner at Jackson Walker, Freeman unquestionably knew of her ongoing intimate relationship with Judge Jones, that they lived together, and co-owned a home.[4] Both her "[k]nowledge and actions are said to be imputed to all members of a firm[.]"[5] Jackson

---

[1] According to Jackson Walker partner Pat Cowlishaw, "[f]rom the time of [Freeman's] arrival …, Houston has become a favored venue for complex debtor cases…. Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirland Ellis acting as lead counsel[.]" *In re Westmoreland Coal Co.*, No. 18-35672, Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, Dkt. 3362-1 (Nov. 13, 2023) (letter attached to response authored by Jackson Walker partner Pat Cowlishaw) (emphasis added). Although it was a team effort, Freeman's "leadership and contribution were recognized as integral." *Id.*

[2] First Amended Complaint ("FAC" or "Complaint") ¶ 32.

[3] Defendants Kirkland & Ellis LLP and Kirkland & Ellis International LLP are collectively referenced hereafter as "Kirkland."

[4] FAC ¶ 74.

[5] *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009); *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (finding that knowledge and actions impute from one attorney at a firm to all other attorneys with whom they work)); *see also In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1346 (5th Cir. 1981) ("knowledge is imputed to partners of the lawyer disqualified, even if the partnership is later dissolved") (citations omitted). Freeman's actions benefitted Jackson Walker with coveted appointments and millions of dollars in attorneys' fees, meaning the Firm and its partners are charged with knowledge of the intimate relationship and their shared home, even if the Firm's leadership continues to claim ignorance. *Reneker v. Offill*, 2012 U.S. Dist. LEXIS 83017, 2012 WL

1

Walker even admits being informed of the relationship  by at least March 2021, when it says Freeman confessed the relationship to the firm.[6]  Yet it never disclosed the existence of the Jones-Freeman relationship.

Instead, Jackson Walker kept the relationship a secret and gathered millions in fees (in concert with Freeman, Jones and Kirkland) through repeated acts of fraud. Jackson Walker maintains these were, at worst, mere ethical violations.[7] Not so. By filing declarations of disinterestedness, proposed orders, motions for attorneys' fees, and motions for final decrees, Jackson Walker necessarily represented to the Court and those interested in the bankruptcy that it did not have any impermissible connection with the judge. But it did have such a connection, and one that undoubtedly required Jones' disqualification. *See* 28 U.S.C. § 455(a) ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned").

Jackson Walker claims no harm, no foul because no one objected to the fees anyways. Of course they didn't. Nobody knew to object because Jones, Freeman, Jackson Walker, and Kirkland were concealing the intimate, live-in relationship between the judge and the Jackson Walker partner.

Jackson Walker had a duty to disclose the relationship but fraudulently failed to do so.  Such failure resulted in direct harm to Plaintiff and, together with other wrongful acts, gives rise to the claims adequately and properly alleged in Plaintiff's First Amended Complaint.

---

2158733, at *11 (N.D. Tex. June 14, 2012) ("imputation turns on whether the agent was acting for or against the principal's interest; knowledge acquired by an agent acting adversely to his principal is not attributable to the principal") (citation omitted); *see also Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) ("[c]ourts will impute knowledge to the corporation as long as the officer/director is acting on the corporation's behalf") (citation omitted).

[6] FAC ¶ 48 & n. 69; *In re Westmoreland Coal Co.*, No. 18-35672, Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, Dkt. 3362-1 at 1 (Nov. 13, 2023).

[7] Motion to Dismiss at ¶ 77.

## II.
### FACTUAL BACKGROUND

Jackson Walker repeatedly colors its recitation of the factual background with attacks on Plaintiff's credibility and character. It accuses Plaintiff of using the courts as a tool for harassment to deflect from the fact that, for years, Defendants were using Judge Jones' courtroom as their personal ATM. Jackson Walker's aspersions on Plaintiff serve only as an attempt to distract the Court from the fact that Defendants were caught with their hand in the proverbial cookie jar.

What is relevant before the Court in regard to Jackson Walker's Motion to Dismiss are the merits of the instant litigation and the factual pleadings made in Plaintiff's First Amended Complaint. Nevertheless, Plaintiff responds to the factual allegations and misrepresentations made in Jackson Walker's factual background.

### A.      Plaintiff intervenes into the McDermott Bankruptcy.

Plaintiff sought to participate in the McDermott bankruptcy as a party with a financial interest in the proceedings.  Jackson Walker describes Plaintiff's participation as involving  a "host of motions" while identifying just seven filings by Plaintiff in a docket spanning four years and 1,158 filings to date.[8] Jackson Walker also describes Plaintiff's participation in the bankruptcy proceedings as taking a scorched earth approach; a contention it supports with Plaintiff's visit to the home of McDermott's former CEO – despite acknowledging that the visit was solely to confirm the address for service of a subpoena.[9]  Mr. Spence, the CFO, recounted before the bankruptcy court at a March 12, 2020 hearing that he had no fear for himself or his family as a result of Plaintiff's visit.[10] When Plaintiff attempted

---

[8] *See In re McDermott International*, 20-30336, Dkt. 1 filed January 21, 2020, through Dkt. 1158, filed April 18, 2024.
[9] Dkt. 46, at 17.
[10] See In re McDermott International, 20-30336, Dkt. 666, at 2:50:16 to 2:50:58.

to offer his explanation of the visit, Judge Jones refused to listen, but expressly made no finding that there was anything wrong with Plaintiff's actions.[11]

Jackson Walker further attempts to wrangle in accusations made against Plaintiff by Kirkland attorneys concerning statements allegedly made during and following the March 12, 2020 hearing.[12] Plaintiff vehemently denies making the statements attributed to him by Jackson Walker's co-conspirators, and in fact recounts that he was instead insulted, threatened and intimidated by the Kirkland attorney in that interaction.[13]

Unsurprisingly, Judge Jones overruled or ignored all of Plaintiff's concerns and confirmed the bankruptcy Plan crafted by his cohorts at Jackson Walker and Kirkland.[14] Judge Jones, on the warpath and perceiving Plaintiff's participation in the McDermott proceedings as an impediment to his fee-funneling machine, even went so far as to enter an order claiming Plaintiff to be a risk to courthouse safety (the basis for which, ironically, being a statement made by Plaintiff expressing concern over his own safety based on the hostility of Kirkland attorneys) and barring him from the federal courthouse without a security escort.[15]

**B.     After being shunned from Jones' courtroom, Plaintiff filed suit in State Court.**

Faced with the reality that Judge Jones and his cadre were unassailably entrenched against him in the bankruptcy court, Plaintiff, consistent and compliant with Jones' order, sought redress elsewhere and filed suit against three former executives of McDermott in state court in June 2020.

---

[11] *Id.* at 2:58:10 to 2:58:32.
[12] Dkt. 46, at 17.
[13] *See In re McDermott International*, 20-30336, Dkt. 701, p. 1, 5-8.

[14] *See In re McDermott International*, 20-30336, Dkt. 684.
[15] *See In re McDermott International*, 20-30336, Dkt. 719.

