IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Michael D. Van Deelen,<br><br>                         Plaintiff,<br><br>v.<br><br>David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP,<br><br>                         Defendants. | Civil Action File<br>No. 4:23-cv-3729<br><br><br><br>Jury Trial Demanded |

To the Honorable Alia Moses,
Chief United States District Judge:

### PLAINTIFF'S RESPONSE TO DEFENDANTS KIRKLAND & ELLIS LLP AND KIRKLAND & ELLIS INTERNATIONAL LLP'S MOTION TO DISMISS

Plaintiff Michael D. Van Deelen files this response to Defendants Kirkland & Ellis LLP and

Kirkland & Ellis International LLP's ("Kirkland") Motion to Dismiss pursuant to Fed. R. Civ. P.

12(b)(6) and would respectfully show the Court the following:

## INTRODUCTION

Between 2018 and 2022, Kirkland & Ellis collected over $162 million in attorneys' fees awarded by former Judge David Jones, in cases where Jones' live-in girlfriend, Elizabeth Freeman, and the firm she worked for, Jackson Walker, were on board as local counsel.[1] Kirkland followed this recipe – hiring Freeman and her firm as local counsel and filing cases in the district where her intimate partner presided – for at least 42 different mega-bankruptcy cases filed after 2019. [2]

Yet, in seeking to dismiss Plaintiff's claims against it, Kirkland protests that it was a mere "bystander" and had "nothing to do with" the self-dealing of Freeman, Jackson Walker, and Judge Jones. The facts alleged in Plaintiff's First Amended Complaint ("FAC") demonstrate, or at the very least allow for the reasonable inference of, the opposite. Facts indicating Kirkland had knowledge of the Jones-Freeman relationship include: (1) Kirkland's filings with Jackson Walker and in the Southern District of Texas increased dramatically immediately after Judge Jones girlfriend became available for hire, (2) the most credible financial periodical in the world reported being told by "multiple Kirkland partners" that they were "long aware of the romantic relationship between the pair," (3) as one of the world's leading law firms that claims to have run a conflict check on bankruptcy judges, Kirkland was likely to have found the same information regarding Jones and Freeman's cohabitation as Plaintiff uncovered as a pro se litigant, and (4) Kirkland itself admits that it was informed by Jackson Walker of the romantic relationship  in March 2021.

Kirkland seems to have been of the belief that it had no obligation to reveal a conflict that so inured to its benefit, a position it maintains in its motion to dismiss. Yet, the Bankruptcy Code and Rules, as well as at least one published opinion, support Plaintiff's argument that Kirkland, as lead

---

[1] First Amended Complaint ("FAC" or "Complaint") ¶ 95.
[2] FAC ¶ 29.

counsel for debtor-in-possession, was required to disclose its knowledge of the intimate, live-in relationship between its local counsel and the judge. *See In re CF Holding Corp.*, 164 B.R. 799, 807–08 (D. Conn. Feb. 17, 1994) ("[t]he general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession"); *see also* 11 U.S.C. § 327(a); Fed. R. Bankr. P. 2014. By failing to do so, and by applications for appointment, declarations of disinterestedness, proposed orders, motions for attorneys' fees, and motions for final decrees, *all e-filed through a Jackson Walker attorney*,[3] Kirkland necessarily represented to the Court and those interested in the bankruptcy that neither Kirkland, nor its local counsel filing on its behalf, had any impermissible "connection" with the judge as contemplated under Rule 5002(b).

Kirkland's misrepresentations were not mere clerical errors. They were not even mere violations of bankruptcy rules. They were a corruption of the bankruptcy process that resulted in direct harm to everyone involved in that process – including Plaintiff. These fraudulent representations are actionable under RICO, as well as through common law claims such as fraud and unjust enrichment, among others. *See Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (denying Rule 12(b)(6) motion to dismiss against RICO/bankruptcy fraud allegation concerning fraudulent disclosure statement, noting that "[l]itigants in all of our courts are entitled to expect that rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require").

Kirkland has not shown itself entitled to dismissal on the pleadings.  Kirkland's threshold arguments are meritless. First, Plaintiff satisfied the particularity and plausibility of standard of Rule

---

[3] *In re McDermott International*, 20-30336, Dkt. 28, Dkt. 990 & Ex. A, Dkt. 1126.

9(b). Second, Plaintiff has standing. He is not asserting claims held by McDermott or its shareholders, but rather his own, individualized claims. Third, Kirkland's failure to disclose the Jones-Freeman relationship proximately caused Plaintiff's injuries. Fourth, Kirland made materially false statements. Likewise, each of Kirkland's grounds for dismissal as to Plaintiff's individual claims fail. Plaintiff satisfied each requirement of its RICO claims. Plaintiff's state law claims are not barred by the judicial-proceedings privilege or attorney immunity, nor are they preempted by federal law. All of Plaintiff's alleged causes of action exist. And none are barred by limitations.  Kirkland's motion to dismiss should be denied.

## Factual Background

Plaintiff sought to participate in the McDermott bankruptcy as a party with a financial interest in the proceedings. Judge Jones overruled or ignored all of Plaintiff's concerns, and confirmed the bankruptcy Plan crafted by his cohorts at Jackson Walker and Kirkland.[4] Not satisfied with Judge Jones having overruled Plaintiff's objections and rendering Plaintiff's investment worthless, Kirkland sought sanctions against Plaintiff, leveling accusations by Kirkland attorneys concerning statements allegedly made during and following the March 12, 2020 hearing.[5] Plaintiff vehemently denies making the statements attributed to him by Kirkland and its attorneys and, in fact, recounts that he was instead insulted, threatened, and intimidated by the Kirkland attorney in that interaction.[6]

Predictably, Judge Jones came to the rescue of his cadre, being the "friend" to Kirkland they claimed him to be. Judge Jones, recognizing Plaintiff's participation in the McDermott proceedings as an impediment to his fee-funneling machine, even went so far as to enter an order claiming Plaintiff

---

[4] *See In re McDermott International*, 20-30336, Dkt. 684.
[5] Dkt. 46, at 17.
[6] *See In re McDermott International*, 20-30336, Dkt. 701, p. 1, 5-8.

to be a risk to courthouse safety (the basis for which, ironically, being a statement made by Plaintiff expressing concern over his own safety based on the hostility of Kirkland attorneys) and barring him from the federal courthouse without a security escort.[7]

### A. After being shunned from Jones' courtroom, Plaintiff filed suit in State Court.

Faced with the reality that Judge Jones and his cadre were unassailably entrenched against him in the bankruptcy court, Plaintiff, consistent and compliant with Jones' order, sought redress elsewhere and filed suit against three former executives of McDermott in state court in June 2020. Kirkland and Jackson Walker promptly removed that lawsuit to Judge Jones' court—a clear ploy seeking their home field advantage.[8]

Due to Judge Jones irrational and overly harsh treatment of Plaintiff previously, Plaintiff sought to have Jones recused from this removed proceeding.[9] During the prosecution of the case against the McDermott executives, Plaintiff received an anonymous letter describing an intimate relationship between Judge Jones and then-Jackson Walker partner Elizabeth Freeman. Plaintiff amended his pending motion to recuse Judge Jones to assert the newly discovered relationship as additional grounds for recusal. Based in part on Jones' implicit denial of the relationship—now unequivocally known to be false—the motion to recuse was denied.[10] Judge Jones subsequently dismissed Plaintiff's adversary proceeding, denying other relief that had been requested by Plaintiff as well.[11] Plaintiff's subsequent appeal to the District Court was denied.[12] That decision is pending before the Fifth Circuit.[13]

---

[7] *See In re McDermott International*, 20-30336, Dkt. 719.
[8] *Van Deelen v. Dickson, et al.*, Case 20-03309, Dkt. 1.
[9] *Dickson,* 20-03309, Dkt. 4.
[10] *Dickson*, 20-03309, Dkt. 42
[11] *Dickson*, 20-03309, Dkt. 81.
[12] *Dickson*, 20-03309, Dkt. 102.
[13] *Van Deelen v. Dickson, et al.*, 23-20436 (5th Cir.).

Throughout the entire process, Judge Jones maintained his denial and Jackson Walker, Kirkland, and Freeman kept mum regarding the information they had concerning the relationship.[14] According to Jackson Walker, it learned about the intimate relationship between Freeman and Jones on March 6, 2021, and disclosed it to Kirkland.  Kirkland does not dispute this fact. It claims Freeman lied to the firms about the ongoing nature of the relationship, and that they believed her even though the firms supposedly just discovered that she had been hiding the relationship from them.

Regardless, Kirkland attorney Anna Rottman appeared for the March 10, 2021, hearing and asserted objections to the admissibility of the letter without mentioning that it knew that Van Deelen was correct, and that Jones and Freeman had been in an intimate relationship while Jones presided over cases in which he awarded Jones, Jackson Walker, and Kirkland millions in attorneys' fees. All the while, Jackson Walker, Kirkland, and Freeman continued to rack up attorneys' fees in numerous bankruptcies presided over by Freeman's paramour, Judge Jones. Kirkland's ongoing malfeasance and cover-up included failing at every opportunity to disclose the relationship—whether believed to be in the past or otherwise—in numerous statements of disinterestedness, in response to the motion to recuse Jones, and in response to the subsequent appeals.

## B. Plaintiff files suit against Judge Jones directly.

Not until he filed his Original Complaint in this action against Judge Jones on October 4, 2023, was he taken seriously.[15] Judge Jones finally admitted to the press his intimate relationship and that he had shared a home with her for years.[16] On November 3, 2023, the U.S. Trustee began filing motions under Fed. R. Civ. P. 60(b)(6) requesting that orders awarding fees and expenses be set aside.[17]

---

[14] *See e.g., 4E Brands*, 22-50009, Dkt. 517, at 3.
[15] Dkt. 1.
[16] Alexander Gladstone & Andrew Scurria, Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer, Wall Street Journal Pro, (Oct. 7, 2023).
[17] *See 4E Brands*, 22-50009, Dkt. 517

As the U.S. Trustee observed, "all orders awarding fees and expenses are tainted" in light of "Judge Jones' failure to recuse himself from presiding over cases where Jackson Walker was counsel for the debtor-in-possession while Freeman was both living with him and a partner at Jackson Walker[.]"[18]

After months of exhaustive research and in response to a motion to dismiss filed by former Judge Jones, Plaintiff filed his First Amended Complaint adding Jones' cohorts, including Freeman, Jackson Walker and Kirkland, as defendants. Jackson Walker's motion to dismiss followed.[19]

### C. Investigations by the U.S. Trustee are ongoing—Kirkland has not been exonerated.

Kirkland mistakes the U.S. Trustee's silence so far on Kirkland's involvement in the Jones' scandal as exoneration.[20] On information and belief, the U.S. Trustee's investigation is ongoing. And it has never indicated Kirkland is outside the realm of its investigation. Nor is the Fifth Circuit's written order identifying a complaint against Judge Jones under the Rules for Judicial Conduct an exculpation as to Kirkland. The Fifth Circuit addressed Jones' conduct alone. That the U.S. Trustee has not yet attempted to claw back fees Jones awarded to Kirkland does not mean that it will not ultimately do so, nor that Plaintiff's claims against Kirkland are in any way deficient.

### Legal Standard

A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face under *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014) (internal citations omitted). A claim has

---

[18] *Id.* at Dkt. 517, at 3.
[19] Dkt. 46.
[20] Motion at 7.

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Escobar v. City of Del Rio*, No. DR-20-CV-0031, 2023 U.S. Dist. LEXIS 176745, *6 (W.D. Tex. Oct. 2, 2023. The complaint must be liberally construed in the plaintiff's favor, all reasonable inferences must be drawn in favor of the plaintiff's claims, and the factual allegations of the complaint must be taken as true. *See Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). Beyond the ordinary pleading standard, a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations about conditions of the mind, such as defendant's knowledge of the truth and intent to deceive, however, may be pleaded generally." *Rodriguez-Meza v. Venegas*, No. DR-17-CV-54, 2018 U.S. Dist. LEXIS 226744, *50 (W.D. Tex. Sept. 27, 2018) (Moses, J.) (quoting *Tel—Tel-Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir.1992) (citing Fed. R. Civ. P. 9(b)). The Court's task is to determine whether a plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Id.* (citing *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

## ARGUMENT

### I. Plaintiff Sufficiently Alleged Core Factual Allegations.

Plaintiff adequately stated a claim under Rule 12(b)(6) and alleged fraud with sufficient particularity under Rule 9(b). Plaintiff's FAC supplies the who, what, when, and where of Kirkland's fraud in failing to disclose the Jones-Freeman relationship.

For example, the FAC alleges that on February 19, 2020, "[e]ven though its partners long knew of the Jones-Freeman relationship, Kirkland … partner Sussberg submitted a declaration of disinterestedness that did not identify the relationship between Judge Jones and its local counsel's

partner Freeman, even while discussing a conflicts search involving bankruptcy judges."[21] It also described that Jackson Walker partner, Matthew Cavenaugh, e-filed the declaration for Kirkland in Jones' court.[22] As described *supra*, Kirkland had a duty to disclose the Jones-Freeman relationship, but fraudulently omitted any discussion of it from the declaration.

Additionally, Plaintiff alleged Kirkland's fraud in filing its August 14, 2020 application for fees, through Cavenaugh, for $8.2 million in Jones' court, with "Kirkland & Ellis partner Sussberg submit[ing] a supporting declaration without disclosing the Jones-Freeman relationship…."[23] Implicit in the filing of Kirkland's motion by a Jackson Walker partner is the representation by Kirkland that there was no improper connection between its local counsel and the judge in violation of the Bankruptcy Code and Rules. Kirkland had a duty to disclose the Jones-Freeman relationship in connection with the filing of this motion, but fraudulently omitted any discussion of it from the declaration. It also fraudulently failed to amend its declaration of disinterestedness.