4

Jackson Walker promptly removed that lawsuit to their Judge Jones' court—a clear ploy seeking their home field advantage.[16]

Due to Judge Jones' irrational and overly harsh treatment of Plaintiff previously, Plaintiff sought to have Jones recused from this removed proceeding.[17] During the prosecution of the case against the McDermott executives, Plaintiff received an anonymous letter describing an intimate relationship between Judge Jones and then-Jackson Walker partner Elizabeth Freeman. Plaintiff amended his pending motion to recuse Judge Jones to assert the newly discovered relationship as additional grounds for recusal. Based ostensibly in part on Jones' implicit denial of the relationship— now unequivocally known to be false—the motion to recuse was denied.[18] Judge Jones subsequently dismissed Plaintiff's adversary proceeding, denying other relief that had been requested by Plaintiff as well.[19] Plaintiff's subsequent appeal to the District Court was denied also.[20] That decision is pending before the Fifth Circuit.[21]

Throughout the entire process, Judge Jones maintained his denial and Jackson Walker, Kirkland, and Freeman kept mum regarding the information they had concerning the relationship which had admittedly disclosed to them at least as early as March 2021.[22] All the while, Jackson Walker, Kirkland, and Freeman continued to rack up attorneys' fees in numerous bankruptcies presided over by Freeman's paramour, Judge Jones. Jackson Walker's ongoing malfeasance and cover-up included failing at every opportunity to disclose the relationship—whether believed to be in the past or otherwise—in numerous statements of disinterestedness, in response to the motion to recuse Jones,

---

[16] Case 20-03309, Dkt. 1.
[17] Case 20-03309, Dkt. 4.
[18] 20-03309, Dkt. 42
[19] 20-03309, Dkt. 81.
[20] 20-03309, Dkt. 102.
[21] Van Deelen v. Dickson, et al., 23-20436 (5th Cir.).
[22] See e.g., 4E Brands, 22-50009, at Dkt. 517, at 3.

and in response to the subsequent appeals. Jackson Walker's only response is to cry foul for having chosen to believe their partner who had allegedly been lying to them for years already.

## C.    Plaintiff files suit against Judge Jones directly.

Not until he filed his Original Complaint in this action against Judge Jones on October 4, 2023, was he taken seriously.[23]  Judge Jones finally admitted to the press his intimate relationship and that he had shared a home with her for years.[24] On November 3, 2023, the U.S. Trustee began filing motions under Fed. R. Civ. P. 60(b)(6) requesting that orders awarding fees and expenses be set aside.[25] As the U.S. Trustee observed, "all orders awarding fees and expenses are tainted" in light of "Judge Jones' failure to recuse himself from presiding over cases where Jackson Walker was counsel for the debtor-in-possession while Freeman was both living with him and a partner at Jackson Walker[.]"[26]

After months of exhaustive research and in response to a motion to dismiss filed by former Judge Jones, Plaintiff filed his First Amended Complaint adding Jones' cohorts, including Jackson Walker, as defendants.  Jackson Walker's motion to dismiss followed.[27]

## III.
### ARGUMENT

## A.    Jackson Walker's Asserted 12(b)(1) Grounds for Dismissal Should Each Be Denied.

Claims may be dismissed under Rule 12(b)(1) based on a lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998) (quotations omitted). A Rule 12(b)(1) motion to dismiss should be granted if it appears certain that the plaintiff cannot prove a plausible set of facts that

---

[23] Dkt. 1.
[24] Alexander Gladstone & Andrew Scurria, Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer, Wall Street Journal Pro, (Oct. 7, 2023).
[25] See See e.g., 4E Brands, 22-50009, at Dkt. 517
[26] *Id.* at Dkt. 517, at 3.
[27] Dkt. 46.

establish subject matter jurisdiction. *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The burden of establishing subject matter jurisdiction rests on the party seeking to invoke it. *St. Paul Reinsurance Co., Ltd v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998).

### 1.     Plaintiff Has Standing.

"Standing jurisprudence contains two strands: Article III [or constitutional] standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Servicios Azucareros de Venez., C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012). As a matter of law, Jackson Walker cannot obtain a Rule 12(b)(1) dismissal for lack of prudential standing, which can only be granted under Rule 12(b)(6). *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) ("unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)"); *see also Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (same).

### a.     Plaintiff has prudential standing.

Jackson Walker did not raise a proper challenge to prudential standing under Rule 12(b)(6), and it need not be considered. *See Bd. of Miss. Levee Comm'rs v. United States EPA*, 674 F.3d 409, 417 (5th Cir. 2012) ("[u]nlike constitutional standing, prudential standing arguments may be waived") (citation omitted). To the extent the Court nevertheless considers prudential standing, the complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 753 (5th Cir. 2021).

7

The premise of Jackson Walker's assertion that Plaintiff lacks standing is mistaken—Plaintiff's claims are not derivative of the bankruptcy. Plaintiff has uniquely personal claims from which he suffered direct harm. *See Galindo v. City of Del Rio*, 2021 U.S. LEXIS 126766, *9 (W.D. Tex. Mar. 26, 2021) (citations omitted) ("individuals have no standing to secure a personal recovery for an alleged wrong done to the business entity, unless they are able to show some direct harm to themselves").

For example, Plaintiff was the victim of a RICO predicate act of obstruction of justice (18 U.S.C. § 1503) when Defendants failed to disclose the romantic, live-in relationship between Jones and Freeman despite Plaintiff's motion to recuse Judge Jones at a time when Jackson Walker admittedly knew of the romantic relationship between Jones and Freeman.[28] As a result, Plaintiff incurred legal expenses to prove a fact that Jackson Walker and the other members of the Enterprise concealed. Had Jackson Walker and the other defendants properly revealed this information from the outset, there would have been no need for Plaintiff to have incurred the expense of seeking to recuse Judge Jones. Had Jackson Walker and the other defendants confirmed the relationship at any point after Plaintiff presented the anonymous letter in connection with his motion to recuse, Plaintiff would not have incurred the expense of appealing the failed (though now proven factually accurate) motion to recuse. Plaintiff incurred these costs directly; they are not derivative of any injury to McDermott.

Additionally, Plaintiff sustained mental anguish damages[29] from the harsh treatment he received in court, including Jones ordering that he could not enter the federal courthouse except with the escort of a court security officer. He also suffered mental anguish after learning his case was

---

[28] *See* FAC ¶100, 101(d) (alleging violation of 18 U.S.C. § 1503, obstruction of justice in connection with improperly influencing officers of the bankruptcy court by "knowingly and deliberately concealed, or failed to properly reveal, the existence of an intimate, personal relationship between Freeman and Judge Jone").

[29] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (citations omitted).

litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for protesting creditors and investors.

Thus, Plaintiff's lost expenses and mental anguish allegations are not injuries under a confirmation plan or order. Rather, they are the result of the defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost.

Plaintiff's mental anguish damages and damages for costs from the motion to recuse are independent of injuries to McDermott and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms"). Further, Plaintiff's claims did not arise until after commencement of the bankruptcy, and do not belong to the estate. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"); *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994) (if "a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action").

Plaintiff seeks relief for his own injuries distinct from the bankruptcy and any claims held by McDermott. His mental anguish damages belong to him, not the bankruptcy estate. So do his damages for legal expenses arguing for recusal. And so do his claims under *Bivens*. To the extent there is overlap with damages to the estate, as a shareholder with a direct, personal interest in a claim, Plaintiff has a right to suit even if the rights of the bankruptcy estate are implicated.

The "several cases" that Jackson Walker claims mirror his injuries, where three bankruptcy courts found a lack of standing under Section 1109 of the Bankruptcy Code because the moving party was not a party in interest, in fact, involve the same plaintiff (Mar-Bow) and the same allegations of

fraud against a restructuring advisor.[30] In *SunEdison*, the plaintiff filed directly into the bankruptcy proceeding seeking to set aside the confirmation plan, the order appointing the advisor, and to disgorge fees.[31] The court found the plaintiff lacked standing under Section 1109 and also lacked prudential standing.[32] In *Old ANR*, the same plaintiff filed a Rule 60(d) motion in the bankruptcy proceeding. The district court found a lack of standing under Section 1109 and Article III.[33] In *SRC Liquidation*, the same plaintiff moved for an examiner to investigate the extent of the advisor's conflicts and misstatements.[34] The district court also found the plaintiff lacked standing under Section 1109 and Article III.