As yet another example, Plaintiff alleged that on September 16, 2022, Cavenaugh, on behalf of Jackson Walker and Kirkland filed a motion for final decree to close the bankruptcy.[24] "Despite admitted knowledge of the intimate relationship between Judge Jones … [and] Freeman, at this time and in violation of its continuing responsibility to supplement its declaration of disinterestedness if new information or relationships are uncovered, … Kirkland & Ellis [failed to] disclose[] the relationship…."[25] Again, Kirkland had a duty to disclose the Jones-Freeman relationship, but

---

[21] FAC ¶ 106(b) (citing *McDermott*, 20-30336, Dkt. 28); *see also* FAC ¶ 119. Paragraph 106(b) of the First Amended Complaint errantly cites paragraph 28 instead of 26.
[22] *Id.*
[23] *Id.* ¶ 106(e) (citing *McDermott*, 20-30336, Dkt. 990 & Ex. A); *see also* FAC ¶ 120–21.
[24] *Id.* ¶ 106(g) (citing *McDermott*, 20-30336, Dkt. 1126); *see also* FAC ¶ 120–21.
[25] *Id.*

fraudulently omitted any discussion of it in the motion, and failed to amend its declaration of disinterestedness.

### A.     Plaintiff's First Amended Complaint plausibly alleges factual allegations that satisfy Rule 9(b).

Kirkland's motion challenges Plaintiff's factual allegations that it knew of the relationship between Jones and Freeman before March 2021.[26] From the outset, Kirkland misstates Plaintiff's burden in pleading knowledge, leaving off the second sentence of Rule 9(b), which in full provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice intent, *knowledge*, and other conditions of a person's mind *may be alleged generally*.

Fed. R. Civ. P. 9(b) (emphasis added). Thus, while fraud allegations must be stated with particularity under Rule 9(b), allegations about conditions of mind, including knowledge, "may be alleged generally." Fed. R. Civ. P. 9(b); *Rodriguez-Meza*, No. DR-17-CV-54, 2018 U.S. Dist. LEXIS 226744, *50 (Moses, J.); *see also Umbrella Inv. Group v. Wolters Kluwer Fin. Servs.*, 972 F.3d 710, 713 (5th Cir. 2020). "If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief." *Umbrella Inv. Group*, 972 F.3d at 713. Still, fraud allegations must not be based on speculation and conclusory allegations. *Id.*

In *Rodriguez-Meza*, your Honor dismissed a RICO conspiracy claim where the complaint generically alleged the defendants knew of and agreed to the conspiracy without alleging *any* specific facts of their knowledge. 2021 U.S. Dist. LEXIS 260678, at *66; *see also Umbrella Inv. Group*, 972 F.3d at 713 (simply pleading that the defendant knew a home was in a flood zone, without any facts explaining how he knew, was insufficient to show fraud).  That is not the case here. Here, Plaintiff's

---

[26] Motion to Dismiss at 7. Plaintiff's claims survive even if none of Kirkland's partners knew of the intimate relationship before March 2021 because the firm continued filing and even argued against Van Deelen's motion to recuse without ever disclosing the relationship. And it failed to amend its own misleading declarations of disinterestedness.

Complaint provides considerable facts, both circumstantial and direct, that Kirkland knew of the intimate relationship between Jones and Freeman, yet never disclosed it.

Kirkland also misapprehends a "core premise of Plaintiff's claims against Kirkland[.]"[27] Plaintiff indeed alleges that Kirkland knew of the Jones-Freeman relationship before Plaintiff's recusal filing in March 2021. But even if Jackson Walker did not know of the relationship until Jackson Walker disclosed it to the firm in March 2021, a disclosure which Kirkland does not deny, as the FAC alleges, Kirkland still committed fraud in failing to amend what it then knew to be fraudulent disclosures.[28]

1. **Plaintiff plausibly alleged Kirkland's knowledge of the Jones-Freeman relationship, circumstantially, by describing the timing of Freeman joining Jackson Walker and the ensuing filing of mega-bankruptcies in Houston by Jackson Walker and Kirkland.**

Kirkland is gravely mistaken that Van Deelen's knowledge allegations depend on a "single public news article."[29] Plaintiff's allegations draw from myriad sources and his counsels' own research, leading to the reasonable conclusion that Kirkland knew of the relationship. First, the FAC describes the uncanny correlation between Freeman joining Jackson Walker and the two law firms pairing to file dozens of mega-bankruptcies in the Southern District of Texas, where the cases would either be heard by Jones or his mentor and close friend Judge Marvin Isgur.[30]

Jackson Walker hired Freeman in 2018.[31] As described in the FAC, "[w]ith Freeman's arrival, Jackson Walker began securing appointments in myriad large Chapter 11 cases, serving as local counsel with Kirkland & Ellis as lead."[32]  By 2019, Jackson Walker ascended to "the leading counsel firm for

---

[27] Motion to Dismiss at 7.
[28] *See* FAC at 50–51, 106(e), 110(e).
[29] Motion to Dismiss at 1.
[30] FAC at ¶¶ 20, 28–31.
[31] FAC at ¶ 85 & n.35.
[32] FAC at ¶ 28.

corporate debtors filing for bankruptcy in Houston."[33] And by 2022 and in 2023, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[34] "Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm."[35] Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com."[36]

Kirkland is simply wrong that the timing "does not fit with [plaintiff's] theory of conspiracy[.]"[37] It claims it worked with Jackson Walker before Freeman joined the firm, citing one case from 2016, *In re Anglo Suisse Offshore Pipeline Partners*.[38] But Kirkland was appointed on behalf of debtor and debtor in possession as "special corporate and compensation counsel only,"[39] while Jackson Walker represented an entity with a claim *against* the debtor.[40] Even if the firms had a few overlapping cases before Freeman, the timing of the mass filings is unmistakable—they followed Freeman's arrival.

Kirkland did not file *any* mega-bankruptcy cases with Jackson Walker as local counsel from 2006 to 2016. Yet, as Plaintiff counsels' research revealed, after Freeman joined Jackson Walker in

---

[33] FAC at ¶ 29.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Motion to Dismiss at 10.
[38] *Id.* (citing *In Re: Anglo Suisse Offshore Pipeline Partners LLC, Delaware EPL of Texas LLC, et al.*; Bk. No. 16-31928 (S.D. Tex.)).
[39] *Anglo Suisse*, No. 16-31928, Dkt. 410 (Jun. 7, 2016).
[40] *Anglo Suisse*, No. 16-31928, Dkt. 2120 (Aug. 1, 2017).

2018, Kirkland selected Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.[41]

As further described in the FAC, this was done despite Kirkland having a local office of its own in Houston.[42] The dramatic shift and proliferation of Kirkland's mega-bankruptcy filings in the Southern District of Texas (with Jackson Walker and Freeman on board as local counsel) suggests Kirkland was aware of the Jones-Freeman relationship and agreed to partake in the opportunity it presented for financial and reputational benefits.

That Kirkland continued working with Freeman after she left Jackson Walker in December 2022, following the second purported "revelation" of her intimate live-in relationship with Jones, does nothing to dispute Kirkland's knowledge or undermine Plaintiff's conspiracy allegations. Even if it did, Plaintiff alleged that the separation of Freeman from the firm was superficial.[43] Freeman's website does not identify a physical address, and Freeman continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker lawyers, and even held mediations there through at least March 2023.[44]

Of course, since at least 2011, Jackson Walker also had an attorney, Matthew Cavenaugh,[45] who clerked for bankruptcy judges in the Southern District, including Judge Marvin Isgur.[46] But the onslaught of Kirkland/Jackson Walker joint filings followed Freeman's 2018 arrival, not Cavenaugh's in 2011.

---

[41] *See* FAC ¶ 29.
[42] FAC at ¶ 30.
[43] FAC at ¶ 78.
[44] *Id.*
[45] *See* Column, Affairs of State, A Pathway to State Bankruptcy, 30-8 ABIJ 12 (Oct. 2011) (authored by Marvin E. Spouse, III and Matthew Cavenaugh; listing Matthew Cavenaugh as "an associate at Jackson Walker LLP in Houston").
[46] *See* https://www.jw.com/people/matthew-cavenaugh/ (noting Cavenaugh clerked for two years for Bankruptcy Judges Wesley W. Steen and Marvin Isgur)

Kirkland downplays the role that Freeman played in the appointments and collecting more than $100 million in fees from Jones while working with Jackson Walker, but Freeman was not just one of any number of attorneys at Jackson Walker working on the mega-bankruptcy cases. She was an essential part of mega-bankruptcy filings in Houston, which Kirkland would have known well.

As Jackson Walker recently acknowledged in response to a motion filed by the U.S. Trustee:

> Elizabeth enjoyed quick and substantial success at Jackson Walker. **From the time of her arrival through today [August 2021], Houston has become a favored venue for complex debtor cases**, in the energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. **Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel**, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but **Elizabeth's leadership and contribution were recognized as integral**.[47]

Additionally, the pairing of Kirkland and Jackson Walker in Houston-filed mega-bankruptcy cases was so pervasive that it caught the attention of the media, both before and after revelation of the intimate Jones-Freeman relationship.[48]

---

[47] *In re Westmoreland Coal Co.*, No. 18-35672, Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, Dkt. 3362-1 (Nov. 13, 2023) (letter attached to response authored by Jackson Walker partner Pat Cowlishaw) (emphasis added).

[48] *See e.g.,* Kirkland's Bankruptcy Partnership With Jackson Walker Could be a Sign of Things to Come, The American Lawyer, Law.com (Aug. 25, 2020) (noting Matthew Cavenaugh signing Kirkland & Ellis' petition for a debtor "wasn't an unusual arrangement for Kirland and Jackson Walker, which are listed as debtor's counsel on a number of recently high-profile bankruptcies…. The relationship between the world's only $4 billion firm and Jackson Walker, a member of the Am Law 200 and the largest Texas-only firm, shows that two firms can build a working relationship that goes beyond a traditional referral arrangement"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Continue Debtor-Side Dominance in Strong Q3 for Big Bankruptcy (Oct. 25, 2023), accessible at https://www.law.com/americanlawyer/2023/10/25/kirkland-ellis-jackson-walker-continue-debtor-side-dominance-in-strong-q3-for-big-bankruptcy/ (last visited on Mar. 11, 2024) (In 2023, "Jackson Walker bankruptcy partner Matthew Cavenaugh was the most-retained local counsel through Q3 in the country, while Kirkland's Joshua Sussberg led lead counsel retentions"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as Restructuring Market Heats Up (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtorside-bankruptcy-as-restructuring-market-heats-up/ (last visited Mar. 11, 2024) ("Kirkland & Ellis [led] large debtor-side representations … by

     **2.**     **Allegations that Kirkland worked with Jones to make Houston the epicenter for mega-bankruptcies provide additional circumstantial facts of Kirkland's knowledge.**

As outlined in the FAC, Houston did not become the venue for Kirkland mega bankruptcy filings by accident.[49] Judge Jones worked with the firm to make Houston a bankruptcy hub. One way Jones did so was by establishing a "complex advisory" committee of bankruptcy attorneys to establish it as such.[50] He did so on June 29, 2018—little over a month after Freeman joined Jackson Walker.[51] Notably, even though not admitted to practice in Texas, the head of Kirkland & Ellis LLP's bankruptcy practice was on the committee.[52]

Kirkland worked directly with Jones, Freeman, and Jackson Walker for years and was awarded $162 million for work in Jones' courtroom.[53] In the context of unprecedented joint filings between the firms, this relationship allows further inference Kirkland knew of the special connection between Freeman and the judge.

     **3.**     **The leading and most credible financial periodical in the world supports Plaintiff's allegations.**

There is also direct evidence of Kirkland's knowledge, something rare for RICO/fraud cases. Indeed, "fraud or fraudulent intent is seldom proven by categorical facts. Rather, such a finding

---

a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm"); Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024) ("Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com").

[49] FAC ¶ 20–21.

[50] FAC ¶ 20.

[51] General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018).

[52] *Id.* (citing General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee).

[53] Although not a basis for the filing of the FAC, Plaintiffs' counsel would note they received an anonymous letter referencing purported meetings between Judge Jones and Kirkland at their offices during which Kirkland was advised that they would be happy with the results if they filed in the Southern District of Texas.[53] In context, these allegations suggest the need for discovery to uncover the extent of the relationship between Kirkland and Judge Jones.

14

ordinarily arises as an inference." *Aetna Casualty & Surety Co. v. Gaines*, 713 F.2d 1187, 1192 (5th Cir. 1983); *see also United States v. Johnson*, 825 Fed. Appx. 156, 166 (5th Cir. 2020) (a defendant's guilty knowledge … may be inferred from 'the development and collocation of circumstances") (quotation omitted).

On November 21, 2023, the Financial Times reported:

> Jackson Walker said it had informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones. Multiple Kirkland partners told the FT that they were **long aware of the romantic relationship between the pair**, though did not know how advanced it was. The Kirkland lawyers assumed the pair had received clearance from a superior court or decided that it was not Kirkland's place to intervene in Jackson's retention applications.[54]

The logical inference from this article is Kirkland knew of the intimate nature of the Jones-Freeman relationship before March 2021. Immediately following the sentence, ""Jackson Walker said it had informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones[,]" the author stated that Kirkland partners told him "that they were long aware of the romantic relationship[.]"[55] While poking holes in Plaintiff's reading, Kirkland offers no contrary interpretation.[56]

Kirkland discredits the source, but the Financial Times is regarded "as the most credible publication in reporting financial and economic issues" in the world, ahead of both The Economist and the Wall Street Journal.[57] Kirkland provides no meaningful basis to disregard this admission by its partners. They do not allege that the partners would not have been in a position to have this

---

[54] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058ccce434 (last visited Mar. 11, 2024).
[55] *Id.*
[56] *See also* Plaintiff's Response to Motion for Sanctions.
[57] According to the Global Capital Markets Survey, which measures readership habits among senior financial decision makers in the world's largest financial institutions, the Financial Times is considered the most important business read, reaching 36% of the sample population, 11% more than the Wall Street Journal, its main rival. https://web.archive.org/web/20131015044909/http://www.gcmsurvey.com/Media.html (-> urldefense.proofpoint.com). The "Financial Times is one of the world's leading finance news websites, globally recognized for its authority." https://www.alphagamma.eu/finance/best-finance-websites/.

knowledge. They do not contend they were misquoted or that their partners did not understand the basic legal concept that their words might be taken as an admission.