As described in *SunEdison* and *SRC Liquidation* noted that the principal of Mar-Bow, Jay Alix, also filed a RICO lawsuit in district court against the restructuring advisor. *SRC Liquidation* indicated that the district court "found Mr. Alix had failed to adequately allege that he had suffered a harm as a result of McKinsey's alleged failure to disclose."[35]

Remarkably, while relying on this trilogy of bankruptcy cases, Jackson Walker omits that the Second Circuit vacated the district court opinion dismissing the plaintiff's RICO claim. In *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022), the Court of Appeals described that the "district court gave insufficient consideration to the fact that [the defendant's] alleged misconduct targeted the federal judiciary[,]" which requires courts "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes."

---

[30] Motion to Dismiss at ¶41 & n 75 (citing *In re SunEdison, Inc.*, No. 16-10992 (SMB), 2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019); *In re Old ANR, LLC*, Case No. 19-00302-KRH, 2019 WL 2179717, at *1 (Bankr. E.D. Va. May 17, 2019); *In re SRC Liquidation LLC*, Case No. 15-10541 (BLS), 2019 WL 4386373, at *1 (Bankr. D. Del. Sept. 12, 2019)).

[31] *In re SunEdison, Inc.*, 2019 Bankr. LEXIS 1908, *1 (Bankr. S.D.N.Y. Jun. 21, 2019).

[32] *Id.* at *18.

[33] *In re Old ANR, LLC*, 2019 Bankr. LEXIS 1666, *14

[34] *In re SRC Liquidation LLC*, 2019 Bankr. LEXIS 2851, *2 (Bankr. D. Del. Sept. 12, 2019).

[35] I*n re SRC Liquidation LLC*, 2019 Bankr. LEXIS 2851, *15 (citing *Alix v. McKinsey & Co. Inc., et al.*, No. 18-CV-4141, 404 F. Supp. 3d 827, 2019 U.S. Dist. LEXIS 139685, 2019 WL 3889855, at *5 (S.D.N.Y. Aug. 19, 2019))).

When a defendant's conduct "target[s] the federal judiciary[,]" a somewhat different analysis is required. Courts must:

> focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes. Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require. **If [Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are <u>directly harmed</u>.** The fact that this case invokes our supervisory responsibilities makes our resolution of it *sui generis* and of little, if any, application to 'ordinary' RICO cases where these responsibilities are not front and center.

*Id.* at 204 (emphasis added).

Under *Alix*, Plaintiff was directly harmed as an unsuccessful participant in the bankruptcy process. *Id.* The need for this Article III Court to superintend the integrity of the bankruptcy court and its process is even greater than *Alix* because the corruption is not limited to bankruptcy participants, but includes the Chief Judge of the Bankruptcy Court.

Further, Plaintiff has alleged facts plausibly demonstrating some injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle him to nominal damages. *See Potomac Electric Power Company v. Electric Motor and Supply, Inc.,* 262 F.3d 260, 265–66 (4th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts."). A finding of nominal damages would also trigger an award of attorneys' fees. Thus, if some damage has been alleged to exist, even if not readily quantifiable, Plaintiff maintains a plausible claim for nominal damages that is adequate to establish damages. *See Potomac,* 262 F.3d at 8. That some injuries may be difficult to quantify does not preclude a showing of causation. *Id.* at 265

("[e]ven if the precise amount of its injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred"); *Alix*, 23 F.4th at 207 ("uncertainty as to amount of damages in not a reason to deny a plaintiff some recovery").

Plaintiff also alleged breach of fiduciary duty and has sought disgorgement, which does not require proof that Jackson Walker "caused actual damage — proof of a breach is enough[.]" *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex. App. 1997), *aff'd as modified*, 997 S.W.2d 229, 42 Tex. Sup. Ct. J. 932 (Tex. 1999); *see Jacobs v. Tapscott*, 2006 U.S. Dist. LEXIS 68619, *23 (N.D. Tex. Sept. 25, 2006) ("in the context of the attorney-client relationship, proof of damages is not required with a request for fee forfeiture in a breach of duty claim"). The breach itself is the harm. Thus, if this Court considers the prudential standing argument, it should be rejected.

### b.    Plaintiff has Article III standing.

Article III standing requires three elements: (1) an "injury in fact" that is (2) "fairly traceable" to the "conduct complained of" and that is (3) likely redressable by a favorable court decision. *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)). Plaintiff's pleadings satisfy each element.

Plaintiff suffered concrete injuries in fact, many of which Jackson Walker's motion completely ignores. Plaintiff sustained mental anguish damages (alleged and recoverable under Plaintiff's breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, legal malpractice, civil conspiracy, *Bivens*, and *Bivens* conspiracy claims)[36] from the harsh treatment he received in court, including Jones ordering that he could not enter the federal courthouse except with

---

[36] FAC ¶¶ 5, 82, 157, 163, 182, 192–93, 200, 215, 222, 227.

the escort of a court security officer.[37] He also suffered mental anguish after learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for protesting creditors and investors. Plaintiff's mental anguish and emotional distress allegations are not incidental to the bankruptcy itself or the loss of shares. Rather, they are the result of, and fairly traceable to, the defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost.

Additionally, Plaintiff sustained costs and expenses, also alleged and recoverable under each of his claims,[38] when Defendants failed to disclose the romantic, live-in relationship between Jones and Freeman despite Plaintiff's motion to recuse Judge Jones at a time when Jackson Walker admittedly knew of the romantic relationship between Jones and Freeman.[39] Had Jackson Walker and the other defendants confirmed the relationship at any point after Plaintiff presented the anonymous letter in connection with his motion to recuse, Plaintiff would not have incurred the expense of appealing the failed (though now proven factually accurate) motion to recuse. Plaintiff incurred these expenses directly as a result of Defendants' efforts to conceal the Jones-Freeman relationship; they are not derivative of any injury to McDermott.

Plaintiff does not "surmise[] that his alleged mental distress" or costs incurred in as a result of Defendants' fraud "will be remedied" from disgorgement of Jackson Walker's fees.[40] These damages

---

[37] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (citations omitted).

[38] *See, e.g.,* FAC ¶ 125, 131, 158,

[39] *See* FAC ¶100, 101(d) (alleging violation of 18 U.S.C. § 1503, obstruction of justice in connection with improperly influencing officers of the bankruptcy court by "knowingly and deliberately concealed, or failed to properly reveal, the existence of an intimate, personal relationship between Freeman and Judge Jone").

[40] Motion to Dismiss at ¶ 51.

are redressable through money damages from Jackson Walker and the remaining defendants. They are not speculative and do not originate from the loss of value in McDermott shares.

*Alix* speaks to the direct harm sustained by Plaintiff in connection with the fraudulent fees awarded through Defendants' targeting of the integrity of federal judiciary. There is nothing attenuated about this harm—Jackson Walker and the remaining defendants corrupted the bankruptcy system, and unsuccessful participants in that process like Plaintiff are "directly harmed." *Alix*, 23 F.4th at 204. Finally, Jackson Walker wrongfully assumes Plaintiff cannot be redressed by disgorged fees because of the limits of the Plan. The U.S. Trustee disagrees that forfeiture must be allocated as Jackson Walker insists and has proposed alternative mechanisms for distributing disgorged fees.[41] Plaintiff has Article III standing.

### 2.    Plaintiff's Complaint is not a collateral attack on the confirmation order.

Jackson Walker claims because he was a participant in the McDermott bankruptcy and did not object to fees, res judicata bars his arguments. Nonsense. He could not object to or appeal from the September 8, 2020 fee order because, unlike Jackson Walker, he did not know at the time that the judge was awarding attorneys' fees to his live-in girlfriend.