While taking issue with the article (but not denying that its partners knew about the relationship), Kirkland simultaneously relies on it as an excuse for non-disclosure—that the partners supposedly "did not know how advanced" the Freeman-Jones relationship was and "assumed the pair had received clearance from a superior court or decided that it was not Kirland's place to intervene in Jackson's retention applications."

However, as lead counsel, Kirkland could not assume propriety by the judge where it had actual knowledge of impropriety—i.e., it knew its local counsel was in an intimate relationship with Jones requiring disqualification. This is not a case where a defendant would be speculating about judicial impropriety. The Fifth Circuit already found probable cause that Jones committed judicial misconduct. Kirkland knew about it, but failed to disclose the connection and allowed its misleading declaration and motions as well as Jackson Walker's to remain uncorrected.

Kirkland is mistaken that as counsel for debtor in possession, it need not disclose a conflict it knows about involving its local counsel and the judge. A similar position was rejected in *CF Holding*, where counsel for the debtor in possession knew about a conflict involving financial advisors appointed by the court. 164 B.R. at 807–08. Like this case, counsel argued that there is "no … authority which imposes upon an attorney a duty to disclose the potential conflicts of interest of another professional…." *Id.* at 807. The court disagreed. "The rule of law of no responsibility proposed by [the law firm] … cannot be consonant with the fiduciary responsibilities imposed on bankruptcy estate professionals." *Id.* at 808. Instead, "[t]he general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a

16

prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession." *Id.*

The court also noted that the Bankruptcy Code provides that when a trustee replaces the debtor, § 326(d) requires the court to deny compensation to the trustee if it "failed to make diligent inquiry into facts" or "with knowledge of such facts, employed a professional person" that is not a disinterested person, or represents an interest adverse to the interest of the estate. *Id.* (citing 11 U.S.C. § 326(d), 327, 328(c)). "It could have been reasonably anticipated that in light of the duties of an attorney for a debtor in possession, that no lower standard would be applied to such attorney with actual knowledge of another professional's loss of disinterestedness." *Id.*

As described *supra*, the Financial Times article is just one of many bases of Plaintiff's allegation that Kirkland knew of the Jones-Freeman relationship. Cases indicating that "unverified hearsay" alone will not support Plaintiff's claims are thus inapposite.[58] Again, Rule 9(b) provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added).

To the extent the party admissions of Kirkland's partners in the Financial Times can be considered hearsay even though they go to the defendant's knowledge, the statements are not rumor, but direct party admissions. Further, the article identifies the source as Kirkland partners. Thus, the source is not entirely anonymous, and discovery will allow for inquiry into the source's reliability.[59]

---

[58] *See* Motion to Dismiss at 8 (citing *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir. 1989); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *15 (S.D. Tex. Sept. 29, 2010)).

[59] *Compare with Walker*, 517 F. Supp. 2d at 807 (where the source of the article was anonymous, there "appear[ed] to be no way to conduct a reasonable inquiry into the source's reliability").

### 4. Kirkland's admission that it knew of the relationship no later than March 2021 supports Plaintiff's allegations.

Even setting aside the foregoing evidence, Kirkland does not dispute that it knew about the Jones-Freeman intimate relationship at least by March 2021, once Jackson Walker disclosed it to the firm. Yet Kirkland did nothing to apprise anyone in the bankruptcy proceedings about it.

The fact that Plaintiff has chosen not to believe the defendants' mixed account of who knew what and when does nothing to negate Kirkland's knowledge. Jackson Walker's general counsel claims that in March 2021, "Freeman confirmed that there had been a romantic relationship."[60] Jackson Walker "disclosed these matters to our Kirkland co-counsel, who disclosed them to the client."[61]

Both Jackson Walker and Kirkland argue Freeman lied to them by claiming there was no current relationship, and none was expected going forward; they "each own their own homes; they do not and have not lived together."[62] But both firms indisputably knew in March 2021 that Freeman had been in an intimate relationship with Judge Jones. Whether they took Freeman at her word on whether it was ongoing, despite her failure to come clean beforehand, is beside the point. They knew about a prior conflict affecting countless interested parties in myriad mega-bankruptcies yet took no measures to disclose the relationship to those parties. In fact, during a March 10, 2021 hearing on a motion to recuse, rather than disclose what the firm knew, Kirkland argued to exclude the anonymous letter received by Van Deelen exposing the Jones-Freeman relationship.[63]

"The Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict

---

[60] *In re 4E Brands Northamerica LLC*, No. 22-50009, Dkt. 526-1 at 3.
[61] *Id.* at 3–4.
[62] *Id.* at 4.
[63] *Van Deelen v. Dickson, et al.*, 20-03309, Dkt 41, 46.

arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (S.D. Tex. June 8, 2010) (citation omitted). Kirkland failed that duty.

Of course, the law firms had every reason to question Freeman's supposed response since Freeman had purportedly been hiding the relationship from them for years. Meanwhile, a simple check of real estate records at the time would have exposed it as false.

Further, Jackson Walker's story (and Kirkland's adoption of it) is inconsistent with Freeman's. According to the U.S. Trustee, in a day-long interview with Freeman, she "stated that her cohabitation with Judge Jones was continuous except during the COVID-19 school closures when she lived with her children at another location. *But she admitted that she never moved out of the home she shared and owned with Judge Jones.*"[64] Additionally, according to the U.S. Trustee, Freeman's lawyer urged Jackson Walker, in the spring of 2022, to disclose the relationship in all past cases and in cases going forward.[65]

The firms are not absolved because they claim they were told the relationship had ended and would not continue. Kirkland's reliance on Jackson Walker's/Freeman's assurance that the relationship had ended and that it would not continue is an implicit admission that it was improper in the first place. And even accepting that Kirkland believed the assurances of the partner who supposedly had been lying to Jackson Walker, it still had a duty to correct previously filed declarations of disinterestedness and to otherwise advise the court and interested parties of the conflict. The firms deliberately chose not to do so and withheld information during a motion to recuse Judge Jones. Thus, even if all other direct and circumstantial evidence including the admissions by Kirland & Ellis' partners in the Financial Times are wrong, there are still sufficient facts to support Plaintiff's allegations of knowledge by Kirkland.

---

[64] *In re 4E Brands Northamerica LLC*, No. 22-500009, Dkt. 645 at 10 n.6 (Feb. 29, 2024) (emphasis added).
[65] *Id.* at 13.

Ultimately, if the statements of Kirkland's co-conspirators relating to knowledge have any persuasive value at all in Rule 12(b)(6) motion to dismiss, at most they "suggest that the defendants' culpability [is] an issue of fact, to be established through litigation[.]" *Smith*, 960 F.2d at 446. Smith v. Our Lady of the Lake Hosp., 960 F.2d 439, 446 (5th Cir. 1992).

### 5. That the Jones-Freeman relationship was easily discoverable by public information supports that Kirkland knew of the Jones-Freeman relationship.

In June 2017, Jones and Freeman executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[66] The Harris County Clerk recorded this document in its public records on June 26, 2017. Jones purchased another million-dollar home that Freeman apparently lived in beforehand, and in which Freeman's parents purportedly moved into.[67] All that information was public record at the time Kirkland admits it knew of the relationship in March 2021.

The pro se litigant who Kirkland so readily disparage was able to find these public documents. Yet, one of the largest law firms in the world either intentionally or recklessly ignored this information, choosing to continue profiting by more than one hundred million dollars. These facts further demonstrate the plausibility of Plaintiff's allegations about Kirkland's knowledge.

### B. Plaintiff's pro se addendum and Original Complaint are not inconsistent with nor do they undermine plausibility of the allegations in his First Amended Complaint.

Kirkland misleads the Court in claiming other inferences are "equally plausible" because Plaintiff posed questions about the significance of revelations from the anonymous letter in his pro se addendum to the motion to recuse. Kirkland makes the same argument with respect to Plaintiff's pro se Original Complaint, which named only Judge Jones and asserted only a *Bivens* claim.

---

[66] FAC ¶ 24.
[67] FAC ¶¶ 25–26.

Kirkland maintains that the various assertions in these documents render the claims in the FAC implausible. What Kirkland misses is that Plaintiff did not have the same facts before him when he filed these documents. He filed his pro se addendum and Original Complaint before Jones admitted to the romantic relationship, before Jackson Walker admitted it knew of the romantic relationship by March 2021, before Jackson Walker indicated it disclosed the romantic relationship to Kirkland in March 2021, and before the Fifth Circuit found probable cause that Jones committed misconduct. His questions and statements in these documents were decidedly *not* an interpretation of the "same facts." Regardless, neither document purports to exculpate Kirkland or speaks to whether the firm knew of the intimate relationship.

Equally meritless is Kirkland's contention that Plaintiff made "contradictory and inconsistent allegations against Kirkland[.]"[68] Though Kirkland speaks in the plural, it identifies a single allegation it finds inconsistent. According to Kirkland, Plaintiff's allegation that it worked with Jackson Walker as co-counsel to exploit the Jones-Freeman conduit is inconsistent with the fact that the firms worked together *before* Freeman joined the firm.

That purported "fact" does not represent an internal inconsistency in Plaintiff's allegations. Regardless, as noted *supra*, Kirkland is simply wrong that the timing "does not fit with [plaintiff's] theory of conspiracy[.]"[69] The one case Kirkland cites shows it represented the debtor while Jackson Walker represented a creditor.[70] That does not follow the lead counsel/local counsel pattern alleged and does not show the firms worked together. Even if the firms had a few overlapping cases before Freeman, the timing of the mass filings followed Freeman's arrival.

---

[68] Motion to Dismiss at 9–10.
[69] Motion to Dismiss at 10.
[70] *See Anglo Suisse*, No. 16-31928, Dkt. 410, Dkt. 2120.

**C. There are no innocent and obvious alternative explanations for Plaintiff's allegations against Kirkland.**

Kirkland broadly states that "every fact alleged" by Plaintiff, apart from the conspiracy allegations, is consistent with a "legal and obvious alternative explanation."[71] That assertion is patently false, as confirmed by Kirkland identifying just two factual allegations. Neither alternative explanation allows for dismissal of Plaintiff's claim.

First, Kirkland references paragraph 91 of the FAC, which alleges the RICO Enterprise sought to secure favorable bankruptcy appointments that were "influenced by intimate relationships and self-interest and not based exclusively on the merits.[72] Kirkland responds that its appointment was due to its status as a dominant US debtor law firm and not because of "intimate relationships and self-interest."[73] Here, Kirkland distorts the pleadings. Plaintiff alleged that the appointments "were influenced by intimate relationships and self-interest and not based exclusively on the merits."[74] That Kirkland may have been appointed, in part, because of its status is not inconsistent with Plaintiff's allegation. Further, even if Kirkland were appointed solely because of its place in bankruptcy practice, it nevertheless participated in a pattern of racketeering activity, breached its fiduciary duty, committed fraud, among other things, by filing dishonest declarations and motions without disclosing the Jones-Freeman relationship, recouping millions and fees and perpetuating the Enterprise. Viewing the pleadings in a light most favorable to Plaintiff under Rule 12(b)(6), Plaintiff plausibly alleged that appointments by Judge Jones were influenced by intimate relationships and not based exclusively on the merits.

---

[71] Motion to Dismiss at 10 (citing *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F.App'x 892, 898 (5th Cir. 2020)).
[72] FAC ¶ 91.
[73] Motion to Dismiss at 10.
[74] FAC ¶ 91.

Kirkland also disputes that it used Jackson Walker as local counsel because of Freeman and her connection to Jones. Kirkland responds that it used Jackson Walker as local counsel because of its local knowledge and because it had partners who had clerked for Jones.[75] This ignores that the filings with Kirkland as lead and Jackson Walker as local counsel only started in mass after Freeman arrived at the firm, and not when Jackson Walker partner Cavenaugh, who clerked for Judge Isgur, joined the firm. It also ignores that Kirkland had a large reorganization section in Houston and also had local knowledge. These reasonable inferences support the allegations. Plaintiff plausibly alleged the key facts necessary for his claims under Rules 9(b) and 12(b)(6).

## II.     The Shareholder Standing Rule is Inapplicable.

Kirkland's assertion of the shareholder standing rule relies on a fundamental misapprehension of Plaintiff's claims. Plaintiff is not appealing the confirmation order. He alleges injuries from the Jones-Freeman-Jackson & Walker-Kirkland & Ellis Enterprise that are personal and distinct from those suffered by McDermott or other shareholders.

"In general, the prudential shareholder-standing doctrine prohibits a shareholder from suing to enforce the rights of the corporation." *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528, 539 (E.D. Tex. Feb. 23, 2022) (citation omitted). It is an exception to the shareholder standing rule, however, that "a shareholder with a direct, personal interest in a cause of action [may] bring suit *even if the corporation's rights are also implicated.*" *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990) (emphasis added).

Plaintiff has uniquely personal claims from which he suffered direct harm. *See Galindo v. City of Del Rio*, 2021 U.S. LEXIS 126766, *9 (W.D. Tex. Mar. 26, 2021) (citations omitted) ("individuals

---

[75] Motion to Dismiss at 10.

have no standing to secure a personal recovery for an alleged wrong done to the business entity, unless they are able to show some direct harm to themselves"). For example, Plaintiff was the victim of a RICO predicate act of obstruction of justice (18 U.S.C. § 1503) by Kirkland and the other defendants, when Kirkland advocated against Plaintiff's motion to recuse Judge Jones at a time when it admittedly knew of the romantic relationship between Jones and Freeman.[76] As a result, Plaintiff incurred costs to prove a fact that Kirkland and the other members of the Enterprise concealed. Had Kirkland and the other defendants properly revealed this information from the outset, there would have been no need for Plaintiff to have incurred the expense of seeking to recuse Judge Jones or filing the appeal from the denial of the recusal. Plaintiff incurred these expenses directly; they are not derivative of any injury to McDermott.