Plaintiff's claims are simply not a collateral attack on the confirmation order. He challenges the RICO Enterprise and conspiracy to conceal the Jones-Freeman relationship, which unjustly enriched all defendants, and which, from Plaintiff's reading, are not included in the confirmation plan.

---

[41] *In re 4E Brands Northamerica, LLC*, Case No. 22-50009, United States Bankruptcy Court, Southern District of Texas, Dkt. 600 at 4-5 (Jan. 9, 2024) (footnote omitted).

**3.      Plaintiff's claims are not barred by the Plan's release, injunction, or exculpation provisions.**

Without much explanation, Jackson Walker attempts to make hay out of the exculpation provisions included in Article VIII of the McDermott Bankruptcy Plan—a plan advocated by Defendants and approved by Judge Jones. Jackson Walker acknowledges, as it must, that this provision does not apply to claims arising from actual fraud, willful misconduct, or gross negligence.[42]

Boldly, Jackson Walker claims that Plaintiff's Amended Complaint "fails to specify the alleged material false statement" made by Jackson Walker. In fact, the FAC explicitly identifies the fraud—failing to disclose the Jones-Freeman relationship in the application for appointment, declaration of disinterestedness, motion for attorneys' fees, and motion for final decree, and failing to amend the declaration of disinterestedness at any point.[43] Under Bankruptcy Rule 5002(b), a judge may not appoint a professional or attorney in a bankruptcy if "that person is or has been so *connected* with such judge … as to render the appointment or employment improper." Fed. R. Bankr. P. 5002(b) (emphasis added). A romantic partner living with a judge for years is exactly the kind of "connection" that should prevent the judge from approving the partner's employment or awarding fees. Indeed, no reasonable person could believe that intimate, live-in partners are not "connected" in such a way as to render appointment improper.

Though this rule is directed at judicial conduct, the Notes of the Advisory Committee on Rules (1985 Amendment) discuss the need for disclosure *to the judge* about connections for the court to consider before appointing a professional. According to the Committee, "Subdivision (b) alerts the potential appointee or employee and party seeking approval of employment to consider the possible

---

[42] Dkt. 46, at 32.
[43] FAC ¶ 106.

relevance or impact of subdivision (b) and indicates to them that appropriate disclosure *must be made* to the bankruptcy court before accepting appointment or employment. The information required may be made a part of the application for approval of employment. *See* Rule 2014(a)." Fed. R. Bankr. P. 5002(b), Notes of the Advisory Committee on Rules (1985 Amendment).

By filing applications for appointment, declarations of disinterestedness, proposed orders, motions for attorneys' fees, and motions for final decrees, Jackson Walker represented to the Court and those interested in the bankruptcy that it had no disqualifying "connection" with the judge as contemplated under Rule 5002(b).[44] *See In re CF Holding Corp.*, 164 B.R. 799, 807–08 (D. Conn. Feb. 17, 1994) ("[t]he general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession"); *see also* 11 U.S.C. § 327(a); Fed. R. Bankr. P. 2014.

The entirety of Plaintiff's Amended Complaint is replete with specific instances of Jackson Walker's intentional failure to be truthful and candid in pleadings and representations submitted to the bankruptcy courts—representations that were accepted without even the bat of an eye by their co-conspirator Judge Jones. Jackson Walker's arguments purportedly made pursuant to the exculpation provision must be denied.

**B.    Jackson Walker's Asserted 12(b)(6) Grounds for Dismissal Should Each Be Denied.**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a complaint states a plausible claim for relief. *See Raj v. Louisiana State Univ.*, 714 F.3d 322, 329-30 (5th Cir. 2013).  Construing the complaint liberally in favor of the plaintiff, a motion to dismiss

---

[44] See e.g., Dkt. 10, at 13, 15, 17, 20 for examples of a but a handful of Jackson Walker's fraudulent and willfully untruthful representations to the bankruptcy courts.

should be denied where the complaint contains enough facts to "state a claim to relief that is plausible on its face" and allows a court to draw a reasonable inference that the defendant is liable for the harm alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Backe v. LeBlanc,* 691 F.3d 645, 648 (5th Cir. 2012).  Because Plaintiff's First Amended Complaint states a plausible factual basis for finding Jackson Walker liable, Jackson Walker's motion to dismiss should be denied.

### 1.    Plaintiff has properly asserted a *Bivens* conspiracy action against Jackson Walker.

Jackson Walker cites *Correctional Services Corp. v. Maleskio*, 534 U.S. 61, 65 (2001) as "unequivocal[ly]" holding that *Bivens* claims cannot be asserted against private actors as Defendants.[45] In actuality, however, *Malesko* noted that "the question of whether a *Bivens* action might lie against a private individual is not presented here." *Id.* at 65. Meanwhile, in the analogous context of a § 1983 action, the Supreme Court has recognized that willful participation in a conspiracy with a state actor may subject a private actor to liability in a § 1983 action. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970); *Solesbee v. Nation*, No. 3:06-CV-0333-D (BH), 2007 WL 9711508, at *4 (N.D. Tex. Feb. 26, 2007), *report and recommendation adopted*, No. CIV A 306-CV-0333-D, 2008 WL 244343 (N.D. Tex. Jan. 29, 2008). And federal courts have recognized the potential viability of a *Bivens* conspiracy involving federal and private actors.  *See, e.g., Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1337-38 (9th Cir. 1987) (allegation of conspiracy between private actor and federal actor to deprive individual of his constitutional rights may state *Bivens* claim); *Roman v. Glass*, 968 F.2d 1211 (4th Cir. 1992) (finding allegations of *Bivens* conspiracy between attorney and government adequate to avoid dismissal).  Thus, the unavailability of a claim of *Bivens* conspiracy asserted against a private actor has not been established by Jackson Walker.

---

[45] Motion to Dismiss at ¶ 64, p. 25

Moreover, while it has not been presented with the situation yet, it is plausible that the Supreme Court would recognize a *Bivens* claim for deprivation of a litigant's constitutional rights to due process, an unbiased tribunal, equal access to courts and equal protection under the laws because the presiding judge was in an undisclosed intimate relationship with another party's attorney. In considering whether to extend *Bivens* to a new context, federal courts are to consider whether there are special factors counseling hesitation. *See, e.g., Watkins v. Carter,* No. 1:11-CV-505, 2022 WL 1651924, at *1 (E.D. Tex. May 23, 2022), aff'd, No. 22-40477, 2023 WL 4312771 (5th Cir. July 3, 2023) (finding a special factor present in claim for excessive force where Fifth Circuit had previously held *Bivens* should not extend to excessive force or retaliation claims). Here, Jackson Walker has not identified or argued any special factor precluding recognition of Plaintiff's *Bivens* conspiracy claim. Because Jackson Walker has not shown that a *Bivens* conspiracy claim cannot be recognized on the facts of this case, Jackson Walker's motion to dismiss the *Bivens* conspiracy claim should be denied.

### 2. Plaintiff has properly alleged the elements of a RICO claim.

#### a. Plaintiff has adequately alleged injuries to his business or property that were proximately caused by Defendants' injurious conduct, thereby establishing his standing to assert a RICO claim.

Jackson Walker mischaracterizes Plaintiff's claimed property damages as consisting *solely* of diminishment of McDermott bankruptcy estate from which Plaintiff hoped to be paid.[46] Beyond his interest in the improperly reduced bankruptcy estate, Plaintiff also suffered injuries that were a direct and inevitable result of Defendants' RICO violations. In particular, Plaintiff's damages include, but are not limited to:  (1) the costs and expenses incurred in filing motions and attending hearings in a bankruptcy proceeding that he did not realize were futile because the playing field was tilted against

---

[46] Motion to Dismiss at pp. 26-27.

him from the outset, (2) the costs and expenses incurred in presenting a motion to recuse based on the Jones-Freeman relationship (and appealing the denial of that motion) when such motion would not have been necessary had Defendants been truthful about the existence of that relationship, (3) the loss of his due process rights and harm to the bankruptcy process in which he took part which, at a minimum, entitled Plaintiff to nominal damages, and (4) mental anguish damages based on the harsh treatment he received from the judge and attorneys who were at risk of being exposed by him, and based on the distress of learning the bankruptcy process he invested substantial time, effort and resources participating in was tainted by corruption.  None of these injuries to Plaintiff are derivative of the injury to the bankruptcy estate.