Plaintiff also sustained mental anguish damages from the harsh treatment he received in court, including Jones ordering that he could not enter the federal courthouse except with the escort of a court security officer.[77] And he suffered mental anguish after learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for protesting creditors and investors.

Thus, Plaintiff's mental anguish and emotional distress allegations are not incidental to the bankruptcy itself or the loss of shares. Rather, they are the result of the defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost.

---

[76] *See* FAC ¶¶100, 101(d) (alleging violation of 18 U.S.C. § 1503, obstruction of justice in connection with improperly influencing officers of the bankruptcy court by "knowingly and deliberately concealed, or failed to properly reveal, the existence of an intimate, personal relationship between Freeman and Judge Jone").

[77] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (citations omitted).

In *Galindo*, a plaintiff who owned an LLC attempted to sue in his own name under a contract with the city. 2021 U.S. Dist. LEXIS 126766, at *10. Since the contract was with the LLC, and not the individual plaintiff, suit could not be maintained on his behalf. Because any economic harm to Galindo was "merely a consequence of an injury suffered by" the LLC, the shareholder standing rule applied. *Id.* at *10.

In contrast, Plaintiff seeks relief for his own injuries distinct from the bankruptcy and any claims held by McDermott. To be sure, Plaintiff never "explicitly acknowledged" his injuries "are entirely based on alleged harm suffered by McDermott" as Kirland falsely claims.[78] His mental anguish damages belong to him, not the bankruptcy estate. So do his damages for expenses arguing for recusal. And so do his claims under *Bivens*. To the extent there is overlap with damages to the estate, as a shareholder with a direct, personal interest in a claim, Plaintiff has a right to suit even if the rights of the corporation are implicated. *Franchise Tax*, 493 U.S. at 336.

This case is also distinguishable from *Libert Sackets Harbor LLC v. Vill. of Sackets Harbor*, because the plaintiff did "not allege an injury independent of [the corporation's] injuries[.]" 776 Fed. Appx. 1, 3 (2d Cir. 2019). Plaintiff's mental anguish damages and damages for legal expenses from the motion to recuse are independent of injuries to McDermott and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms, and the shareholder standing rule is therefore inapplicable"). Further, Plaintiff's claims did not arise until after commencement of the bankruptcy, and do not belong to the estate. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in

---

[78] Motion to Dismiss at 19.

property as of the commencement of the case"); *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994) (if "a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action"). The shareholder standing rule is inapplicable.[79]

### III.   Plaintiff Plausibly Pleaded Proximate Causation as to Kirkland.

Kirkland's proximate cause argument misconstrues Plaintiff's claims and disregards the burdens and required inferences under Rule 12b(6). It also ignores that the "proximate cause analysis differs somewhat" when a defendant in a RICO case "target[s] the federal judiciary." *Alix*, 23 F.4th at 204. Courts must "focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes." *Id.* "Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require." *Id.* When, as here, a defendant has corrupted the bankruptcy disclosure process, "then the unsuccessful participants in that process are directly harmed." *Id.*

Plaintiff plausibly alleged Defendant's conduct corrupted the appointments of counsel, awards of attorneys' fees, and Plaintiff's motion to recuse by denying other bankruptcy participants information that would have caused them to scrutinize, reveal and object to Defendants' involvement, all of which proximately caused Plaintiff's injuries. Where the goal was to deny Plaintiff (and other shareholders and creditors) a level playing field in proceedings before Judge Jones, Defendants ought not be heard to disavow that Plaintiff was injured in the very way they intended: by making futile expenditures, incurring unnecessary expenses, and suffering adverse rulings.

---

[79] In a footnote, Kirkland indicates "[t]he Debtors released the claims under their Plaint that Plaintiff purports to assert here." Motion at 13 n.7. This provision does not apply to claims arising from actual fraud, willful misconduct, or gross negligence, (i.e., this case), which explains why Kirkland relegated the argument to a footnote. *See* Jackson Walker Motion to Dismiss at ¶ 58.

The direct injuries alleged by Plaintiff – including mental anguish, having to incur expenses, and nominal damages – resulted from Defendants' keeping all bankruptcy participants other than themselves in the dark about the influential Freeman-Jones relationship. Consequently, the causation element of RICO standing has been plausibly alleged.

Plaintiff's damages are not based *solely* on the diminished bankruptcy estate. Plaintiff suffered as a direct and inevitable result of Defendants' fraud, including expense incurred in litigating the motion to recuse and nominal damages. Plaintiff also alleged facts plausibly demonstrating some injury to his due process rights and the bankruptcy process in which he took part that. These injuries, at a minimum, entitle him to nominal damages. *See Potomac Electric Power Company v. Electric Motor and Supply, Inc.,* 262 F.3d 260, 265–66 (4th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts").

It is at least plausible that these expenditures and expenses form a recoverable pecuniary loss that is not derivative of any injury sustained by the McDermott bankruptcy estate. *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. LLP,* 985 F.2d 102 (2d Cir.1993) (plaintiff horse breeders, who purchased equipment and trained horses – under assurances from defendant that horse racing would continue after defendant purchased facility, had standing to bring a RICO action to recover financial expenditures and expenses).

Kirkland's independent and superseding cause argument[80] further misconstrues Plaintiff's allegations. The FAC does not allege Kirkland is responsible for the loss of Plaintiff's entire

---

[80] Motion to Dismiss at 16–17.

investment. Plaintiff's lawsuit attributing responsibility to McDermott executives for this loss is inapposite to his claims here.

Kirkland's "temporal requirement" argument gets it nowhere.[81] Kirkland asks for the inference that it first learned of the Jones-Freeman relationship in March 2021 (without disavowing that any of its partners knew beforehand). But Plaintiff's well-pleaded factual allegations indicate Kirkland partners were long aware of the relationship dating back to the onslaught of Jackson Walker-Kirkland & Ellis mega-bankruptcy filings. As alleged, Kirkland knew of the intimate, live-in nature of the Jones-Freeman relationship by February 2020, when it submitted its application for appointment as lead counsel and e-filed a declaration of disinterestedness through one of Jackson Walker's partners. And it knew of the relationship when it filed its motion for attorneys' fees and motion for final decree in August 2020 and September 2022, respectively. And it knew of the relationship when it opposed Plaintiff's motion to recuse on March 10, 2021. Thus, Plaintiff's causation allegations are entirely consistent with the maxim that cause must precede effect. Further, even if this Court were to make inferences in Kirkland's favor (it should not in this Rule 12(b)(6) motion), Kirkland had a continuing duty to amend its disclosure after March 2021 and to correct the misimpression left by these motions. See *Beirne, Maynard & Parson, L.L.P.*, 2010 U.S. Dist. LEXIS 146549, at *25-26.

Kirkland's arguments that Plaintiff effectively "admits" that only fees awarded to Jackson Walker were improper and that Plaintiff never questions that Kirkland earned its fees border on frivolous.[82] By repeatedly describing the award of attorneys' fees to Kirkland as "improper" and procured through fraud, Plaintiff plainly alleged that Defendants, and Kirkland specifically, did not

---

[81] Motion to Dismiss at 14.
[82] Motion to Dismiss at 14–15.

earn and are not entitled to any attorneys' fees.[83] In fact, Kirkland cites to a paragraph where Plaintiff described the attorneys' fees to Kirkland as "improperly awarded"[84] and then falsely asserts that Plaintiff's discussion of improper fees to Jackson Walker constitutes an admission that *only* the fees awarded to Jackson Walker were improper.[85] Kirkland's self-serving interpretation, indulging unreasonable inferences in its own favor, is not permitted under Rule 12(b)(6).

Kirkland posits that the estate would likely have had to pay fees to another firm regardless.[86] However, it can be reasonably inferred that Judge Jones would be more generous to his live-in girlfriend and her consortium than a firm outside the conspiracy. Regardless, Plaintiff alleged breach of fiduciary duty and has sought disgorgement, which does not require proof that Kirkland "caused actual damage — proof of a breach is enough[.]" *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex. App. 1997), *aff'd as modified*, 997 S.W.2d 229, 42 Tex. Sup. Ct. J. 932 (Tex. 1999); *see Jacobs v. Tapscott*, 2006 U.S. Dist. LEXIS 68619, *23 (N.D. Tex. Sept. 25, 2006) ("in the context of the attorney-client relationship, proof of damages is not required with a request for fee forfeiture in a breach of duty claim").

*Alix* speaks to the direct harm sustained by Plaintiff in connection with the fraudulent fees awarded through Defendants' targeting of the integrity of federal judiciary. There is nothing attenuated about this harm—Jackson Walker and the remaining defendants corrupted the bankruptcy system, and unsuccessful participants in that process like Plaintiff are "directly harmed." *Alix*, 23 F.th at 204

---

[83] *See e.g.,* FAC ¶ 91 ("Kirkland … secur[ed] favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded to … Kirkland & Ellis as attorneys' fees - that were influenced by intimate relationships and self-interest and not based exclusively on the merits"); ¶ 92 (Defendants carried out the Enterprise through improper and unlawful acts including … securing large awards of attorneys' fees that directly benefitted Jackson Walker, Freeman, and Kirkland & Ellis indirectly benefitted Judge Jones himself without disclosing the Jones-Freeman relationship"); ¶ 124 (discussing "the improper … award of attorneys' fees to … Kirkland & Ellis"); ¶ 158 (seeking "disgorgement of profits and forfeiture of fees" for Kirkland's breach of fiduciary duty).
[84] Motion to Dismiss at 14–15 (citing ¶ 96).
[85] Motion to Dismiss at 15 (citing ¶ 203–04).
[86] Motion to Dismiss at 15 (citing *L. Funder, L.L.C. v. Munoz*, 924 F.3d 753, 761 (5th Cir. 2019)).

(2d Cir. 2022). Kirkland wrongfully assumes Plaintiff's cannot be redressed by disgorged fees because of the limits of the plan. The U.S. Trustee disagrees that forfeiture must be allocated as Jackson Walker insists and has proposed alternative mechanisms for distributing disgorged fees.[87] Plaintiff plausibly alleged causation.

## IV.     Plaintiff Alleged Materially False Statements by Kirkland.

Plaintiff's FAC asserts that Kirkland, as lead counsel for debtor-in-possession, had an affirmative duty to disclose to the court and those interested in the bankruptcy that its local counsel, which e-filed documents on Kirkland's behalf, had a connection with Judge Jones requiring disqualification.[88] As Plaintiff observed, Kirkland should have done so in its application for appointment, declaration of disinterestedness, motion for attorneys' fees, and motion for final decree, all of which were e-filed by Jackson Walker.[89] But it did not. It never disclosed the relationship despite its admitted knowledge of it by March 2021.

### A. Plaintiff identified Kirkland's fraudulent omissions with particularity.

Kirkland believes the allegations of fraud fail because Plaintiff cannot "quote or even specifically identify a single actual statement by Kirkland[.]"[90] That is precisely the point. Kirkland never disclosed.

A plaintiff may rely on nondisclosure as "proof of a scheme to defraud … where the defendant is under a duty to disclose." *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016). As described *supra*, the Bankruptcy Code and Rules, not to mention the rules of ethics, placed a duty on Kirkland

---

[87] *In re 4E Brands Northamerica, LLC*, Case No. 22-50009, United States Bankruptcy Court, Southern District of Texas, Docket No. 600 at 4-5 (Jan. 9, 2024) (footnote omitted).
[88] FAC ¶ 50, 60, 61, 80–82, 92, 95.
[89] FAC ¶ 106.
[90] Motion to Dismiss at 18.

to disclose the connection between the judge and its local counsel responsible for all of Kirkland's filings.

When a plaintiff asserts fraud by omission, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). Plaintiff did so. He described the facts omitted—that Kirkland's local counsel had a connection with Judge Jones that required disqualification. He described the places where the omissions should have appeared—Kirkland's application for appointment, the declaration of disinterestedness, the motion for attorneys' fees, and in the motion for final decree, all of which were filed by Jackson Walker.[91] Additionally, the omission should have been made in filings correcting its local counsels' declaration of disinterestedness and in a filing ahead of the hearing on the motion to recuse Judge Jones.[92]

Plaintiff also outlined how failing to disclose the connection made these documents misleading. In particular, Plaintiff and other participants reasonably expected that there was no undisclosed disqualifying connection between the judge and counsel for debtor-in possession.[93]

**B.    The FAC referenced the bankruptcy rules to describe Kirkland's duty to disclose; It alleged fraud in Kirkland concealing material facts about the Jones-Freeman relationship.**

Since fraud by omission requires a duty to disclose, Plaintiff's First Amended Complaint referred to bankruptcy rules requiring disclosure of the connection between Jones and Kirkland's local

---

[91] FAC ¶ 106.
[92] FAC ¶ 60–61, 71.
[93] FAC ¶¶ 114, 119–20, 135–36.

counsel who e-filed on its behalf.[94] Plaintiff made clear he was not asserting mere rule or ethical violations.[95]

Indeed, Kirkland repeatedly failed to disclose a disqualifying connection between the judge and its local counsel, even while referencing a search for conflicts involving bankruptcy judges.[96] Kirkland went so far as to argue against Plaintiff's recusal motion that raised the Jones-Freeman relationship without ever mentioning that it knew the allegations were correct.[97] Meanwhile, Kirkland collected $8.2 million in the McDermott bankruptcy and more than $160 million with "in cases in which Jackson Walker served as co-counsel before Judge Jones."[98]

Kirkland simply misstates the record when it claims Plaintiff "explicitly" "alleges Kirkland's statements were fraudulent *because* Kirkland supposedly violated Rule 2014."[99] None of the paragraphs support that assertion and it is belied by the whole of Plaintiff's complaint.[100] Plaintiff references the rules and other authorities to show Kirkland's duty to disclose, not to establish fraud.