Under the fraudulent belief that all participants in the McDermott bankruptcy were on level footing as disinterested parties, Plaintiff incurred legal expenses and travel expenses to object to the proposed confirmation plan in the McDermott bankruptcy[47] and to participate in several hearings before Judge Jones; never suspecting the futility of advocating against a plan prepared and advocated for by the judge's girlfriend and associated firms. It is, at least, plausible that such expenditures and expenses, made by Plaintiff in reliance on false representations by Enterprise members that they were disinterested and conflict-free parties, form a recoverable financial loss that is not derivative of any injury sustained by the McDermott bankruptcy estate. *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. LLP,* 985 F.2d 102 (2d Cir.1993) (plaintiff horse breeders, who purchased equipment and trained horses under assurances from defendant that horse racing would continue after defendant purchased facility had standing to bring a RICO action to recover financial expenditures and expenses).

---

[47] FAC ¶ 58.

19

Due to Defendants' predicate acts of fraud, Plaintiff was forced to incur legal expenses in an additional context: *i.e.,* to prove a fact – that Judge Jones was involved in an intimate relationship with one of the debtor's attorneys that was kept secret by the Enterprise members – that warranted Judge Jones' recusal and/or the other Defendants' removal as counsel for debtor.  Had Jackson Walker and the other defendants properly revealed this information from the outset, there would have been no need for Plaintiff to have incurred the expense of seeking to recuse Judge Jones.  Had Jackson Walker and the other Defendants confirmed the relationship at any point after Plaintiff presented the anonymous letter in connection with his motion to recuse, Plaintiff would not have incurred the expense of appealing the failed (though now proven factually accurate) motion to recuse.  These expenses were incurred directly by Plaintiff and are not derivative of any injury to McDermott.

The injury visited upon the bankruptcy system and process by Defendants' acts also represents a direct harm to Plaintiff.  "**If [a Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are <u>directly harmed</u>.**" *Alix,* 23 F.4th at 204 (emphasis added).  Defendants' wrongful acts corrupted the bankruptcy process and inflicted direct harm on Plaintiff as a participant in that bankruptcy process.

Plaintiff has also alleged facts plausibly demonstrating an injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle Plaintiff to nominal damages.  *Potomac,* 262 F.3d at 265-266(5th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts.").  A finding of nominal damages would also trigger an award of attorneys' fees.  Thus, if some damage has been alleged to exist, even if it is not

readily quantifiable, Plaintiff has asserted a plausible claim for nominal damages that is adequate to establish standing.  *Potomac,* 262 F.3d at 8.

Moreover, it cannot be said at this early stage in proceedings that Plaintiff has no financial interest in the fees that were wrongfully paid to Jackson Walker, Freeman, and Kirkland that may be ordered disgorged. Freeman bases its argument on the assumption that any disgorged fees will be returned to the estate and distributed according to the current Plan, the provisions of which make it unlikely estate proceeds will stretch to equity holders. Defendants' assumption, however, is not an established fact. The U.S. Trustee has theorized that disgorged legal fees could be distributed under various means including a race-to-the-courthouse, modifications to the Plan, or a conversion to a Chapter 7 bankruptcy proceeding. *See In re 4E Brands Northamerica, LLC,* Case No, 22-5009, Dkt No. 600 at 4-5 (Bkr.Ct. S.D.Tex, Jan 9 2024) (discussing potential distributions of fees and recognizing that the confirmed Plan could be modified to allow for distribution of disgorged fees).  It seems only just that fees wrongly obtained by Defendants through a scheme that targeted and damaged the bankruptcy system as a whole and *all* those who participated in it, would, once recovered, be shared in some portion by all the deceived participants in the bankruptcy case. Thus, it cannot be said at this early stage of proceedings, and under the exceptional facts of this case, that Plaintiff's interest in the attorneys' fees wrongly paid to Defendants is wholly insufficient to afford a plausible basis for standing..

### b.    Plaintiff has adequately alleged predicate acts.

Jackson Walker challenges Plaintiff's pleading of predicate criminal acts on two grounds: (1) by rebutting Plaintiff's allegations that Jackson Walker knew of the Jones-Freeman relationship, and (2) by asserting that its receipt of fees did not "rise to the level of a criminal act for RICO purposes." The first argument merely shows that the extent of Jackson Walker's knowledge of the Jones-Freeman

affair is a disputed fact. It does not warrant dismissal. The second argument derives from a distinguishable case involving relatively routine fee practices, *not* a large-scale bankruptcy court scandal. Neither argument warrants dismissal of Plaintiff's RICO claim on the pleadings.

Plaintiff has alleged, and offered facts that show or infer, that Jackson Walker knew of the Jones-Freeman relationship and fraudulently misrepresented that such relationship did not exist. *See* Argument, *infra*, at B.2.e.. Any contrary position taken by Jackson Walker merely establishes a disputed question of fact, it does not disprove Plaintiff's allegations material misrepresentations were made by Jackson Walker and the other Defendants constituting predicate criminal acts.

Continuing to focus on its fee awards and ignore the fraudulent acts that enabled them, Jackson Walker points to the Fifth Circuit's opinion in *St. Germain v. Howard* as authority for finding that crimes involving fraudulently obtained legal fees do not constitute racketeering activity. 556 F.3d 261, 263 fn.1 (5th Cir. 2009). In *St. Germain,* the plaintiff asserted mail and wire fraud based on the attorney defendant using multiple names on bills ("Howard and Reed" or "Howard, Reed and Taylor, Attorneys at Law"), charging a non-refundable minimum fee, overbilling, or sharing fees with parties not identified on the client's contract. *Id.* So benign were such acts that the court noted the plaintiffs themselves "acknowledged that the 'patterns of racketeering activity' they allege are at worst violations of the rules of professional responsibility." *Id.* at 263. Not surprising, the court concluded that, because *criminal* acts had not been alleged, the RICO claim was properly dismissed. Here, Plaintiff *has* alleged criminal acts occurring within the context of possibly the largest bankruptcy scandal in history. These allegations of predicate acts are sufficient to state a claim under RICO.

c.    **Plaintiff has adequately alleged the Enterprise's structure and a purpose for the Enterprise that is separate from its racketeering acts.**

Contrary to Jackson Walker's suggestion, Plaintiff has alleged that the Enterprise had a purpose separate and apart from its predicate acts. That is, the Enterprise undertook both legitimate actions (providing legal services related to bankruptcy proceedings) and actions which constituted a pattern of racketeering (e.g., bankruptcy fraud, mail and wire fraud, honest services fraud).  Thus, the purpose of the Enterprise was not merely to commit frauds, but rather, to boost the professional reputations and financial opportunities of the Enterprise members through means that sometimes included fraudulent acts of racketeering. This was plainly alleged in Plaintiff's First Amended Complaint:

> [T]he purpose of the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise was to utilize the intimate relationship between Judge Jones and Freeman to enrich Freeman, Jackson Walker, and Kirkland & Ellis directly and increase their prestige and influence in bankruptcy practice, while also enriching Judge Jones directly or indirectly, all without disclosing the intimate relationship to affected parties and creditors.[48]

> [...]The Enterprise functioned to achieve the shared goal of enriching Defendants (both directly through approval of improper attorneys' fee awards and indirectly by elevating the status and demand for Defendants Jackson Walker, Freeman, and Kirkland & Ellis as bankruptcy attorneys) by securing favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded to Jackson Walker and Kirkland & Ellis as attorneys' fees - that were influenced by intimate relationships and self-interest and not based exclusively on the merits.[49]

Cases where an alleged enterprise was found not to have an existence separate and apart from its racketeering activities typically involve members who came together solely for a particular (often

---

[48] FAC ¶ 87.