The *Alix v. McKinsey & Co.* opinion on remand does not support Kirkland's position as it says.[101] 2023 U.S. Dist. LEXIS 145872, *5 (S.D.N.Y. Aug. 18, 2023). Kirkland clings to a hyper-

---

[94] FAC ¶¶ 36–37 ("Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest"); ¶ 42 ("Cavenaugh also e-filed the application for Kirkland & Ellis to serve as lead counsel for the debtors and debtors in possession, including a declaration of disinterestedness completed by Kirkland & Ellis partner Joshua Sussberg that did not identify the relationship between Judge Jones and Freeman"); ¶ 50 ("'The Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises.' *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)). The McDermott bankruptcy remained pending for another year and eight months after Jackson Walker's claimed discovery of the relationship, yet neither it, nor Freeman, nor Kirkland & Ellis ever disclosed the intimate relationship."); ¶ 80 (discussing rules requiring Judge Jones' disqualification);

[95] FAC ¶ 5.

[96] *McDermott*, 20-30336, Dkt. 428-1 ¶ 26.

[97] FAC ¶¶ 60, 71.

[98] FAC ¶ 95.

[99] Motion to Dismiss at 19.

[100] *See* FAC ¶¶ 105(g); 137–38.

[101] Motion to Dismiss at 19.

technical interpretation of Rule 2014 to say it need not disclose a disqualifying connection between its local counsel who filed Kirkland's papers and the judge. However, *Alix* reminded that this rule "requires bankruptcy professionals to disclose all connections, even those that would not necessarily be disqualifying[,]" and further that "[t]he scope of disclosure is much broader than the question of disqualification." 2023 U.S. Dist. LEXIS 145872, at *5 (quotation omitted). Even if Kirkland is correct and it was not required to disclose under Rule 2014 (it was, and was also required to disclose under other rules),[102] *Alix* recognizes that "the relevant question is whether [the defendant] knowingly concealed connections[,]" and "not whether [the defendant] complied with Rule 2014." *Id.* at *54 n. 13. As described in the FAC, Kirkland knowingly concealed the Jones-Freeman connection repeatedly—not only in its declaration of disinterestedness, but also in its failure to amend its declaration, its motions, and its argument on the motion to recuse. Further, it knowingly concealed the Jones-Freeman relationship by failing to correct its local counsel's misleading filings as well.

Kirkland may have "erred on the side of disclosure" with respect to its own attorneys, but it covered up the elephant in the room by omitting the disqualifying connection it knew about between its local counsel responsible for Kirkland filings and Judge Jones. Whether this is a violation of Rule 2014, Rule 5002(b), or the rules of ethics (it is), it is clearly a fraudulent omission.

That Plaintiff cannot show, without discovery, Joshua Sussberg's individual knowledge when he signed his declaration of disinterestedness is not controlling. Plaintiff plausibly alleged facts that Kirkland partners did know, and their "[k]nowledge and actions are said to be imputed to all members of [the] firm." *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009). Even if Kirkland's version of events is accepted as true, it learned of

---

[102] *See* Fed. R. Bankr. P. 5002(b) & Notes of the Advisory Committee on Rules (1985 Amendment); 11 U.S.C. § 1327; *CF Holding*, 164 B.R. at 807–08; *see also* 28 U.S.C. § 455(a).

romantic relationship between Jones and Freeman no later than March 2021, yet failed to amend Sussberg's declaration for more than a year and a half before moving to close the bankruptcy in September 2022.

### C.     Case law and other authority supports Plaintiff's argument that, as lead counsel for debtor-in-possession, Kirkland was required to disclose.

Kirkland claims "[t]he caselaw" interpreting Rule 2014 supports its reading that it need not disclose the disqualifying connection between its local counsel that filed its pleadings and the judge. By "caselaw" Kirkland means a single, unpublished, four-paragraph, nonprecedential memorandum opinion that cannot be cited in the circuit where it was authored and has never been cited by any court. *See Eon*, 1995 U.S. App. LEXIS 17140, at *3. Meanwhile, Kirkland ignores *CF Holding*, which rejects its position. 164 B.R. at 807–08 (reading the disclosure requirement broadly to require counsel to disclose a connection as to another professional). Kirkland also ignores Bankruptcy Rule 5002(b) and the Notes of the Advisory Committee that indicate disclosure of a disqualifying connection with the judge must be made.

That professionals are required to submit separate disclosures says nothing about lead debtor-in-possession's counsel's obligations to disclose a known connection involving its local counsel.[103] Plaintiff is not attempting to hold Kirkland to "a higher disclosure standard than the federal judiciary." Jones was required to disclose his relationship with Freeman. Kirkland was too.

### D.     Kirkland's fraudulent omissions were material.

It defies logic that Kirkland's failure to disclose an intimate, live-in relationship between the judge presiding over the bankruptcy and its local counsel could be considered anything less than material. Yet, Kirkland makes the argument. According to Kirkland, its disclosure of the "Freeman-

---

[103] *See* Motion to Dismiss at 22.

Jones relationship could not have impacted the outcome of "the transaction in question"]"[104] Wrong. Had Kirkland disclosed, Judge Jones would have been disqualified. *See* 28 U.S.C. § 455(a) ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned); Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, at 3. Plaintiff would not have incurred expenses in moving for, arguing, and appealing a recusal motion and would not have suffered mental anguish in connection with the proceedings before Jones. Jackson Walker would not have been appointed or awarded fees. And based on Kirkland's pattern of deceit in concealing the relationship in *McDermott* and numerous other bankruptcies, Kirkland likely would not have been appointed or recovered fees. Kirkland's non-disclosure undoubtedly impacted the outcome.

Kirkland did not make a typo on a tax return or forget to list a prior residence. It concealed an intimate, live-in relationship between its longtime local counsel and the judge who presided over countless bankruptcies involving the two firms. Any reasonable person would find this fraudulent omission material.

## V.    Kirkland's "Independent" Grounds for Dismissal Should Each Be Denied.

### A.    Plaintiff has properly alleged RICO claims.

#### 1.    Plaintiff has standing to bring a RICO claim.

The Fifth Circuit has held that RICO "does not impose much of a standing requirement[.]" *Whalen v. Carter,* 954 F.2d 1087, 1090 (5th Cir.1992). The RICO standing provision simply provides that "[a]ny person ***injured in his business or property*** by reason of a violation of section 1962 of this chapter may sue therefor…" 18 U.S.C. § 1964(c) (emphasis added). A plaintiff must plead (1)

---

[104] *See* Motion to Dismiss at 22–23.

damage to business or property and (2) that the damage was caused by the defendants' RICO violation. *Potomac,* 262 F.3d at 264. Plaintiff has alleged facts satisfying each element.

> ### a. Plaintiff has plausibly alleged an injury to his business or property by reason of Defendants' RICO violations.

Kirkland misinterprets Plaintiff's property damages as *solely* a diminished bankruptcy estate from which Plaintiff hopes to be paid. But Plaintiff also suffered injuries that were a direct and inevitable result of Defendants' RICO violations. Plaintiff's damages include, but are not limited to: (1) the costs and expenses incurred in filing motions and attending hearings in a bankruptcy proceeding that he did not realize were futile because the playing field was tilted against him from the outset, (2) the costs and expenses incurred in presenting a motion to recuse based on the Jones-Freeman relationship (and appealing the denial of that motion) when such motion would not have been necessary had Defendants been truthful about the existence of that relationship, (3) the loss of his due process rights and harm to the bankruptcy process in which he took part which, at a minimum, entitled Plaintiff to nominal damages, and (4) mental anguish damages based on the harsh treatment he received from the judge and attorneys who were at risk of being exposed by him, and based on the distress of learning the bankruptcy process he invested substantial time, effort and resources participating in was tainted by corruption. None of these injuries to Plaintiff are derivative of the injury to the bankruptcy estate.

Under the fraudulent belief that all participants in the McDermott bankruptcy were on level footing as disinterested parties, Plaintiff incurred legal expenses and travel expenses to object to the proposed confirmation plan in the McDermott bankruptcy[105] and to participate in several hearings before Judge Jones; never suspecting the futility of advocating against a plan prepared and advocated

---

[105] FAC ¶ 58.

for by the judge's girlfriend and associated firms. It is at least plausible that such expenditures and expenses, made by Plaintiff in reliance on false representations by Enterprise members that they were disinterested and conflict-free parties, form a recoverable economic loss not derivative of any injury sustained by the McDermott bankruptcy estate. *See Standardbred Owners,* 985 F.2d 102.

Due to Defendant's predicate acts of fraud, Plaintiff was forced to incur expenses in an additional context: *i.e.,* to prove a fact – that Judge Jones was involved in an intimate relationship with one of the debtor's attorneys that was kept secret by the Enterprise members – that warranted Judge Jones' recusal and/or the other Defendants' removal as counsel. Had Kirkland properly revealed this information from the outset, there would have been no need for Plaintiff to have incurred the expense of seeking to recuse Judge Jones. These expenses were incurred directly by Plaintiff and are not derivative of any injury to McDermott.

The injury visited upon the bankruptcy system and process by Defendants' acts also represents a direct harm to Plaintiff. "If [a Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are directly harmed." *Alix v. McKinsey & Co.,* 23 F.4th 196, 204 (2d Cir. 2022)(emphasis added).. Defendants' wrongful acts corrupted the bankruptcy process and inflicted direct harm on Plaintiff as a participant in that bankruptcy process.

Plaintiff also alleged facts plausibly demonstrating an injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle Plaintiff to nominal damages. *Potomac,* 262 F.3d at 265-266; *Rosario,* 962 F.2d at 1021. A finding of nominal damages would also trigger an award of attorney's fees. Thus, if some damage has been alleged to exist, even if it is not readily quantifiable, Plaintiff has asserted a plausible claim for nominal damages that is adequate to establish standing. *See Potomac,* 262 F.3d at 8.

Moreover, it cannot be said at this early stage in proceedings that Plaintiff has no financial interest in the fees that were wrongfully paid to Kirkland, Jackson Walker and Freeman and may be ordered disgorged. Kirkland assumes any disgorged fees will be returned to the estate and distributed according to the current Plan. This is not an established fact. The U.S. Trustee has theorized that disgorged legal fees could be distributed under various means including a race-to-the-courthouse, modifications to the Plan, or a conversion to a Chapter 7 bankruptcy proceeding. *See In re 4E Brands Northamerica, LLC,* Case No, 22-5009, Dkt No. 600 at 4-5 (Bkr.Ct. S.D.Tex, Jan 9 2024) (discussing potential distributions of fees and recognizing that the confirmed Plan could be modified to allow for distribution of disgorged fees). It seems only just that fees wrongly obtained by Defendants through a scheme that targeted and damaged the bankruptcy system as a whole and *all* those who participated in it, would, once recovered, be shared in some portion by all the deceived participants in the bankruptcy case. Thus, it cannot be said at this early stage of proceedings, and under the exceptional facts of this case, that Plaintiff's interest in the attorneys' fees wrongly paid to Defendants is wholly insufficient to afford a plausible basis for standing at this preliminary stage in proceedings.

That some direct injuries may be difficult to quantify does not preclude a showing of causation sufficient to confer standing. The Fifth Circuit has emphasized that it is the fact of injury, and not the amount, which must be established for standing purposes:

> The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount…. Even if the precise amount of its injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred…

*Potomac,* 262 F.3d at 265. Plaintiff plausibly alleged an injury to his business or property.

> **b.    Plaintiff plausibly alleged that his injuries were caused by Defendants' RICO violations.**

The second standing question – whether Plaintiff's injury was proximately caused by Kirkland's conduct – can also be answered in the affirmative. The purpose of the Enterprise was to secure reputational and financial benefits for the Enterprise members based on the relationship between Freeman and Jones. Defendants furthered the goals of the Enterprise by denying other bankruptcy participants information that would have caused them to scrutinize, reveal and object to Defendants' involvement. Where the goal was to prevent Plaintiff (and other shareholders and creditors) from being on an equal playing field in proceedings before Judge Jones, Defendants ought not be heard to disavow that Plaintiff was injured in the very way they intended: by making futile expenditures, incurring unnecessary legal fees, and suffering adverse rulings.

Simply stated, the injuries to Plaintiff resulted from Defendants' scheme to keep all bankruptcy participants other than the Enterprise members in the dark about the influential Freeman-Jones relationship. Consequently, the causation element of RICO standing has been plausibly alleged.

> **2.    Plaintiff has properly alleged a RICO Enterprise.**

Kirkland erroneously argues that Plaintiff has failed to allege a RICO enterprise because he did not allege (1) the Enterprise's separate existence, (2) the Enterprise's decision-making structure, and that the Enterprise functions as a continuing unit.  Kirkland is wrong on all counts.