[49] FAC ¶ 91.

one-time) criminal activity. *See, e.g., Fernandez-Lopez v. Hernandez,* 2020 WL 9396487 (W.D. Tex. Nov. 20, 2020) (no shared purpose found where Enterprise members came together only for one-time act of visa fraud).   That is not the case here.   Defendants here are alleged to have been a working consortium of legal professionals who conspired to boost their reputational status and income through *both* legitimate legal work and illegal acts, including RICO predicate acts. This scheme, consisting of both legitimate and illegal acts, was repeated in numerous mega-bankruptcy cases filed in the Southern District of Texas over a period of years. Thus, the Enterprise did not exist merely to perform RICO predicate acts; the Enterprise existed to further the professional and financial benefits to its members and used RICO predicate acts to improperly inflate those benefits.   The facts alleged in this case are akin to those in *Diamond Consortium, Inc. v. Manookian,* where enterprise members were alleged to have provided representation and acted as co-counsel in other litigations. 2017 WL 1495091 (E.D. Tex. April 26, 2017).   The court in *Diamond Consortium* found that an association-in-fact enterprise had been adequately pled to have an existence separate and apart from the pattern of racketeering.   *Id.* The same finding should follow in the case at bar.

With regard to Jackson Walker's single sentence argument that Plaintiff's Complaint was devoid of details regarding the Enterprise's organization, hierarchy and structure:  it is enough that Plaintiff has alleged the Enterprise's structure through allegations regarding its purpose, relationships and continuing acts.

### d.   Plaintiff has plausibly alleged that his injuries were caused by Defendants' RICO violations.

The second standing question – whether Plaintiff's injury was proximately caused by Jackson Walker's conduct – can also be answered in the affirmative.   The purpose of the Enterprise was to secure reputational and financial benefits for the Enterprise members based on the relationship

between Freeman and Jones.  Defendants furthered the goals of the Enterprise by denying other bankruptcy participants information that would have caused them to scrutinize, reveal and object to Defendants' involvement.  Where the goal was to prevent Plaintiff (and other shareholders and creditors) from being on an equal playing field in proceedings before Judge Jones, Defendants ought not be heard to disavow that Plaintiff was injured in the very way they intended: by making futile expenditures, incurring unnecessary legal fees, and suffering adverse rulings.

Simply stated, the injuries to Plaintiff resulted from Defendants' scheme to keep all bankruptcy participants other than the Enterprise members in the dark about the influential Jones-Freeman relationship.  Consequently, the causation element of RICO standing has been plausibly alleged.

> ### e.    Plaintiff has adequately alleged the existence of a conspiracy.

Plaintiff has properly alleged the elements of a RICO claim, thereby defeating Jackson Walker's argument that the RICO conspiracy count fails for lack of an underlying RICO claim. Beyond that, Jackson Walker's argument that Plaintiff has failed to allege an agreement between itself and the other Defendants to further the aims of the Enterprise is simply untrue.

Plaintiff has clearly alleged that Defendants, including Jackson Walker, agreed to exploit the Jones-Freeman relationship while concealing the relationship from others:

> Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[50]

Moreover, Plaintiff has alleged ample facts showing *or inferring* Jackson Walker's agreement to participate in a scheme to leverage the Jones-Freeman relationship for financial and reputational

---

[50] FAC ¶ 197.

benefits.  Not the least of those facts is the allegation (and Jackson Walker's admission) that it was informed of the relationship between Freeman and Jones in March of 2021.[51] While evidence suggests Jackson Walker knew of the relationship earlier,  at a minimum, it is undisputed that  Jackson Walker knew of the Jones-Freeman relationship for more than six month before Judge Jones dismissed the adversary proceeding on October 12, 2021, for nearly two years before the district court affirmed the denial of Plaintiff's motion to recuse Judge Jones on January 9, 2023,  and for well over two years before the relationship became publicly known and the Fifth Circuit issued an order finding probable misconduct.[52]  Yet, Jackson Walker would have the Court believe that (without discussing it with its partner Freeman, its lead counsel Kirkland, or the presiding Judge Jones) Jackson Walker *independently* made the wrong decision that it should not  reveal an intimate relationship between one of its partners and the federal judge she appeared before.  Even further, Jackson Walker asks the court to assume Kirkland, one of the "world's leading law firm" *independently* made the same mistake and concluded that the conflict did not warrant disclosure.  In the context of a motion to dismiss, where all reasonable inferences must be indulged in Plaintiff's favor, the most plausible explanation for why four sophisticated and legally knowledgeable defendants would arrive at the same (wrong) conclusion to not disclose the Jones-Freeman relationship is that they agreed amongst themselves not to do so.

There is other circumstantial evidence from which one can reasonably draw an inference that Jackson Walker knew of the Jones-Freeman relationship and conspired to keep the relationship secret so as to garner benefits from it.  For instance, while it is customary for lawyers to work several years before attaining the rank of "partner," Jackson Walker states that Freeman was hired in 2018 and

---

[51] *See* Motion to Dismiss at p. 4; Kirkland's Motion for Sanctions at p. 16.
[52] FAC ¶¶ 61, 63.

immediately made an income partner in the bankruptcy group.[53]   Similarly, after Freeman joined

Jackson Walker, the firm was hired as local counsel in 42 of the 46 mega-bankruptcies Kirkland filed

in the Southern District of Texas since 2019.[54]  This was an abrupt turn-around for a firm that had

not been hired as local counsel by Kirkland for any mega-bankruptcy cases from 2006 to 2016.  The

unprecedented increase in demand for Jackson Walker's bankruptcy services (once Freeman came on

board) suggests that Jackson Walker and Kirkland were aware of the Jones-Freeman relationship and

had agreed to partake in the opportunity it presented for financial and reputational benefits.

Ultimately questions regarding the extent of Jackson Walker's knowledge, its motives, and its

agreement to participate in the Enterprise are uniquely within Jackson Walker's control and will be a

subject of discovery.  At this point, it is sufficient that Plaintiff has alleged Jackson Walker's agreement

to the conspiracy and alleged facts from which it can be inferred that Jackson Walker agreed to conceal

and benefit from the Jones-Freeman relationship.

### 3.    The attorney immunity doctrine does not bar Plaintiff's tort claims.

Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a

non-client for conduct committed in the course of representing the lawyer's client.  *Taylor v. Tolbert,*

644 S.W.3d 637, 642 (Tex. 2022) Attorney immunity exists to encourage aggressive representation and

advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third

parties.  *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). Attorney immunity is not

unlimited, however. Immunity attaches to "the kind of conduct" attorneys engage in when discharging

their professional duties; therefore, if an attorney engages in conduct that is not "lawyerly work" or is

"entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the

---

[53] FAC ¶ 84, fn. 135 (citing *4E brands*, No. 22-50009, Dkt. 526 at 2).
[54] FAC ¶ 29.

attorney-immunity defense is inapplicable. *Taylor*, 655 Sw.3d at 646; *Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  As the party seeking to apply the attorney immunity defense, Jackson Walker bears the burden of proving that its actions were the type of conduct involving a "uniquely lawyerly capacity" and calling upon the attorney's "skills as an attorney."  *Taylor*, 655 SW.3d at 645-46 (movant bears burden of conclusively proving affirmative defense of attorney immunity applies).  That showing has not been made here.