> **a.    Plaintiff has alleged a purpose for the Enterprise that is separate from its predicate acts of racketeering.**

Contrary to Kirkland's suggestion, Plaintiff alleged that the Enterprise had a purpose separate and apart from its predicate acts. That is, the Enterprise undertook both legitimate actions (providing legal services related to bankruptcy proceedings) and actions which constituted a pattern of racketeering (e.g., bankruptcy fraud, mail and wire fraud, honest services fraud). Thus, the purpose of

the Enterprise was not merely to commit frauds; but rather, to boost the professional reputations and

financial opportunities of the Enterprise members through means that sometimes included fraudulent

acts of racketeering. This was plainly alleged in Plaintiff's First Amended Complaint:

> [T]he purpose of the Jones-Freeman-Jackson Walker-Kirkland & Ellis
> Enterprise was to utilize the intimate relationship between Judge Jones
> and Freeman to enrich Freeman, Jackson Walker, and Kirkland & Ellis
> directly and increase their prestige and influence in bankruptcy
> practice, while also enriching Judge Jones directly or indirectly, all
> without disclosing the intimate relationship to affected parties and
> creditors.[106]
>
> The Enterprise functioned to achieve the shared goal of enriching
> Defendants (both directly through approval of improper attorneys' fee
> awards and indirectly by elevating the status and demand for
> Defendants Jackson Walker, Freeman, and Kirkland & Ellis as
> bankruptcy attorneys) by securing favorable bankruptcy court
> appointments and rulings – including millions of dollars, if not tens of
> millions of dollars, awarded to Jackson Walker and Kirkland & Ellis as
> attorneys' fees - that were influenced by intimate relationships and self-
> interest and not based exclusively on the merits.[107]

Cases where an alleged enterprise was found not to have an existence separate from its

racketeering activities typically involve members who came together solely for a particular (often one-

time) criminal activity. *See, e.g., Fernandez-Lopez v. Hernandez*, 2020 WL 9396487 (W.D. Tex. Nov. 20,

2020) (no shared purpose found where enterprise members came together only for one-time act of

visa fraud). That is not the case here. Defendants are alleged to have been a working consortium of

legal professionals who conspired to boost their reputational status and income through *both* legitimate

legal work and illegal acts, including RICO predicate acts. This scheme, consisting of both legitimate

and illegal acts, was repeated in numerous mega-bankruptcy cases filed in the Southern District of

Texas over a period of years. Thus, the Enterprise did not exist merely to perform RICO predicate

---

[106] FAC ¶87.
[107] FAC ¶ 91.

acts; the Enterprise existed to further the professional and financial benefits to its members and used RICO predicate acts to improperly inflate those benefits. The facts alleged in this case are akin to those in *Diamond Consortium, inc. v. Manookian,* where enterprise members were alleged to have provided representation and acted as co-counsel in other litigations. 2017 WL 1495091 (E.D. Tex. April 26, 2017). The court in *Diamond Consortium* found that an association-in-fact enterprise had been adequately pled to have an existence separate and apart from the pattern of racketeering. *Id.* The same finding should follow here.

> **b.    Plaintiff has adequately alleged the Enterprise's structure by alleging the purpose, relationships and continuing acts of the Enterprise.**

The Supreme Court addressed the decision-making structure of a RICO Enterprise in *Boyle v. U.S.,* 556 U.S. 938 (2009). In *Boyle,* a RICO defendant argued that the district court erred by failing to instruct the jury that it was required to find that the enterprise had an ascertainable structural hierarchy distinct from the charged predicate acts. In rejecting such a requirement, the Supreme Court recognized that "[a]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. *Such a group need __not__ have a hierarchical structure or a 'chain of command'* ... members of the group need not have fixed roles." *Id.* at 948 (emphasis added); *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 368 (3d Cir. 2010) (recognizing that, after *Boyle,* an association-in-fact enterprise need have no formal hierarchy or means for decision-making).

In rejecting a strict requirement of a structural hierarchy distinct from the charged predicate acts, the Supreme Court made several comments that are instructive here. First, the structure of an association-in-fact enterprise may be established by looking for three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associated to pursue the enterprise's purpose. *Boyle,* 556 U.S. at 946. Second, the Supreme Court

directly addressed whether an enterprise's structure must go beyond that inherent in the pattern of racketeering activity in which it engages. *Id.* at 2240. The Court noted that, to the extent phrasing requiring a structure/purpose beyond the racketeering activity, "is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct." *Id.* at 947, 2245. This unremarkable holding merely affirms that the existence of an enterprise is an element distinct from the enterprise's pattern of racketeering activity. *Id.* at 947, 2245. On the other hand, the Supreme Court cautioned, "if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect." *Id.* To the contrary the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce." *Id.*

Post *Boyle,* recent Texas federal court cases have moved away from any strict requirement of a hierarchical structure or decision-making process. *Dell Inc. v. Mishra*, No. A-16-CV-00641-SS, 2018 WL 3717119, at *5 (W.D. Tex. Aug. 3, 2018) (an association-in-fact enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods−by majority vote, consensus, a show of strength, *etc*[.]").  Cases that continue to reference an hierarchical or decision-making structure tend to do so as one means of demonstrating that the RICO Enterprise functions as a separate and continuing unit. But there are other means of doing so as well. Proof of an association-in-fact's separate existence may be derived from evidence of rules, routines or processes through which the entity maintains its continuing operations and seeks to conceal its illegal acts. *Boyle v. United States*, 556 U.S. 938 (June 8, 2009) (Stevens, dissent). Proof of an enterprise's separate existence may also be established through evidence that it provides goods or services to third parties, as such an undertaking will require organizational elements more comprehensive than those necessary to perform a pattern of predicate acts. *Id.*

Here, Plaintiff has alleged that, for at least six years, the members of the Enterprise worked together to provide legitimate legal services to third parties while also increasing the demand, prestige and compensation received for those services through acts of racketeering.[108] Kirkland's routinely involved Jackson Walker and Freeman in bankruptcy cases filed in the Southern District of Texas; involving at least 46 large cases since 2018.[109] Enterprise members followed a uniform course of conduct for concealing the Jones-Freeman relationship in legal filings, legal proceedings and even when directly raised by Plaintiff in court.[110] These facts plausibly allege the existence of a continuing Enterprise.

### c. Plaintiff properly alleged that Kirkland operated and managed the Enterprise.

A defendant participates in the conduct of an enterprise's affairs when it has some part in directing those affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). It is not necessary that the defendant have "primary" responsibility for the enterprise's affairs. *Id.* Nor is RICO liability limited to those with a formal position in the enterprise. *Id.* It is only necessary that the defendant have taken some part in directing the enterprise's affairs. *Id.*

Here, Kirkland made numerous decisions exhibiting participation in the Enterprise including: deciding to file cases in the Southern District of Texas, associating Jackson Walker and Freeman on cases filed before Judge Jones,[111] deciding to file or allow to be filed pleadings and documents in Judge Jones's court without disclosing the relationship between Judge Jones and Freeman,[112] and assuming the Jones-Freeman relationship had been cleared by a superior court without investigating or

---

[108] FAC ¶¶ 39-45, 92.(j), 155(g), 218, 220(f).
[109] FAC ¶ 29.
[110] FAC ¶¶ 2, 34, 39-47, 49, 59-61.
[111] FAC ¶ 29.
[112] FAC ¶ 121.

intervening.[113] These acts, taken in furtherance of the Enterprise's purpose, extend far beyond the minimal involvement of defendants that courts have deemed insufficient to meet the participation test. *Compare with Reves v. Ernst & Young*, 507 U.S. 170, 176 (1993) (participation requirement not met where accountant defendants only reviewed a series of completed transactions and certified the records as fairly portraying the defendants' financial status).

### 3.    Plaintiff has adequately alleged predicate acts.

Plaintiff properly alleged that Defendants filed numerous misleading and dishonest federal court papers without disclosing the Jones- Freeman relationship, amounting to bankruptcy fraud, honest services fraud, mail and wire fraud, and obstruction of justice—each actionable under RICO.[114]

Violations of 18 U.S.C. § 1503 Obstruction of Justice:   18 U.S.C. § 1503(a) prohibits any person from influencing, obstructing, impeding, or intimidating any officer of a federal court in the discharge of his duty. Kirkland takes an inappropriately narrow view of Plaintiff's obstruction of justice allegations: saying Plaintiff includes no "specific instance" of Kirkland influencing Jones.[115] While it may be true that, lacking discovery at this early stage of proceedings, Plaintiff cannot speak to the details of specific communications between Kirkland and Jones, Plaintiff can (and does) allege patterns of behavior suggesting a scheme and intent to influence. Most tellingly, *after Freeman joined Jackson Walker in 2018*, Kirkland hired Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.[116] This was an abrupt switch after Kirkland had filed no mega-bankruptcy cases at all with Jackson Walker as local counsel from 2006 to 2016. It is reasonable to infer that Kirkland made such a dramatic and rapid change in practices

---

[113] FAC ¶ 71.
[114] FAC ¶ 5.
[115] Motion to Dismiss at 29.
[116] FAC ¶ 29.

because it had determined that employing and aligning itself with the Judge's girlfriend was influential with Judge Jones.[117] Moreover, the scheme to influence Judge Jones worked to the extent that Judge Jones approved Kirkland's application for appointment, approved 100% of Kirkland's requested fees, adopted Defendants' proposed fee orders verbatim, and issued other rulings favorable to Kirkland's position.[118] These facts sufficiently state a plausible claim that Kirkland concealed and leveraged the Jones-Freeman relationship to influence bankruptcy proceedings in Jones' court, and sufficient to allege a predicate act of obstruction of justice warranting further investigation through discovery.

<u>Violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud)</u>. Plaintiff has alleged actionable false representations by Kirkland and the other Defendants, including misrepresentations as to Defendants' disinterested status and misrepresentations regarding the existence of the Jones-Freeman relationship.[119] The fact that these misrepresentations were sometimes made in court filings does not immunize them from constituting predicate acts of fraud. These were not mere "pleading errors" as Kirkland calls them. They were repeated and deliberate false representations as to a known and directly material objective fact.

Kirkland inexplicably contends that plaintiff has not alleged Kirkland had knowledge of the Jones-Freeman relationship and concealed that information "to secure large awards of attorneys' fees." In truth, those two allegations are made repeatedly throughout Plaintiff's FAC.[120] These allegations of intent are supported by factual inferences arising from Kirkland's rapid increase in filings in the

---

[117] FAC ¶ 101(b).
[118] FAC ¶ 39-47, 176.
[119] FAC ¶¶ 105, 106, 109, 110, 114, 118.
[120] FAC ¶ 4 ("Both firms knew of the relationship and used it to profit"); FAC ¶ 71 ("[Kirkland and Jackson walker] knew Van Deelen's allegations concerning the intimate relationship between Jones and Freeman were true…"); FAC ¶ 75 ("Although Partners at Kirkland & Ellis long knew of the relationship as well, they continued not to disclose it"); FAC ¶ 79 ("Freeman, Jackson Walker, Kirkland & Ellis and Judge Jones all profited from their secret"); FAC ¶ 138 ("…Kirkland & Ellis knew about the relationship between Judge Jones and Freeman, but nevertheless falsely represented that there was no conflict involving Judge Jones").

Southern District of Texas and consistent use of Jackson Walker as local counsel for those filings – two changes that happened to occur after Judge Jones' girlfriend became available for hire as local counsel.

With regard to mail and wire fraud, Kirkland objects to Plaintiff's allegation that "matters" were sent through the mail and over the wires. The paragraphs that follow in the FAC, however, describe the materials as including: declarations of disinterestedness, applications for appointment as counsel, applications for attorneys' fees, orders awarding fees, a motion for a final decree, and a final decree.[121] In addition, Plaintiff alleged that the mails and wires were used for co-conspirators to communicate with one another regarding the Enterprise, to communicate with clients and potential clients about the opportunities presented by appearing in Judge Jones' courtroom with Freeman as counsel, to make misrepresentations regarding the existence of the Jones-Freeman relationship, and to send invoices or bills reflecting improperly influenced fee awards.[122] Even Kirkland's cited case, *Warnock v. State Farm Mut. Auto Ins. Co.,* first *denied* a motion to dismiss where litigation documents, correspondence, and "materials" were alleged to have been sent by mail and wire – before later disposing of the predicate acts on summary judgment. 833 F. Supp. 2d 604, 609 (S.D. Miss. 2011).

Lastly, to the extent that Kirkland is looking for allegations regarding Jones' incentive to participate in the Enterprise' scheme, those allegations exist. Plaintiff has alleged that Freeman and Jones are co-owners of a home.[123] Plaintiff also alleged that lucrative payments approved to Freeman by Jones indirectly benefited Jones himself as they flowed back into the Freeman-Jones household.[124] In short, Kirkland provided Judge Jones' girlfriend with employment opportunities for her and her

---

[121] FAC ¶¶ 105-106, 109-110.
[122] FAC ¶¶ 105, 109.
[123] FAC ¶ 24.
[124] FAC ¶ 101(c), 113, 123, 197, 220(h).

firm and received approval of their employment and fee applications. Meanwhile Jones knew that a portion of the fees he awarded Freeman would indirectly benefit him as they were available for the support of his domestic household. These allegations sufficiently support the challenged elements of the predicate acts of fraud, bribery and honest service fraud.

**B.    Plaintiff adequately alleged Kirkland's agreement to the RICO conspiracy**.

Kirkland charges that "Plaintiff does not allege that Defendants agreed or otherwise coordinated to conceal the relationship." In truth, Plaintiff clearly alleged that Defendants agreed to exploit the Jones-Freeman relationship while concealing the relationship from others:

> Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[125]

Kirkland may label Plaintiff's allegations of an agreement as conclusory; but the law recognizes agreements to commit illegal acts are rarely proclaimed from the rooftops. For that reason, direct evidence of agreement is unnecessary. *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978). Instead, "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence...." *Id.* The existence of an agreement, a defendant's guilty knowledge, and the defendant's participation in the RICO conspiracy may each be inferred from the circumstances. *U.S. v. Jones,* 873 F.3d 482, 489 (5th Cir. 2017); *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys.,* LLC, 566 B.R. 815, 857 (W.D. Tex. 2017).

Plaintiff alleged ample facts showing *or inferring* Kirkland's agreement to participate in a scheme to leverage the Freeman-Jones relationship for financial and reputational benefits. Not the least of those facts is the allegation (and Kirkland's admission) that it was informed of the relationship between

---

[125] FAC ¶ 197.