First, Jackson Walker conveniently (but erroneously) defines the conduct at issue as "completing bankruptcy applications," "appearing at hearings," or "seeking court approval of the Plan."  These are not the acts giving rise to Plaintiff's claims. Plaintiff's claims arise from Jackson Walker's scheme to employ the girlfriend of a federal judge and to secretly leverage that intimate relationship to garner increased employment opportunities, increased fees, and increased professional standing. That is neither an act of advocacy nor one requiring lawyerly skill.  "An attorney is not immune from suit for participating in criminal or 'independently fraudulent activities' that fall outside the scope of the attorney's representation of a client." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,* 595 S.W.3d 651, 657 (Tex. 2020)

Even to the extent that Defendants' scheme led Jackson Walker to omit and conceal the obvious conflict in court filings, disclosing an obvious conflict of interest is not a uniquely lawyerly tasks. The duty to disclose conflicts is something required of _all_ participants in a bankruptcy proceeding. *See, e.g.,* 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals").  The Texas Supreme court affirmed this logic noting that a lawyer who made statements to the press on a client's behalf is not partaking of the office, training and skill of an attorney "because anyone – including press agents, spokespersons, or someone with no particular training or authority at all – can

publicia a client's allegations to the media." *Taylor*, 655 SW.3d at 646.  The same is true here.  Attorney immunity does not attach to the administrative act of identifying one's connections with other participants in a bankruptcy case because doing so is not an act of legal advocacy and does not require any particular "lawyerly" skill.

Going a step farther, knowingly misrepresenting one's conflict status to the Court is not a lawyerly act.  Jackson Walker compares itself to the attorney in *Bethel* who was accused of destroying key evidence by disassembling and testing a trailer's brakes while representing the defendant in a fatal car accident case.  But *Bethel* involved the distinguishable circumstance where an attorney was accused of destruction of property during testing – but the alleged destruction amounted to disassembling the brakes without a protocol or video, changing the position of adjuster screws to facilitate disassembly, and spilling oil.  *Id.* at 658.  Those facts – involving inadvertent changes to evidence resulting from discovery testing – are nothing like the deliberate conduct at issue in the case at bar.

The Texas Supreme Court has had several occasions to consider the scope of the attorney immunity defense.  Its comments on the types of conduct that are not protected by attorney immunity are instructive here.  For instance, while declining to recognize a categorical exception for conduct alleged to be criminal, the court noted that "there is a wide range of criminal conduct that is not within the 'scope of client representations'" and therefore not subject to attorney immunity. *Bethel,* 595 at 657.  Nor does immunity apply to acts that do not involve the provision of legal services. For example, an attorney who participates in a fraudulent business scheme with a client is unprotected by attorney immunity, as such acts are "entirely foreign to the duties of an attorney." *Cantey Hanger,* 467 S.W.3d at 482 (citing *Poole v. Houston & TC Ry. Co.,* 58 Tex. 134, 137 (1882)).

Here, Jackson Walker and the other defendants are alleged to have conspired to use the secret Jones-Freeman relationship to secure professional and financial benefits for themselves.  This scheme

29

existed separate and apart from Defendants' representation of its bankruptcy clients.  Likewise, Jackson Walker's concealment of the Jones-Freeman relationship also was not an act of legal representation, but, rather a ministerial or administrative matter required of lawyers and non-lawyers alike in a bankruptcy proceeding. Because Jackson Walker's misrepresentation and concealment of the Jones-Freeman relationship was (1) outside the scope of the legal representation it provided to McDermott and (2) not a lawyerly act in that it was required of lawyers and non-lawyers alike, attorney immunity should not apply to bar Plaintiff's state law claims.

### 4. The Bankruptcy Court does not have exclusive jurisdiction over Van Deelen's claims.

Jackson Walker contends that the Bankruptcy Court retains exclusive jurisdiction over matters "arising out of" or "relating to" the McDermott Chapter 11 case.   Courts have explained the limited parameters of such jurisdiction.  Proceedings that "arise out of" Chapter 11 cases are those which "would have no existence outside of the bankruptcy." *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987).  For example the filing of a proof of claim is a proceeding that "arises" from a bankruptcy case.  *Id.*  A proceeding is "related to" the Chapter 11 case when the outcome of that proceeding could impact the estate being administered in bankruptcy.  "Related to" jurisdiction diminishes after confirmation.  A post-confirmation debtor is meant to return to normal operations with post-confirmation disputes resolved in the normal course in state or district courts.  *In re Craig's Stores of Tex., Inc.,* 266 F.3d 388, 390 (5th Cir. 2001) (adopting a narrow approach to post-confirmation bankruptcy jurisdiction and noting that after confirmation of a plan of reorganization, the debtor may not come "running to the bankruptcy judge").  Here, this case exists separately from the McDermott bankruptcy proceeding and involves claims for direct injuries to Plaintiff that will not impact the bankruptcy estate; in fact, Plaintiff's claim does not even involve the debtor in the bankruptcy. Consequently, Jackson Walker has not shown that the present case arises out of or relates to the McDermott Chapter 11 case.

Furthermore, the need for this case to be heard in an Article III court, rather than a bankruptcy court, is apparent.  In *Alix*, 23 F.4th at 204, the Court of Appeals described that need was due "the fact that [the defendant's] alleged misconduct targeted the federal judiciary[,]" and noted that such misconduct requires courts "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes." When a defendant's conduct "target[s] the federal judiciary[,]" courts must

> focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes.  Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require. **If [Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are <u>directly harmed</u>**. The fact that this case invokes our supervisory responsibilities makes our resolution of it *sui generis* and of little, if any, application to 'ordinary' RICO cases where these responsibilities are not front and center.

*Id.* at 204 (emphasis added).

### 5. JW's Additional Reasons to Dismiss are Without Merit.

#### a. Plaintiffs' claims are not time-barred.

The parties disagree as to the date Plaintiff's claims accrued.  Jackson Walker contends that Plaintiff claims accrued on or before March 6, 2021, when Plaintiff received an anonymous letter alerting him to the Jones-Freeman relationship.  The claim did not accrue on that date, however, because despite Plaintiff's diligent efforts to investigate the allegations of the anonymous letter – including bringing the allegations of the anonymous letter to Defendants' attention via a motion to recuse Judge Jones – Defendants continued to fraudulently conceal the relationship and their scheme to benefit from it.  Thus, despite diligent efforts, Plaintiff lacked knowledge of the cause of his injury

– as was necessary for accrual – until October 7, 2023 when Jones admitted the relationship and confirmed that the allegations in the anonymous letter were correct. *Kingham v. Pham,* 753 F. App'x 336, 337 (5th Cir. 2019) (per curiam) ("an action accrues when a plaintiff knows both the existence of an injury and the cause of the injury.")

Texas's equitable tolling principles are available to address situations, such as this, where strict application of the statute of limitations would be inequitable. Texas recognizes both tolling based on fraudulent concealment and a discovery rule.[55] *Valdez v. Hollenbeck,* 465 S.W.3d 217, 229 (Tex. 2015) ("We have recognized two doctrines that may delay accrual or toll limitations: (1) the discovery rule and (2) fraudulent concealment."); *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 927, 929-30 (Tex. 2011).  Both doctrines are applicable in the case at bar.

Fraudulent concealment tolls limitations until the claimant, using reasonable diligence, discovered or should have discovered the injury.  *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The Fifth Circuit "applies a four-prong test for fraudulent concealment under which the plaintiff must demonstrate: '(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.'" *Id.*.   The estoppel effect of fraudulent concealment continues until a party learns of facts or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Here, Defendants were presented with Plaintiff's suspicions regarding the Jones-Freeman relationship and, rather than coming clean about the relationship, doubled-down on their efforts to conceal the relationship – going so far as to oppose what have proven to be truthful and meritorious grounds for seeking Judge Jones

---

[55] *Rotella v. Pederson,* 144 F.3d 892, 897 (5th Cir. 1998) ("Because the Texas statute of limitations is borrowed in § 1983 cases, Texas' equitable tolling principles also control.")

recusal.   In far less egregious circumstances than those present here, the Fifth Circuit has found an entitlement to equitable tolling.  *See, e.g., Green v. Doe*, 260 Fed. Appx. 717, *2-3 (5th Cir. 2007).