Freeman and Jones in March of 2021.[126] While evidence suggests Kirkland knew of the relationship earlier,  at a minimum, it is undisputed that  Kirkland knew of the Jones-Freeman relationship for more than six month before Judge Jones dismissed the adversary proceeding on October 12, 2021, for nearly two years before the district court affirmed the denial of Plaintiff's motion to recuse Judge Jones on January 9, 2023,  and for well over two years before the relationship became publicly known and the Fifth Circuit issued an order finding probable misconduct.[127] Yet, Kirkland would have us believe that, as the self-proclaimed "dominant US debtor law firm" and "world's leading law firm," it exercised its legal judgment and expertise to *independently* arrive at the decision that the existence of an intimate relationship between the presiding judge and a lawyer for the debtor did not need to be disclosed. It stretches incredulity even further to think that Jackson Walker, one of the largest and most established firms in Texas, independently arrived at the same decision. It is implausible that four sophisticated legal defendants (including two large firms and a federal judge) all arrived at, and adhered for years to, the same (*wrong*) conclusion that the Freeman-Jones relationship did not have to be disclosed without ever consulting with one another and agreeing on a course of action. The more plausible explanation, and an inference supported by the alleged facts, is that Defendants agreed amongst themselves not to disclose the Jones-Freeman relationship.

There is other circumstantial evidence from which one can reasonably draw an inference that Kirkland knew of, but agreed not to reveal, the Jones-Freeman relationship because of its potential benefits to Defendants. For instance, Kirkland did not file any mega-bankruptcy cases with Jackson Walker as local counsel from 2006 to 2016. Yet, after Freeman joined Jackson Walker in 2018, Kirkland hired Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the

---

[126] Motion to Dismiss at 16.
[127]  FAC ¶¶ 61, 63.

Southern District of Texas since 2019.[128] This was done despite Kirkland having a local office of its own in Houston. The dramatic shift and proliferation of Kirkland's mega-bankruptcy filings in the Southern District of Texas (with Jackson Walker and Freeman on board as local counsel) suggests Kirkland was aware of the Jones-Freeman relationship and agreed to partake in the opportunity it presented for financial and reputational benefits.

It is also odd that Kirkland hired Jackson Walker as local counsel but accepted (supposedly without inquiry or question) that Freeman, a former clerk for Judge Jones, would not perform one of the primary tasks local counsel are hired to perform: appearing in the local courtroom.[129] It is reasonable to infer that Kirkland accepted this abnormality in local counsel behavior (and did not investigate it further) because Kirkland was aware of the Jones-Freeman relationship and agreed to conceal it for Kirkland's own benefit.

Ultimately, questions regarding the extent of Kirkland's knowledge, its motives, and its agreement to participate in the Enterprise are uniquely within Kirkland's control and will be a subject of discovery. At this point, it is sufficient that Plaintiff has alleged Kirkland's agreement to the conspiracy and alleged facts from which it can be inferred that Kirkland agreed to conceal and benefit from the Jones-Freeman relationship.

## C.   Plaintiff has properly alleged a *Bivens* conspiracy.

The victim of a constitutional violation by a federal agent has a right to recover damages against the agent in federal court pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971); *Bush v. Lucas*, 647 F.2d 573, 575 (5th Cir. 1981), *aff'd*, 462 U.S. 367 (1983). When a *Bivens* claim is asserted in a context other than what has been recognized by the Supreme Court in three

---

[128] FAC ¶ 29.
[129] FAC ¶ 62.

previous *Bivens* cases, as Plaintiff does here, the right to recover may be recognized where the Defendant has established no "special factors" counselling hesitation. That condition is met in the case at bar.

Kirkland fails to establish a "special factor" precluding a *Biven's* conspiracy claim under the facts of this case. Kirkland first asserts the circular logic that recognition of a new cause of action is itself a special factor that should preclude recognition of a new cause of action. If the law were as Kirkland suggests, there would be no need for a new context test at all; every new context would present a disqualifying special factor simply by virtue of being new. The Supreme Court's caution about "uncertainty" of new cases as a special factor is better understood as applying to cases likely to have unpredictable and widespread consequences; not as an obstacle to recognition of narrow and egregious misconduct such as exists here. *See Egbert v. Boule*, 596 U.S. 482, 493 (2022) (cautioning that uncertainty as to "'systemwide' consequences" of recognizing a new *Bivens* action may be a special factor). Nor do the U.S. Trustee's powers provide an alternative remedy barring recognition of a *Bivens* claim. The U.S. Trustee's duties are focused on protecting the integrity of the bankruptcy system, not remedying violations of individuals' constitutional rights.

The facts of this case are unprecedented and extraordinary. The hesitancy to extend *Bivens* to new contexts is rooted in considerations of separation of powers, leading courts to evaluate who should decide a damages remedy—Congress or the courts. *See Bivens,* 403 U.S. at 443. The egregious conduct at issue here took place within the judicial branch, and thus it seems logical that same branch should address the conduct and the remedy under *Bivens*. Notably, Kirkland has not cited a case that expressly states a *Bivens* claim cannot be brought in a case with facts like those here.

**D.    Plaintiff adequately alleged reliance in connection with his state law claims.**

Kirkland is alleged to have repeatedly misrepresented, both affirmatively and by omission, that there were no undisclosed connections or conflicts of interest, and that Kirkland was a disinterested persons within the definition of Section 101(14) of the Bankruptcy Code.[130] By claiming to be a "disinterested person," Kirkland falsely represented that it "[did] not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason[.]" 11 U.S.C. § 101(14); see also Fed. R. Bankr. P. 5002(b) & Notes of the Advisory Committee on Rules (1985 Amendment); 11 U.S.C. § 1327; *CF Holding*, 164 B.R. at 807–08; *see also* 28 U.S.C. § 455(a). In particular, Kirkland misrepresented that it knew of no potential connections with the bankruptcy judges in the Southern District of Texas, including Judge Jones.[131] Plaintiff properly alleges that he relied on such misrepresentations by Kirkland and the other Defendants.[132]

"A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment." *Worldwide Asset Purchasing, L.L.C. v. Rent–A–Center E., Inc.,* 290 S.W.3d 554, 566 (Tex.App.—Dallas 2009, no pet.). Here, Plaintiff alleges that he relied on the misrepresentations of Kirkland (and the other Defendants) that there were no conflicts or undisclosed information bearing on the fair and impartial handling of the bankruptcy estate and resolution of bankruptcy proceedings.[133]  In reliance on Defendants' misrepresentations, Plaintiff did not challenge the appointment of the judge's girlfriend (and her associated firms) as counsel for the debtor.[134] Nor did Plaintiff challenge the fees paid from the bankruptcy estate as being

---

[130] FAC ¶¶ 4, 36, 37, 95, 105, 110, 114, 119, 120, 188, 189.
[131] FAC ¶¶ 37, 119.
[132] FAC ¶¶ 136, 138, 139, 146, 148, 181.
[133] FAC ¶¶ 146, 148.
[134] FAC ¶ 138.

an inappropriate product of an undisclosed intimate relationship between one of the debtor's attorneys and the judge awarding the fees.[135] Plaintiff also did not seek the recusal of Judge Jones due to his intimate relationship with debtor's attorney until he received the anonymous letter – which did not happen until more than a year after the case was filed and only as the case was winding down.[136] These allegations of reliance are sufficient to support Plaintiff's state law claims.

Kirkland lofts two odd challenges to Plaintiff's reliance allegations, but neither has merit. First, Kirkland contends Plaintiff's allegations of reliance are lacking because Plaintiff did not expressly state that he read Kirkland's misleading court filings. Plaintiff alleges repeatedly that he relied on the false representations contained in Defendants' applications for appointments.[137] The obvious inference from Plaintiff's allegations of reliance on statements set forth in legal documents filed with the Court is that Plaintiff (and/or Plaintiff's attorney) read those documents. This inference is particularly warranted where Defendants complain about Plaintiff's over-involvement in the bankruptcy proceedings while simultaneously suggesting Plaintiff (and Plaintiff's attorneys)[138] did not read the legal documents filed in his case. Kirkland's authorities for finding reliance lacking where a misrepresentation was not read each arose in a summary judgment context (not in a motion to dismiss) and involved admissions by the plaintiff that the misrepresentation was not read. *See Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 171 (5th Cir. 1996); *Lafrentz v. Lockheed Martin Corp.,* No. 4:18-CV-4229, 2021 WL 4350175, at *4 (S.D. Tex. Sept. 10, 2021). Read as a whole and indulging all inferences

---

[135] FAC ¶ 149.

[136] FAC ¶ 59.

[137] FAC ¶¶ 136, 138, 139, 146, 148, 181.

[138] Reliance in this context is similar to a securities action where the market price of a security reflects its value such that even an investor who did not read an offering statement may indirectly rely upon the representations contained therein via the judgments of those who do. *Longden v. Sunderman,* 737 F. Supp. 968, 979 (N.D. Tex. 1990).

in Plaintiff's favor, the FAC plausibly shows that Plaintiff relied upon, and acted in reliance upon, Defendants' misrepresentations that they were disinterested parties.

Kirkland's second challenge to Plaintiff's reliance allegations fares no better. Kirkland argues that Plaintiff could not have relied on its misrepresentations about disinterestedness because Plaintiff eventually asserted the Jones-Freeman relationship as a basis for seeking to recuse Judge Jones and for asserting legal claims against Jones. That Plaintiff eventually uncovered Defendants' deception does not negate his prior reliance or the harm that was suffered due to his prior reliance. The McDermott bankruptcy case was initiated in early 2020.[139] Kirkland's application to serve as lead counsel, including the misleading declaration of disinterestedness completed by Kirkland & Ellis partner Joshua Sussberg, was filed in February of 2020.[140] The anonymous letter alerting Plaintiff to the intimate relationship between Jones and Freeman was not received by Plaintiff until March 8, 2021.[141] Thus, the record indicates that, for over a year, and for most of the duration of the bankruptcy proceeding, Defendants successfully concealed the Freeman-Jones relationship from Plaintiff and Plaintiff did not question Kirkland's assertions of disinterestedness. This lack of awareness – until *after* the harm had been done – distinguishes the present case from the cases cited by Kirkland. *See Mathis v. DCR Mortg. III Sub, I, LLC*, 952 F. Supp. 2d 828, 835 (W.D. Tex. 2013) (no reliance on defendants' representation that a notice of foreclosure acceleration had been sent when plaintiff had filed a lawsuit to prevent foreclosure asserting failure to receive a notice of acceleration); *Bomar Oil & Gas, Inc. v. Loyd,* No. 10-08-00016-CV, 2009 WL 2136404, at *1 (Tex. App.—Waco July 15, 2009), on reh'g, 298 S.W.3d 832 (Tex. App.—Waco 2009) (no reliance on representations as to charges to be levied against

---

[139] FAC ¶ 39; *In re McDermott*, 20-30336, Dkt. 428, 428-1.
[140] FAC ¶ 42; *In re McDermott*, 20-30336, Dkt. 428, 428-1.
[141] FAC ¶ 59.

mineral interest, where plaintiff immediately and repeatedly challenged expenses and demanded additional information to substantiate representations); *Omrazeti v. Aurora Bank FSB,* No. 12-CV-00730-DAE, 2013 WL 3242520, at *10 (W.D. Tex. June 25, 2013)(no reliance because plaintiff's own allegations show he hired a lawyer to stop foreclosure because he did not believe that accuracy of property records claimed to be fraudulent).

### E.   Plaintiff's state law claims are not preempted.

The sole Texas case,  *In re Brentwood Lexford Partners, LLC,* merely stands for the proposition that a court will not entertain a claim based on a bankruptcy code violation when the bankruptcy code specifically provides a remedy for that violation.  292 B.R. 255, 275 (Bankr. N.D. Tex. 2003). But Kirkland does not contend that Rule 2014 provides a cause of action to Plaintiff to address Kirkland's misrepresentations. Thus, Kirkland has not (and cannot) make the baseline showings necessary to support its argument that Plaintiff's state law claims are preempted by the Bankruptcy Code.

Nor does Kirkland explain how any of Plaintiff's state law causes of action conflict with Bankruptcy Code requirements. *In re Perry,* 425 B.R. 323, 397 (Bankr. S.D. Tex. 2010) (provisions of the Bankruptcy Code may preempt state laws *when they conflict*). Cases where bankruptcy preemption has applied typically involve parallel tort actions in state courts against a debtor or creditor based on conduct that risks subverting the Bankruptcy Court's authority to adjudicate matters relating to the debtor's estate. Thus, a significant component of a preemption analysis in the bankruptcy context should be the degree to which the state law claims interfere with administration of the debtor's estate.

Kirkland contends that Plaintiff's state law claims are preempted by Rule 2014 of the Bankruptcy Code. Kirkland does not cite, and Plaintiff has not found, any case holding state law claims preempted based on Rule 2014. The case Kirkland cites in this regard, *In re Shirley,* merely holds that a state law claim for fees brought  by an attorney representing the debtor-in-possession is precluded

when the same fee request was denied by the bankruptcy court 134 B.R. 940, 945 (Bankr. App. 9th Cir. 1992).  It says nothing about precluding a state law claim for damages against a non-debtor that does not draw upon the assets of the bankruptcy estate or interfere with administration of the bankruptcy estate.  Plaintiff's state law claims – asserted against defendants who were _not_ debtors in the bankruptcy proceedings – are peripheral to, and do not impugn, the bankruptcy process. Simply stated, Plaintiff's state court claims do not impact the Bankruptcy Court's control over bankruptcy proceedings or the bankruptcy estate and should not be held preempted.

**F.     Plaintiff's state law claims are not barred by Texas's "attorney immunity" or "judicial-proceedings privilege."**

**1.   The judicial proceedings privilege does not bar Plaintiff's state law claims.**

Kirkland distorts the purpose of Texas's judicial proceedings privilege, which provides that "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander…" *James v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982). The policy behind the judicial proceedings privilege is to protect the integrity of the adversarial litigation process and ensure that a court or jury is able to get the information it needs without witnesses and litigants fearing retaliatory suits for defamation. *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982). Consistent with this purpose, Texas courts generally discuss and apply the privilege in relation to defamatory statements.  The Texas Supreme Court declined to expand the privilege beyond libel and slander. *James,* 637 S.W.2d at 918; *Bird v. W.C.W.,* 868 S.W.2d 767, 771 (Tex. 1994). Kirkland's own cited cases are consistent with this approach. *See e.g. Wilkinson v. USAA Fed. Sav. Bank Tr. Services,* No. 14-13-00111-CV, 2014 WL 3002400, at *7 (Tex. App.—Hous. [14th Dist.] July 1, 2014) (applying privilege to statement about quality of lawyer's services); *Collins v. Zolnier,* No. 09-17-00418-CV, 2019 WL 2292333, at *1 (Tex. App.—Beaumont May 30, 2019) (applying privilege to statement about drug use and criminal activity).