The discovery rule provides another exception to application of the statutory time bar. The Texas discovery rule standard is similar to the federal accrual standard.  *McGowan v. S. Methodist U.*, No. 3:18-CV-00141-N, 2024 WL 455340, at *8 (N.D. Tex. Feb. 5, 2024).  Kirkland argues that Plaintiff cannot avoid the limitations bar because his injury was not "inherently discoverable." To be "inherently undiscoverable", an injury need not be absolutely impossible to discover. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997).  An "injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.*   That is the case here.  A shareholder in a bankruptcy case is unlikely to know that the presiding judge is involved in a romantic relationship with the debtor's lawyer, let alone that the debtor's legal counsel conspired with the judge to keep the relationship secret because doing so provides them financial and reputational benefits. *See, e.g., Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (finding legal malpractice is inherently undiscoverable because it is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.).

Where a plaintiff's complaint "plausibly sets out facts where the discovery rule might apply, the Court cannot resolve that issue in the context of a Motion to Dismiss." *Cypress/ Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.*, 814 F.Supp.2d 698, 707–08 (N.D. Tex. 2011). Jackson Walker's motion to dismiss on limitations grounds should be denied.

      **b.**    **Plaintiff has adequately alleged reliance and harm in connection with his state law claims.**

"A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment." *Worldwide Asset Purchasing, L.L.C. v. Rent–A–Center E., Inc.,* 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.). Here, Plaintiff alleges that he relied on the misrepresentations of Jackson Walker (and the other Defendants) that there were no conflicts or undisclosed information bearing on the fair and impartial handling of the bankruptcy estate and resolution of bankruptcy proceedings.[56] In reliance on Defendants' misrepresentations, Plaintiff did not challenge the appointment of the judge's girlfriend (and her associated firms) as counsel for the debtor.[57] Nor did Plaintiff challenge the fees paid from the bankruptcy estate as being an inappropriate product of an undisclosed intimate relationship between one of the debtor's attorneys and the judge awarding the fees.[58] Plaintiff also did not seek the recusal of Judge Jones due to his intimate relationship with debtor's attorney until he received the anonymous letter – which did not happen until more than a year after the case was filed and only as the case was winding down.[59] These acts of reliance impacted Plaintiff, not the debtor, and are sufficient to support Plaintiff's state law claims.

Jackson Walker throws ethical obligations to the wind to argue that Plaintiff was unjustified in expecting Jackson Walker, a firm representing its "adversary" in the bankruptcy proceeding, to tell the truth about conflicts of interest. Not surprisingly, Jackson Walker cites no authority for its ridiculous position that a filed document setting forth a firm's conflicts of interest should only be relied upon by

---

[56] FAC ¶¶ 136, 149, 181, 188, 190.
[57] FAC ¶¶ 136, 138, 188.
[58] FAC ¶¶ 136, 138, 149.
[59] FAC ¶¶ 59, 188.

parties' whose interests are aligned with that firm.  Such a distinction is particularly non-sensical here where Jackson Walker's misrepresentations about the existence of the Jones-Freeman relationship were made within the bankruptcy proceeding and directed at persons involved in that proceeding, such as Plaintiff, for the purpose of inducing them not to (1) object to Jackson Walker and Freeman's representation, (2) seek the recusal of Judge Jones, and (3) challenge the fees awarded to Freeman, Jackson Walker and Kirkland.  Having induced Plaintiff to rely on its misrepresentations, Jackson Walker should not be heard to complain Plaintiff was unjustified in doing so.

### c.    Plaintiff has alleged facts showing or inferring that Jackson Walker was unjustly enriched.

The law does not allow a person to profit by wrongdoing at the expense of another. Unjust enrichment allows recovery when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Perales v. Bank of Am., N.A.,* No. CIV.A. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014).  Jackson Walker does not challenge the adequacy of Plaintiff's allegations with regard to its receipt of a benefit (appointments, fees, and status) or its use of fraud and undue advantages (concealing the romantic relationship between one of its attorneys and the presiding judge).  Instead, Jackson Walker contends the claim should be dismissed because, in Jackson Walker's opinion, Plaintiff is not any worse off that he would have been if Jackson Walker had not been unjustly enriched.  Jackson Walker's subjective and disputed views of the harm to Plaintiff or the value of its own work are not grounds for dismissal on the pleadings.

In an analogous case involving trade secret appropriation, a Texas federal court noted that the mere fact the defendant would have realized profits even without the having appropriated trade secrets to improve its manufacturing, did not compel the conclusion that it was not unjustly enriched by the appropriation. *AMS Sensors USA Inc. v. Renesas Elecs. Am. Inc.,* No. 4:08-CV-00451, 2021 WL

12234726, at *7 (E.D. Tex. Dec. 14, 2021). The amount of profits attributable to the misappropriation was for the fact-finder to decide. *Id.* The same is true here. Whether Jackson Walker would have been hired by Kirkland without the Jones-Freeman connection and whether Jackson Walker would have been awarded the same amount of fees by a disinterested judge are issues for a jury to decide. But it is, at least, plausible that Jackson Walker profited unduly by concealing and capitalizing upon the Jones-Freeman relationship. Accordingly, Jackson Walker's motion to dismiss Plaintiff's unjust enrichment claim should be denied.

### d.   Plaintiff has properly stated a claim for respondeat superior.

Jackson Walker contends that Plaintiff's respondeat superior claim is dependent on the existence of an underlying tort. Because Plaintiff has adequately stated tort claims against Jackson Walker and the other Defendants, the Respondeat Superior claim also survives.

### e.   Plaintiff withdraws his claim against Jackson Walker for professional negligence.

Plaintiff interprets Jackson Walker's argument that it does not owe a duty to a non-client "for the negligent performance of legal service" as a challenge to the adequacy of Plaintiff's professional negligence claim.[60]   Plaintiff hereby withdraws his claim against Jackson Walker for professional negligence.

---

[60]  Non-clients are permitted to bring claims against attorneys under various theories asserted by Plaintiff in this case. *E.g. McCamish v. F.E. Appling Interests,* 991 S.W.2d 787, 792 (Tex.1999) (noting that liability under the tort of negligent misrepresentation is based on the breach of the duty created by awareness of a non-client's reliance on the misrepresentation rather than the duty owed to a client); *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.App.-Houston [1st Dist.] 1985, no writ)(attorney can be held liable to third parties for fraudulent or malicious acts). Jackson Walker has not identified any particular claim that fails on the pleading for lack of an alleged duty.

**C.** **If Jackson Walker's Response Is Not Denied In Its Entirety, Plaintiff Should Be Permitted To File An Amended Complaint.**

Should this Court find Plaintiff's Complaint deficient in any regard, Plaintiff respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995).  Giving Plaintiff leave to amend his Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiff brings.

**IV.**
**CONCLUSION AND PRAYER**

Plaintiff Michael Van Deelen respectfully requests that the Court deny Defendant Jackson Walker LLP's Motion to Dismiss. Plaintiff further requests that the Court grant him all other and further relief to which he is justly entitled.

**Dated May 8, 2024**

Respectfully submitted,

By:   /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
802 Carancahua Street, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

*Attorneys for Plaintiff Michael Van Deelen*

## Certificate of Service

I hereby certify that on May 8, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

/s/ Mikell A. West

38