Kirkland's false representations of disinterestedness are not defamatory statements. The mere fact that wrongful acts and omissions Kirkland made elsewhere were also made in a court filing should not immunize Kirkland from liability. This is the conclusion drawn by the Texas Supreme Court where the mere fact that a doctor communicated his misdiagnosis to the Court during a legal proceeding did not immunize him from liability for medical malpractice. *James*, 637 S.W.2d at 917-918. Ultimately, while an in-court statement may not form the basis of a defamation action, "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law." *Id.* at 917-918.

## 2. Attorney immunity does not bar Plaintiff's state law claims.

Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a non-client for conduct committed in the course of representing the lawyer's client. *Taylor v. Tolbert,* 644 S.W.3d 637, 642 (Tex. 2022) Attorney immunity exists to encourage aggressive representation and advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third parties. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). Attorney immunity is not unlimited, however. Immunity attaches to "the kind of conduct" attorneys engage in when discharging their professional duties; therefore, if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the attorney-immunity defense is inapplicable. *Taylor*, 655 Sw.3d at 646; *Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). As the party seeking to apply the attorney immunity defense, Kirkland bears the burden of proving that its actions were the type of conduct involving a "uniquely lawyerly capacity" and calling upon the attorney's "skills as an attorney." *Taylor*, 655 SW.3d at 645-46 (movant bears burden of conclusively proving affirmative defense of attorney immunity applies). That showing has not been made here.

Plaintiff's claims arise from Defendants' scheme to employ the girlfriend of a federal judge and to secretly leverage that intimate relationship to garner increased employment opportunities, increased fees, and increased professional standing. That is neither an act of advocacy nor one requiring lawyerly skill. "An attorney is not immune from suit for participating in criminal or 'independently fraudulent activities' that fall outside the scope of the attorney's representation of a client." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,* 595 S.W.3d 651, 657 (Tex. 2020)

Even to the extent that Defendants' scheme led Kirkland to omit and conceal the obvious conflict in court filings, disclosing an obvious conflict of interest is not a uniquely lawyerly tasks. The duty to disclose conflicts is something required of *all* participants in a bankruptcy proceeding. *See, e.g.,* 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals"). The Texas Supreme court affirmed this logic noting that a lawyer who made statements to the press on a client's behalf is not partaking of the office, training and kill of an attorney "because anyone – including press agents, spokespersons, or someone with no particular training or authority at all – can publicize a client's allegations to the media." *Taylor*, 655 SW.3d at 646. The same is true here. Attorney immunity does not attach to the administrative act of identifying one's connections with other participants in a bankruptcy case because doing so is not an act of legal advocacy and does not require any particular "lawyerly" skill. Going a step farther, knowingly misrepresenting one's conflict status also requires no legal skill and is not a lawyerly act either.

The Texas Supreme Court has had several occasions to consider the scope of the attorney immunity defense. Its comments on the types of conduct that are not protected by attorney immunity are instructive here. For instance, while declining to recognize a categorical exception for conduct alleged to be criminal, the court noted that "there is a wide range of criminal conduct that is not within

the 'scope of client representations'" and therefore not subject to attorney immunity. *Bethel,* 595 at 657. Nor does immunity apply to acts that do not involve the provision of legal services. For example, an attorney who participates in a fraudulent business scheme with a client is unprotected by attorney immunity, as such acts are "entirely foreign to the duties of an attorney." *Cantey Hanger,* 467 S.W.3d at 482 (citing *Poole v. Houston & TC Ry. Co.,* 58 Tex. 134, 137 (1882)).

Here, Kirkland and the other defendants are alleged to have conspired to use the secret Jones-Freeman relationship to secure professional and financial benefits for themselves. This scheme existed separate and apart from Defendants' representation of its bankruptcy clients. Likewise, Kirkland's concealment of the Jones-Freeman relationship also was not an act of legal representation; but, rather a ministerial or administrative matter required of lawyers and non-lawyers alike in a bankruptcy proceeding. Because Kirkland's misrepresentation and concealment of the Jones-Freeman relationship was (1) outside the scope of the legal representation it provided to McDermott and (2) not a lawyerly act in that it was required of lawyers and non-lawyers alike, attorney immunity does not apply.

### G.   Plaintiff's claims for negligent misrepresentation, professional negligence, unjust enrichment and *Bivens* conspiracy are not time-barred.

The parties disagree as to the date Plaintiff's claims accrued. Kirkland contends that Plaintiff suffered an injury that began the limitations period running on one of three dates: March 2020 (when the bankruptcy plan was confirmed and Plaintiff's shares were cancelled), September 2020 (when fees were awarded to Kirkland) or March 2021 (when Plaintiff received an anonymous letter reporting the Freeman-Jones relationship). While Plaintiff did suffer harm on the first two dates, they cannot establish accrual because there was no way for Plaintiff to know at those times that the harm resulted from Defendants' tortious acts and were not merely adverse (but fair and uninfluenced) rulings. Further, while Plaintiff's receipt of an anonymous letter on March 6, 2021 led Plaintiff to take

reasonable and diligent steps to investigate its allegations – including bringing the allegations of the anonymous letter to Defendants' attention via a motion to recuse Judge Jones – Defendants continued to fraudulently conceal the relationship and their scheme to benefit from it. Thus, despite diligent efforts, Plaintiff lacked knowledge of the cause of his injury – as was necessary for accrual. *Kingham v. Pham,* 753 F. App'x 336, 337 (5th Cir. 2019) (per curiam) ("an action accrues when a plaintiff knows both the existence of an injury and the cause of the injury."). Knowledge and accrual of Plaintiff's claims *against Kirkland in particular,* came even later, as the March 6, 2021 anonymous letter did not refer to Kirkland, and Plaintiff did not have reason to suspect Kirkland's involvement in concealing the Jones-Freeman affair until a later point within the limitations period. Limitations accrued by October 7, 2023, when Jones admitted the relationship and confirmed that the allegations in the anonymous letter were correct.

This case presents a textbook scenario for tolling of a statute of limitations: Defendants who are alleged to have knowingly conspired to commit wrongful acts, committed the wrongful acts in fact, and then made repeated misrepresentations and deceptions to conceal the wrongful acts from a plaintiff who reasonably relied on their deception. Fortunately, Texas's equitable tolling principles are available to address situations, such as this, where strict application of the statute of limitations would be inequitable and include both tolling based on fraudulent concealment and a discovery rule.[142] *Valdez v. Hollenbeck,* 465 S.W.3d 217, 229 (Tex. 2015) ("We have recognized two doctrines that may delay accrual or toll limitations: (1) the discovery rule and (2) fraudulent concealment."); *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 927, 929-30 (Tex. 2011). Both doctrines apply here.

---

[142] *Rotella v. Pederson,* 144 F.3d 892, 897 (5th Cir. 1998) ("Because the Texas statute of limitations is borrowed in § 1983 cases, Texas' equitable tolling principles also control.")

Fraudulent concealment tolls limitations until the claimant, using reasonable diligence, discovered or should have discovered the injury. *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The Fifth Circuit "applies a four-prong test for fraudulent concealment under which the plaintiff must demonstrate: '(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.'" *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The estoppel effect of fraudulent concealment continues until a party learns of facts or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Here, Defendants (including Kirkland) were presented with Plaintiff's suspicions regarding the Jones-Freeman relationship and, rather than coming clean about the relationship, doubled-down on their efforts to conceal the relationship. In far less egregious circumstances than those present here, the Fifth Circuit found an entitlement to equitable tolling. *See, e.g., Green v. Doe*, 260 Fed. Appx. 717, *2-3 (5th Cir. 2007).

The discovery rule provides another exception to application of the statutory time bar. The Texas discovery rule standard is similar to the federal accrual standard. *McGowan v. S. Methodist U.*, No. 3:18-CV-00141-N, 2024 WL 455340, at *8 (N.D. Tex. Feb. 5, 2024). Kirkland argues that Plaintiff cannot avoid the limitations bar because his injury was not "inherently discoverable." To be "inherently undiscoverable", an injury need not be absolutely impossible to discover. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997). An "injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* That is the case here. A shareholder in a bankruptcy case is unlikely to know that the presiding judge is involved in a romantic relationship with the debtor's lawyer, let alone that the debtor's legal counsel conspired with the judge to keep the relationship secret because doing so provides them financial and

reputational benefits. *See, e.g., Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (finding legal malpractice is inherently undiscoverable because it is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.).

Where a plaintiff's complaint "plausibly sets out facts where the discovery rule might apply, the Court cannot resolve that issue in the context of a Motion to Dismiss." *Cypress/ Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.*, 814 F.Supp.2d 698, 707–08 (N.D. Tex. 2011). Because that standard is amply satisfied in the case at bar, Kirkland's motion to dismiss on limitations grounds should be denied.

### H.   Plaintiff withdraws his claim against Kirkland for professional negligence and breach of fiduciary duty.

Plaintiff hereby withdraws his claim against Kirkland for professional negligence and breach of fiduciary duty.

### I.   Plaintiff has alleged facts stating a basis for finding Kirkland liable for its participation in the breach of fiduciary duties and under a theory of respondeat superior.

While the Texas Supreme Court may not have weighed in on whether Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty, numerous Texas trial and appellate courts recognize the claim. *See Hendricks v. Thornton,* 973 S.W.2d 348 (Tex. App.—Beaumont 1998, pet. denied); *Floyd v. Hefner,* 556 F.Supp.2d 617 (S.D. Tex. 2008). Moreover, even if a claim for aiding and abetting has not been officially recognized by the Texas Supreme Court, Texas has long recognized a similar claim for knowing participation in a breach of fiduciary duty. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 514 (Tex. 1942). Recent decisions in state and federal courts recognize its continuing vitality. *See Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007); *D'Onofrio*

*v. Vacation Publ'ns., Inc.,* 888 F.3d 197, 215 (5th Cir. 2018); *Hunter Bldgs. & Mfg., L.P. v. MBI Global LLC,* 436 S.W.3d 9, 15 (Tex. App. — Houston [14th Dist.] 2014, pet. denied).

While labeled as a claim for aiding and abetting a breach of fiduciary duty, Plaintiff's complaint alleges each of the elements of a claim for knowing participation in a breach of fiduciary duty, including (1) the existence of a fiduciary relationship;[143] (2) that the third party knew of the fiduciary relationship;[144] and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.[145] *See Meadows,* 492 F.3d at 639 (stating elements of claim for knowing participation). When a complaint contains sufficient factual allegations to state a claim, a court should not grant a motion to dismiss based on an imperfect statement of the legal theory. *Young Innovations, Inc. v. Dental Health Products, Inc.,* No. CV 4:18-01726, 2019 WL 13211665, at *3 (S.D. Tex. Aug. 8, 2019). Instead, the complaint should be examined to determine if they provided a basis for relief on any theory. *Id., citing, Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 221 n.7 (5th Cir. 2018) (per curiam). Thus, Courts have been willing to re recognize the aiding and abetting allegations as stating a claim for "knowing participation" in a breach of fiduciary duty. *Young Innovations*, 2019 WL 13211665, at *3 (construing claim for aiding and abetting as claim for knowing participation in a breach of fiduciary duty); *In re Schlotzsky's Inc.*, 351 B.R. 430, 439 (Bankr. W.D. Tex. 2006) (declining to dismiss a knowing participation claim that was labeled as an aiding and abetting claim). The same should be done here.

Kirkland also contends that there is no independent cause of action for respondeat superior. To the extent Kirkland is arguing that the Complaint's respondeat superior allegations are better

---

[143] FAC ¶ 160.
[144] FAC ¶ 160.
[145] FAC ¶ 161.

viewed as a theory of liability than as a freestanding cause of action, the title is irrelevant. The point of Plaintiff's allegation is to alert Defendants that Plaintiff is seeking to hold them liable under facts that, if proven, would establish respondeat superior. Whether labeled as a cause of action or a theory of liability, the allegations in Plaintiff's Complaint are sufficient to establish respondeat superior. Kirkland does not contend otherwise. *See Seitzman v Hudson Riv. Assoc.*, 143 Misc 2d 1068, 1070 (Sup Ct 1989) (recognizing analogous circumstance where independent cause of action for punitive damages does not exist but deeming the complaint to demand punitive damages on the underlying causes of action).

### J.      If Kirkland's motion to dismiss is not denied outright, Plaintiff requests leave to amend.

Should this Court find Plaintiff's Complaint deficient in any regard, Plaintiff respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Giving Plaintiff leave to amend his Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiff brings.

### CONCLUSION AND PRAYER

Plaintiff Michael Van Deelen respectfully requests that the Court deny Defendant Kirkland's Motion to Dismiss. Plaintiff further requests that the Court grant him all other and further relief to which he is justly entitled.

**Dated May 8, 2024**

Respectfully submitted,

By:   /s/ Mikell A. West
      Mikell A. West
      Texas State Bar No. 24070832
      S.D. Tex. Bar No. 1563058
      Robert W. Clore
      Texas State Bar No. 24012426
      S.D. Tex. Bar No. 2032287
      BANDAS LAW FIRM, P.C.
      802 Carancahua Street, Suite 1400
      Corpus Christi, Texas 78401
      Telephone: (361) 698-5200
      Facsimile: (361) 698-5222
      mwest@bandaslawfirm.com
      rclore@bandaslawfirm.com

*Attorneys for Plaintiff Michael Van Deelen*

**<u>Certificate of Service</u>**

I hereby certify that on May 8, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*