

United States District Court
Southern District of Texas
**FILED**
**ENTERED**
August 16, 2024
Nathan Ochsner, Clerk
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MICHAEL D. VAN DEELEN, § | |
| § | |
| **Plaintiff,** § | **Case No. 4:23-CV-03729-AM** |
| § | |
| v. § | |
| § | |
| DAVID R. JONES, ELIZABETH § | |
| CAROL FREEMAN, JACKSON § | |
| WALKER, LLP, KIRKLAND & § | |
| ELLIS, LLP, AND KIRKLAND & § | |
| ELLIS INTERNATIONAL, § | |
| LLP, § | |
| **Defendants.** § | |

### MEMORANDUM OPINION AND ORDER

Before the Court are the Defendants' Motions to Dismiss the Plaintiff's Amended Complaint, filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6) by Defendants David R. Jones (ECF No. 39); Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP (collectively "Kirkland") (ECF No. 44); Jackson Walker, LLP (ECF No. 46); and Elizabeth Freeman (ECF No. 45). Kirkland has also filed a Motion for Sanctions. (ECF No. 41.)

The Amended Complaint alleges a sprawling tapestry of ethical lapses by major players in the nation's bankruptcy system. The Defendants insist that these accusations, however salacious, create no viable cause of action for the Plaintiff to pursue. Upon reviewing the applicable law and the Plaintiff's allegations, the Court agrees and dismisses the Plaintiff's claims—though it does so with some consternation.

1

## I. BACKGROUND

### A. Factual Allegations

The Plaintiff alleges that the Defendants—a former Chief United States Bankruptcy Judge, his romantic partner, and two firms with nationally renowned bankruptcy practices—rigged the nation's busiest bankruptcy court for profit and prestige. This scheme propelled the Defendants to national prominence and yielded tens of millions of dollars in attorneys' fees, all drawn from bankruptcy estates at the expense of creditors. The Defendants advanced this scheme, the Plaintiff claims, through a pattern of deception that included the concealment of a romantic relationship between then-Chief Judge David R. Jones ("Jones") and Elizabeth Freeman ("Freeman"), a partner at Jackson Walker, LLP ("Jackson Walker") and Jones's former law clerk. This relationship, while unknown to the public, was an open secret among the close inner circle of lawyers whom Jones appointed to dozens of the most lucrative bankruptcy cases in the country. According to the Plaintiff, the Defendants' scheme diminished the financial recovery of parties, like him, with a pecuniary interest in the cases Jones oversaw. The Plaintiff ultimately seeks relief from what he calls "perhaps the most significant bankruptcy scandal in U.S. history." (ECF No. 10 at 2.)

### a. Houston Rises to National Prominence for Chapter 11 Filings.

Today, Houston looms large in the nation's bankruptcy system, but this was not always so. According to the Plaintiff, Jones transformed Houston, almost single-handedly, from a "bankruptcy backwater" into the chapter 11 filing capital of the nation. (*Id.* at 7-8 (quoting Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 323 Ill. L. Rev. 351, 372 (2013)).) Upon becoming Chief Judge of the United States Bankruptcy Court for the Southern District of Texas in 2015, Jones set out to make Houston an attractive venue for large corporate chapter 11 filings. (*Id.* at 7.) He established a "complex advisory" committee that featured the head of Kirkland's

2

bankruptcy practice, among other prominent bankruptcy lawyers in Jones's inner circle.   (*Id.*)
Jones also directed all complex chapter 11 bankruptcies filed in any division in the district to
himself and the Honorable Marvin Isgur, United States Bankruptcy Judge, who also sits in
Houston.  (*Id.*)  Consequently, parties filing chapter 11 cases in the Southern District would reliably
face one of two judges—Chief Judge Jones or Judge Isgur—in a district that was now custom built
for goliath chapter 11 filings.  (*Id.* at 8.)

Predictably, bankruptcy lawyers flocked to Houston.  (*Id.* at 7-8.)  The city soon became
"the single most popular destination for large, public company bankruptcy filings," far surpassing
New York and Delaware.[1]  By 2023, Jones and Judge Isgur oversaw nearly <u>half</u> of all large chapter
11 cases nationally.  (*Id.* at 8.)

### b.  *Jones and Freeman Begin a Romantic Relationship.*

While Jones was transforming his docket into the top venue for major chapter 11 filings,
he and his then-law clerk, Elizabeth Freeman, maintained an intimate relationship.[2]  (*Id.* at 8.)
Although it is unclear when the relationship began, Jones's and Freeman's lives were meaningfully
intertwined as early as 2016, when Jones purchased a home in Coldspring, Texas, in which
Freeman had lived since 2007.  (*Id.* at 9.)  A year later, Jones and Freeman were living together in
a co-owned home in Houston.  (*Id.* at 8.)  And in 2020, Freeman's parents moved into Jones's

---

[1] (ECF No. 10 at 7-8 (quoting Levitin, *supra*, at 374).)

[2] According to the Amended Complaint, Freeman clerked for Jones from 2011 to 2018.  (*Id.* at 8.)

Coldspring home—which Jones still owns. (*Id.* at 9.) Jones has since admitted to maintaining a romantic and personal relationship with Freeman. (*Id.* at 25.)

### c. *Jackson Walker's and Kirkland's Bankruptcy Practices Skyrocket.*

Freeman left Jones's chambers in 2018 and joined Jackson Walker, where she became a bankruptcy partner. (*Id.* at 9-10.) Upon her arrival, the firm immediately began securing lucrative appointments as local counsel in large Houston bankruptcies. (*Id.* at 10.) Jackson Walker soon became the go-to local counsel firm for corporate debtors filing for bankruptcy in Houston. (*Id.*) By 2022, Jackson Walker was the top firm in the country for local counsel appointments in large bankruptcies. (*Id.*)

Jackson Walker was not the only firm whose bankruptcy practice burgeoned after Freeman entered private practice. Kirkland's bankruptcy practice also began rapidly expanding in 2018. (*Id.* at 11.) According to the Plaintiff, these two firms formed a relationship that "went beyond a traditional referral arrangement," in which Kirkland would serve as lead counsel on dozens of complex bankruptcies, with Jackson Walker hired as local counsel. (*Id.* at 10-11 (citation omitted).) The Plaintiff claims that Kirkland used Jackson Walker as "a back channel to Houston's two judges," as the firm included former law clerks to both Judge Isgur and Jones.[3] By 2023, Kirkland was the nation's top firm representing debtors in large chapter 11 cases "by a significant margin." (*Id.* at 10 (citation omitted).)

### d. *Jones Presides Over Cases Involving Freeman, Jackson Walker, and Kirkland.*

Despite his ongoing romantic relationship with Freeman, Jones presided over many cases in which Freeman, Jackson Walker, and Kirkland appeared as counsel. (*Id.* at 12.) These cases

---

[3] (*Id.* (quoting Sujeet Indap, *The Downfall of the Judge Who Dominated Bankruptcy in America*, Financial Times (Nov. 21, 2023), https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434).)

were goldmines for the firms.  (*Id.* at 12-13.)  Jones awarded over $12 million in attorneys' fees

and expenses to Jackson Walker across at least 26 cases, including several matters in which

Freeman was substantially involved.  (*Id.* at 13.)  Kirkland's attorneys' fees in these matters totaled

$162 million.  (*Id.* at 12.)  These cases included the chapter 11 bankruptcies of Seadrill Partners,

LLC[4] and GWG Holdings.[5]  Yet in none of the cases did anyone disclose the obvious conflict.  (*Id.*

at 13.)  In fact, both Jackson Walker and Kirkland filed declarations of disinterestedness, which

included verified statements of the attorneys' potential conflicts on each case but did not mention

the Jones-Freeman relationship.  (*Id.*)

      The case most pertinent to this suit is the chapter 11 bankruptcy of McDermott

International, Inc. ("McDermott"), a company in which the Plaintiff once held 30,000 shares.  (*Id.*

at 23.)  In February 2020, Jackson Walker partner Matthew Cavanaugh[6] ("Cavanaugh") filed an

---

[4] In December 2020, Kirkland and Jackson Walker filed applications to be appointed counsel and co-counsel, respectively, to the debtors in possession in the Seadrill Partners bankruptcy. (*Id.* at 13-14.) In support of their application, the firms provided declarations of disinterestedness with no mention of the Jones-Freeman relationship. (*Id.*) Jones approved the applications, and the attorneys began billing for their work on the case. (*Id.* at 13.) In July 2021, Jackson Walker moved for $286,885 in attorneys' fees, including $28,223 for Freeman's work on the case. (*Id.* at 14.) Kirkland moved for $4.8 million in attorneys' fees. (*Id.*) Jones granted these fees as requested. All the while, the Defendants concealed Jones's relationship with Freeman. (*Id.*)

[5] The bankruptcy of GWG Holdings was initially assigned to Judge Isgur, but in November 2022, Jackson Walker moved to appoint Jones to mediate the case. (*Id.* at 22.) One month later, Freeman left Jackson Walker and started her own law firm. (*Id.*) Yet she remained closely involved with the case. (*Id.*) Soon after Judge Isgur referred the case to Jones for mediation, Freeman was appointed trustee for the post-confirmation Wind Down Trust—a lucrative position. (*Id.*) Jackson Walker requested $1.3 million in attorneys' fees on August 21, 2023. (*Id.*) This included $23,415 for the work Freeman performed during her last month at the firm. (*Id.* at 22-23.) The firm also requested $205,157.81 for work it had contracted out to Freeman's new solo practice. (*Id.*) Yet again, no one disclosed the Jones-Freeman relationship, and Jackson Walker affirmed that they had no conflict with any bankruptcy judges in the Southern District of Texas. (*Id.*) And even now, the Plaintiff claims, Freeman remains involved in the GWG Holdings bankruptcy. (*Id.* at 23.)

[6] Cavanaugh clerked for Judge Isgur before joining Jackson Walker. (*Id.* at 11.)

application for the firm to be appointed as Kirkland's conflicts counsel and co-counsel. (*Id.* at 15.) As in previous cases, Jackson Walker's application included a declaration of disinterestedness that did not mention the Jones-Freeman relationship. (*Id.*) Jones approved the request. (*Id.*) Although Jones's appointment order did not mention his ongoing relationship with Freeman, he ordered Jackson Walker to "review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise." (*Id.* at 16 (quoting *In re McDermott Int'l, Inc., et al.*, No. 20-30336 (Bankr. S.D. Tex.), ECF No. 591).) Jones further advised the firm that "[i]f any new relevant facts or relationships are discovered or arise, Jackson Walker LLP will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a)." (*Id.*) In March 2020, Jones appointed Kirkland as lead counsel for the debtors in possession. (*Id.* at 17.)

The case proceeded, and the parties submitted a proposed reorganization plan (the "Plan"), which set forth the terms of McDermott's reorganization. (*Id.*) The Plan, among other things, cancelled "all equity interests of McDermott International Inc," including the Plaintiff's 30,000 shares in the company. *McDermott*, Bk. No. 20-30336, ECF No. 684 at 41. The Plaintiff opposed this Plan and litigated his objections before Jones. (ECF No. 10 at 23.) After several heated exchanges with the Plaintiff, Jones forbade him from entering his courthouse unless escorted by a court security officer. (*Id.* at 23-24.) Jones also notified the United States Marshal and United States Attorney about the Plaintiff's unruly behavior in court. (*Id.* at 24.)

Over the Plaintiff's objections, Jones entered orders confirming the Plan on March 12 and 14, 2020. (*Id.* at 17.) Five months later, on August 14, 2020, Cavenaugh filed an application for $21,154.16 in expenses and $391,655 in attorneys' fees. (*Id.*) Freeman's work accounted for nearly a third of those fees. (*Id.*) Over a two-month period, Freeman billed 147 hours, including

2.7 hours for appearing at a telephonic hearing before Jones.  (*Id.*)  Cavenaugh also filed a fee

application on Kirkland's behalf.  (*Id.*)  In it, Kirkland sought $8.2 million in attorneys' fees and

$142,428.01 in expenses.  (*Id.*)  Jones adopted the firms' proposed fee award orders verbatim.  (*Id.*

at 18.)  Throughout the fee application process, neither Jones, nor Freeman, nor anyone at the law

firms, disclosed the Jones-Freeman relationship.  (*Id.*)

### e.  *An Anonymous Letter Uncovers the Jones-Freeman Relationship.*

While the McDermott bankruptcy was ongoing, the Plaintiff sued several McDermott

officers in state court for conspiracy, fraud, breach of fiduciary duty, and other state law claims.[7]

But despite filing his case in state court, the Plaintiff soon faced a familiar cast of characters.  The

McDermott officers, represented, inevitably, by Jackson Walker and Kirkland, removed the case

to bankruptcy court, where it was assigned, of course, to Chief Judge Jones.  (*Id.* at 24.)  Still

unaware of the Jones-Freeman relationship, the Plaintiff moved to recuse Jones based on the

latter's "animosity" toward the Plaintiff in the McDermott bankruptcy proceedings.  (*Id.*)  The

motion languished on Jones's docket for seven months.  (*Id.*)

While waiting for Jones to rule on the recusal motion, the Plaintiff received an anonymous

letter.  (*Id.*)  The letter accused Jones of corruption and of maintaining an intimate relationship

with Freeman.  (*Id.*)  The Plaintiff emailed Cavenaugh on March 6, 2021, with this new

information.  (*Id.* at 28.)  He also filed this letter on March 8, 2021, as an addendum to his recusal

motion.  (*Id.* at 24.)  The next day, Jones referred the motion to Judge Isgur, who, after a hearing,

---

[7] *See McDermott*, No. 20-30336, ECF No. 983.  The Plaintiff alleged that McDermott's executives needlessly placed the company into bankruptcy "so company insiders [could] dramatically improve their financial positions on the backs of regular shareholders." *Id.* at 20.  Indeed, under the Plan, up to 7.5% of the newly created common stock would go to "management employees and members of the New Board…" *McDermott*, No. 20-30336, ECF No. 5 at 41.  Thus, while McDermott's shareholders lost their entire interest in the company, its executives made millions.

denied the recusal motion in a one-sentence order. (*Id.*) Judge Isgur also ordered the clerk's office to seal the anonymous letter. (*Id.*) Jones then promptly dismissed the Plaintiff's adversary proceeding. (*Id.* at 25.) The Plaintiff appealed the dismissal to the district court, where the dismissal and denial of the motion to recuse were affirmed. (*Id.*)

In none of these proceedings did Jones, Freeman, Jackson Walker, or Kirkland disclose that Jones was maintaining an intimate relationship with Freeman. (*Id.*) In fact, the relationship remained hidden from the public until the Plaintiff filed this lawsuit. (*Id.*) Only then did Jones admit that he and Freeman shared a home and were romantically involved. (*Id.*) However, he told the Wall Street Journal that he was "entitled to a certain degree of privacy" and claimed that he had no duty to disclose the relationship because he and Freeman were unmarried. (*Id.*) He also insisted that Freeman's work did not benefit him financially and that the pair had "agreed" that she would never appear in his courtroom. (*Id.*)

Contrary to these assurances, Freeman was closely involved in several matters before Jones. For instance, she was deeply involved in the McDermott bankruptcy, where her billable hours alone yielded $114,002.50 in attorneys' fees. (*Id.* at 17.) And in January 2023—two years after the Plaintiff shared the anonymous letter exposing the Jones-Freeman relationship—Jones appointed Freeman as a trustee in the mediation of the GWG Holdings bankruptcy, a position in which she was set to earn $100,000 per month for the first six months, then $50,000 per month after that. (*Id.* at 22.) Far from limiting her involvement in these cases, Freeman remained a key player in each of them.

### f. *Chief Judge Richman and the United States Trustee Begin Investigating the Allegations.*

After the Jones-Freeman relationship came to light, Chief Judge Priscilla Richman of the United States Court of Appeals for the Fifth Circuit issued written findings on October 13, 2023,

identifying a complaint against Jones. (ECF Nos. 10 at 26, 10-1 at 2.)  She found that "Judge Jones is in an intimate relationship with Elizabeth Freeman" and "that they have cohabitated (living in the same house or home) since approximately 2017." (ECF No. 10-1 at 2.)  Chief Judge Richman further found that Freeman had appeared before Jones in various matters in which Jackson Walker was involved.  (*Id.*)  And across these cases, the money billed for Freeman's services was "substantial," as were all the fees payable to Jackson Walker.  (*Id.* at 3.)  Even when Freeman was not directly involved in Jackson Walker's cases before Jones, Chief Judge Richman explained, she still "obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones" because she was an equity partner at the firm.  (*Id.*)

Chief Judge Richman found that even when the Plaintiff's recusal motion went before two other judges for their independent review, Jones again failed to disclose the obvious conflict of interest that would have prompted those judges to order his recusal.  (*Id.* at 3-4.)  In fact, far from recusing himself from cases involving Freeman, Jones "recommended to other judges in the Southern District of Texas that Ms. Freeman be appointed to the Lawyer Admissions Committee for the Southern District of Texas Bankruptcy Court." (*Id.* at 4.)  Chief Judge Richman ultimately found probable cause to believe that Jones had violated the ethics code applicable to federal judges, including bankruptcy judges, and began further review under Rule 11 of the Rules for Judicial Conduct and Judicial-Disability Proceedings.  (*Id.* at 5-7.)  But before any further disciplinary action could proceed, Jones announced his resignation on October 15, 2023.  (ECF No. 10 at 27.)

A few weeks later, the United States Trustee began filing motions in the United States Bankruptcy Court for the Southern District of Texas to claw back the fees Jones awarded to Jackson Walker.  (*Id.* at 27-28.)  It argued that the fee awards were "tainted in light of Judge Jones's failure to recuse himself from presiding over cases where Jackson Walker was counsel for the

debtor-in-possession while Freeman was both living with him and a partner at Jackson Walker."
(*Id.* at 28 (quoting *In re 4E Brands*, No. 22-50009 (Bankr. S.D. Tex.), ECF No. 517 at 3) (internal
quotation marks omitted).)  In response, Jackson Walker claimed it did not learn of the relationship
until March 6, 2021, when Freeman, faced with the Plaintiff's accusations, finally admitted to the
firm that she and Jones had been romantically involved.  (*Id.*)  Still, she insisted that the
relationship had ended before March 2020 and that they had never lived together or co-owned a
home.  (*Id.*)  Jackson Walker shared this information with Kirkland.  (*Id.*)

What Jackson Walker did not do, however, was disclose the relationship to anyone else,
including Judge Isgur, who had yet to rule on the Plaintiff's motion to recuse Jones.  (*Id.* at 29.)
Thus, after Kirkland and Jackson Walker learned of the Jones-Freeman relationship, they willfully
withheld from Judge Isgur[8] the one crucial fact that would have led to Jones's recusal.  (*Id.*)
Likewise, no one at the firms disclosed the Jones-Freeman relationship in the McDermott
bankruptcy proceedings, or in any other case before Jones.  (*Id.*)  In fact, just two days after
learning of the relationship, Jackson Walker affirmed its disinterestedness in yet another
bankruptcy proceeding before Jones.  (*Id.*)

Despite the law firms' assurances that they had only just learned of the relationship from
Freeman, multiple partners at Kirkland told the Financial Times "that they were *long aware* of the
romantic relationship between [Jones and Freeman]," although they "did not know how advanced
it was."  (*Id.* at 28-29 (quoting Indap, *supra*) (internal quotation marks omitted) (emphasis in
original).)  These partners insisted that they "assumed [Jones and Freeman] had received clearance
from a superior court or decided that it was not Kirkland's place to intervene in [Jackson Walker's]

---

[8] The Amended Complaint includes no allegations regarding the extent of Judge Isgur's knowledge
of the Jones-Freeman relationship.

retention applications." (*Id.* at 29 (quoting Indap, *supra*) (internal quotation marks omitted).) Additionally, the Plaintiff alleges, "a cursory check of real property records" would have revealed "not only that Freeman and Judge Jones co-owned a house, but also that Jones purchased another home in Coldspring, Texas where Freeman previously resided and where Freeman's parents began residing in 2020." (*Id.* at 30.)  But instead of taking any steps to verify that the relationship had ended, as Freeman claimed, Jackson Walker chose instead to bury its head in the sand and accept her "flimsy" promise that the relationship was over. (*Id.*)  And so, even after learning of the Jones-Freeman relationship, Jackson Walker and Kirkland continued to enjoy lucrative appointments in major bankruptcy cases before Jones.

At some point between 2021 and 2022, Jackson Walker learned from "an unidentified 'credible third party'" that the relationship was still ongoing. (*Id.* at 31 (quoting *In re 4E Brands*, No. 21-30936 (Bankr. S.D. Tex.), ECF No. 258 at 4).)  But once again, the firm kept this revelation under wraps and did not amend its prior conflicts disclosures in any of its cases before Jones. (*Id.* at 31-32.)  Instead, it addressed the matter internally by deducting from Freeman's compensation as an equity partner the profits derived from cases before Jones. (*Id.* at 32.)  The firm also retained the $12.6 million Jones had already awarded them across various cases. (*Id.*)

Freeman left Jackson Walker in 2022—after the firm confirmed that Freeman had lied about the duration and extent of her relationship with Jones. (*Id.*)  Yet their working relationship continued. (*Id.*)  Long after leaving the firm, Freeman "continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker partners, and even held mediations there through at least March 2023." (*Id.* at 33.)  In this way, Freeman's departure was merely "window dressing to create an appearance of propriety" while preserving Jackson Walker's back channel to the most desirable appointments in the nation's largest bankruptcy cases. (*Id.* at 32-33.)

These are serious allegations; but at this stage, they remain only allegations.  The Court accepts them as true for the limited purpose of determining whether the Amended Complaint survives dismissal.

## B.  Procedural Background

This suit began on October 4, 2023, when the Plaintiff filed his *pro se* Complaint[9] against Jones.  (ECF No. 1.)  The Complaint advanced a *Bivens* claim against Jones and sought injunctive and declaratory relief.  (*Id.*)  Pursuant to General Order 2023-21, the case was transferred to the undersigned judge on October 24, 2023.  *In the Matter of Referral of Lawsuits Against David R. Jones*, Gen. Order No. 2023-21 (S.D. Tex. Oct. 20, 2023) (Crane, C.J.).  On December 29, 2023, Jones filed a *pro se* Motion to Dismiss the Complaint.  (ECF No. 9.)

The Plaintiff, now represented by counsel, expanded the scope of this suit on January 11, 2024, when he filed his Amended Complaint, which added new claims and named new defendants—namely Freeman, Jackson Walker, and Kirkland.  (ECF No. 10.)  The Amended Complaint advances the following causes of action: a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim against all the Defendants (Count I), a RICO conspiracy claim against all the Defendants (Count II), common law fraud as to all the Defendants (Count III), breach of fiduciary duty as to all the Defendants (Count IV), aiding and abetting breach of fiduciary duty as to Kirkland (Count V), negligent misrepresentation as to all the Defendants (Count VI), professional negligence as to Jackson Walker, Kirkland, and Freeman (Count VII), common law

---

[9] The Court has sealed several filings that contain individuals' home addresses, including the Plaintiff's original Complaint.  (*See* ECF Nos. 1, 3, 6, 7, 9, 10, 11, and 19.)  The Court ordered the parties to resubmit those filings with only home addresses redacted.  Those filings are now publicly available at ECF Nos. 35-1 (formerly ECF No. 7), 35-2 (formerly ECF No. 9), 35-3 (formerly ECF No. 19), 36-1 (formerly ECF No. 1), 36-2 (formerly ECF No. 3), 36-3 (formerly ECF No. 6), 36-4 (formerly ECF No. 10), and 36-5 (formerly ECF No. 11).

civil conspiracy as to all the Defendants (Count VIII), unjust enrichment as to all the Defendants (Count IX), a *Bivens* claim against Jones (Count X), a *Bivens* conspiracy claim against all the Defendants (Count XI), and "*respondeat superior* and/or agency liability" as to Jackson Walker and Kirkland (Count XII). (ECF No. 10 at 35-93.)

Jones filed his second Motion to Dismiss on March 11, 2024, asserting judicial immunity. (ECF No. 39.) Thereafter, Kirkland filed a Motion for Sanctions (ECF No. 41) and a Motion to Dismiss under Rule 12(b)(6) (ECF No. 44), and Freeman filed a Motion to Dismiss under Rule 12(b)(6) (ECF No. 45). Jackson Walker then filed a Motion to Dismiss under both Rule 12(b)(1) and Rule 12(b)(6). (ECF No. 46.) The parties have since filed extensive briefing on the issues[10] and, on June 6, 2024, presented oral arguments. These Motions are now ripe for decision.

## II. LEGAL STANDARD

### A. Rule 12(b)(1) Standard

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted). In defending against a Rule 12(b)(1) motion, the plaintiff, as the party asserting jurisdiction, bears the burden of proving that jurisdiction exists. *Id.* Courts assessing subject matter jurisdiction under Rule 12(b)(1) may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or

---

[10] The Plaintiff filed timely responses to each motion. (ECF Nos. 62-66.) The day after his deadline, however, he filed amended responses, (ECF Nos. 67-70), despite the Court having denied his second request for an extension of time. (*See* ECF No. 61.) Because these amended filings are untimely, the Court will refer only to those responses which the Plaintiff timely filed.

(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Id.*

### B.  Rule 12(b)(6) Standard

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  A motion filed under Rule 12(b)(6) tests the legal sufficiency of a pleading and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  "The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when all well-pleaded facts are assumed true and are viewed in the light most favorable to the plaintiff."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  The Court cannot, however, "accept as true conclusory allegations or unwarranted deductions of fact."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (internal quotation marks omitted).  When conducting a Rule 12(b)(6) analysis, courts generally should not go beyond the pleadings and must limit their inquiry to the facts stated in the complaint.  *See* Fed. R. Civ. P. 12(d); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

### III. ANALYSIS

### A.  Dismissal Under Rule 12(b)(1)

The Court will first address Jackson Walker's jurisdictional challenge.  (ECF No. 46 at 29-33.)  According to Jackson Walker, the Court has no jurisdiction to consider the Plaintiff's claims because the Plaintiff lacks standing to bring them.  (*Id.*)  The "threshold question in every federal case" is "determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  U.S. Const., Art. III, § 2.  No case or controversy exists when a

party lacks standing to sue. *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016). To establish Article III standing, plaintiffs must show (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant," and which (3) a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Lack of standing under Article III warrants dismissal under Rule 12(b)(1) for want of subject matter jurisdiction. *Home Builders Ass'n*, 143 F.3d at 1010.

### a. Injury

Jackson Walker contends the Plaintiff has not suffered an injury sufficient to establish standing. An injury in fact represents "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). Here, the Plaintiff frames his alleged injuries in several different ways across his filings. The Amended Complaint describes his harm mainly as his reduced financial recovery from the McDermott estate due to the Defendants' actions. (*See, e.g.*, ECF No. 10 at 46.) In recent filings, however, the Plaintiff seems to walk back this characterization of his injury. (*See generally* ECF Nos. 63, 65, 66.) He now frames his harm as (1) the emotional distress Jones caused by treating him harshly during the McDermott bankruptcy and subverting the integrity of the judicial process, (2) the costs associated with litigating his motion to recuse Jones, and (3) violations of his civil rights that entitle him to nominal damages "at a minimum." (*See* ECF Nos. 63 at 8, 65 at 8-9, 66 at 24-25.) The Court will examine each alleged injury in turn.

### i.  *Reduced Recovery from the Bankruptcy Estate*

Scattered throughout the Amended Complaint are various versions of the following allegation: that the attorneys' fees Jones improperly awarded to Jackson Walker and Kirkland diminished the McDermott bankruptcy estate, thereby reducing the recovery available to satisfy

15

McDermott's creditors, including the Plaintiff.[11]  In advancing this claim, the Plaintiff misrepresents his position in the McDermott bankruptcy.[12] The bankruptcy court records show he was not, in fact, a creditor to the bankruptcy estate.[13]  Rather, he was an equity shareholder who held 30,000 shares of McDermott stock.  (ECF No. 10 at 23.)  These shares were extinguished by the reorganization plan (the "Plan").[14]  (Id.)  Once Jones confirmed the Plan in March 2020—five months before he approved the law firms' fee awards—the Plaintiff retained no interest whatsoever in the McDermott estate.[15]  Ultimately then, the Plaintiff has not shown that the Defendants' actions

---

[11] (See, e.g., ECF No. 10 at 86 ("Plaintiff's recovery as a bankruptcy creditor was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by the fees improperly awarded to Jackson Walker and Kirkland & Ellis by Judge Jones…"); see also id. at 67, 68, 69, 81.)

[12] The Plaintiff is inconsistent in describing his interest in McDermott.  Within the Amended Complaint, the Plaintiff refers to himself sometimes as a shareholder, and other times as a creditor. (Compare ECF No. 10 at 4 ("Mr. Van Deelen was a shareholder of McDermott International, Inc."), with id. at 45 (referring to "creditors, such as Plaintiff").)

[13] The Plaintiff's own filings during the bankruptcy proceeding confirm he was a shareholder, not a creditor. See, e.g., Party in Interest's Amended Motion for Order Appointing Trustee or Examiner Pursuant to 11 U.S.C. Section 1104, McDermott, No. 20-30336, ECF No. 441 at 2 ("Van Deelen is a party in interest to the existing action who owns 30,000 shares of McDermott International stock."); Letter to Court, McDermott, No. 20-30336, ECF No. 253 ("I am an equity holder and party in interest of McDermott International."); McDermott, No. 20-30336, ECF No. 510 at 2 ("Van Deelen is a party in interest to the existing action who owns 30,000 shares of McDermott International stock.").

[14] Not all reorganization plans extinguish shareholders' equity interest, but bankruptcy courts often approve such arrangements "to shield the business against efforts to force liquidation."  Lynn M. Lopucki & William C. Whitford, Bargaining Over Equity's Share in the Bankruptcy Reorganization of Large, Publicly Held Companies, 139 U. Pa. L. Rev. 125, 127-28 (1990) ("[A reorganization] plan may extend the time for payment of the debtor's obligations, reduce the amounts of those obligations, compel creditors to accept stock in full or partial payment of their rights, or even cancel stock or obligations without compensation.").

[15] Even if the Plaintiff had retained his equity interest, it would have given him at best a residual claim to the estate after McDermott's numerous creditors and preferred stockholders were made whole. See, e.g., Barry E. Adler, Bankruptcy and Risk Allocation, 77 Cornell L. Rev. 439, 441 n.8 (1992) ("Common stock represents the residual claim to a corporation's earnings and assets after

deprived him of anything he had not already lost long before Jackson Walker and Kirkland requested attorneys' fees.[16]  Thus, the Plaintiff's alleged harm cannot satisfy Article III's injury-in-fact requirement.[17]

      *ii.*   <u>*Mental Anguish*</u>

      The Amended Complaint also alleges that the Plaintiff "sustained mental anguish damages as a result of the harsh treatment he received in court, and as a result of learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for protesting creditors and investors." (ECF No. 10 at 34.)  Even if properly pleaded, this injury can only confer standing as to the Plaintiff's state law and *Bivens* claims, because RICO does not permit recovery for emotional injuries.  *See Genty v. Resol. Tr. Corp.*, 937 F.2d 899, 918 (3d Cir. 1991) (finding that the federal RICO statute does not permit recovery for emotional harm); *see also Zareas v. Bared-San Martin*,

---

the corporation satisfies its obligations to creditors and any 'preferred' stockholder with a superior claim.").

[16] Notably, the Plaintiff does not allege that but-for the Defendants' actions, the reorganization would not have extinguished his shares or that McDermott would not have filed for bankruptcy. Nor does he allege that but-for the Defendants' actions, the Plan would not have been approved.

[17] Even if the Plaintiff was a McDermott creditor with a prioritized interest in the bankruptcy estate, prudential concerns would defeat standing.  Beyond Article III standing, a plaintiff must satisfy various prudential standing requirements to bring suit.  Generally, these principles present a Rule 12(b)(6) issue, rather than a jurisdictional defect.  *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990).  Here, limits on shareholder standing bar the Plaintiff from redressing harms committed against the McDermott bankruptcy estate.  *See Matter of Educators Grp. Health Tr.*, 25 F.3d 1281, 1284 (5th Cir. 1994).  "If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim."  *Id.*  Courts have long rejected attempts by creditors and shareholders to bring derivative claims owned by the bankruptcy estate.  *See Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 306 (5th Cir. 2001).  Even accepting that the Defendants defrauded McDermott of millions of dollars in attorneys' fees, the Plaintiff has not shown that this injury is <u>his</u> to redress, rather than the bankruptcy estate's.  Thus, to the extent the Plaintiff has alleged a harm against McDermott, he fails to show why he is the one to redress it.

209 F. App'x 1, 2 (1st Cir. 2006) ("[C]laims for personal injuries, such as emotional distress, are not 'business or property' and are not cognizable under RICO."). The Plaintiff, however, has not properly alleged such an injury.

In Texas, plaintiffs seeking redress for emotional injuries face an uphill battle. *See, e.g.*, *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442-44 (Tex. 1995). Such claims "have long been distrusted by the common law," and Texas courts have forged only a narrow path for them to succeed. *Id.* Mental anguish requires "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish thus establishing a substantial disruption in the plaintiff['s] daily routine," or "evidence of a 'high degree of mental pain and distress' that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Id.* at 444 (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990)); *see also Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex. App.—Corpus Christi 1992) (discussing the severity requirement).

The Plaintiff was understandably worried, vexed, embarrassed, and angry during the McDermott bankruptcy. But his allegations go no further. Other than stating that his experience in Jones's court was "extremely stressful," the Plaintiff provides no detail about the nature, duration, or severity of his supposed emotional injury. (ECF No. 10 at 75.) Nor does he specify how his mental anguish has affected his daily life or manifested physically. *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) ("Compensation can only be for mental anguish that causes 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'") (quoting *Parkway*, 901 S.W.2d at 444).

Although "'at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice' to establish standing," *Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560), "[a] federal court is powerless to create its own

jurisdiction by embellishing otherwise deficient allegations of standing," *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990). Here, even under a generous reading of the Plaintiff's mental anguish allegations, the Plaintiff "does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990)).

Moreover, even if properly pleaded, the Plaintiff's mental anguish allegations fail to the extent they derive from McDermott's alleged injuries. *See Galindo v. City of Del Rio*, No. DR-20-CV-20-AM, 2021 WL 2763033, at *4 (W.D. Tex. Mar. 26, 2021) (dismissing allegations of mental anguish as derivative of harms to a business). Courts resist attempts to manufacture shareholder standing based on a shareholder's emotional injuries. *See Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721, 729 (8th Cir. 2001) ("Doubtless a sole shareholder may suffer shame and humiliation when the corporation is destroyed, but an 'emotional injury' exception would swallow the rule against shareholder standing."), *opinion vacated then reinstated*, 286 F.3d 498 (8th Cir. 2002); *see also Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019) ("[B]ecause Simao's emotional distress and legal expenses indirectly stem from the alleged harm to Liberty, the owner of the land at issue, and because he does not allege an injury independent of Liberty's injuries, Simao does not have standing to assert his retaliation claim.").

Here, the Plaintiff claims he was anguished to learn that there was "no level playing field for protesting creditors and investors." (ECF No. 10 at 34.) This aspect of the Plaintiff's mental anguish allegations "blur[s] the distinction between [McDermott] and himself" and therefore fails to allege an injury personal to him. *Galindo*, 2021 WL 2763033, at *4. Accordingly, the Plaintiff's mental anguish allegations do not satisfy Article III's injury-in-fact requirement for any of the Plaintiff's claims.

### iii. *Prior Legal Expenses*

In recent filings, the Plaintiff frames his injury as the money he spent during the McDermott bankruptcy and his motion to recuse.[18]  In particular, he highlights (1) "the costs and expenses incurred in filing motions and attending hearings in a bankruptcy proceeding that he did not realize were futile because the playing field was tilted against him from the outset," and (2) "the costs and expenses incurred in presenting a motion to recuse based on the Jones-Freeman relationship (and appealing the denial of that motion) when such motion would not have been necessary had Defendants been truthful about the existence of that relationship." (ECF No. 66 at 37.)  Notably, these allegations appear only in the Plaintiff's responses to the Motions to Dismiss, and not the Amended Complaint. (*See, e.g.*, *id.*)  The Amended Complaint does not seek "costs and expenses incurred in filing motions and attending hearings." (*See* ECF No. 10.)  It merely seeks "costs," without any further information. (*Id.* at 63.)  A plaintiff cannot seek "costs" and later decide what "costs" means. *See Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) ("[S]tanding is not created by a declaration in court pleadings.") (citation omitted).  To the extent the Plaintiff seeks to amend his allegations to include new injuries, a response in opposition to a motion to dismiss is not the proper vehicle. *See Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016).

Even if the Plaintiff had properly alleged prior litigation costs as an injury, it would not give him standing to bring his RICO and state law claims.  The Supreme Court has long rejected attempts to achieve standing through litigation costs alone. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990)

---

[18] The Plaintiff focused primarily on this injury at the June 6, 2024, motions hearing.

("[An] interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."); *c.f. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("[A plaintiff] cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). In *Steel*, the Court explained that "a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit." 523 U.S. at 107. Lower courts have applied this principle to suits seeking prior litigation costs. *See Hole v. Tex. A&M Univ.*, 360 F. App'x 571, 573 (5th Cir. 2010) ("[A] party who voluntarily initiates litigation and does not win a judgment, cannot then sue to recover attorney's fees as a compensable injury."); *see also Lopez v. Hous. Indep. Sch. Dist.*, 124 F. App'x 234, 235-36 (5th Cir. 2005) (per curiam) (finding no standing where the appellant's only injuries were legal costs incurred in a prior mediation in which he was not the prevailing party). Thus, even if the Court read the Amended Complaint liberally to seek prior litigation costs, such costs would not constitute an injury for Article III standing purposes.[19]

   iv.   *Nominal Damages for Constitutional Violations*

   Lastly, the Plaintiff claims that the Defendants' scheme violated his due process rights, thereby entitling him to at least nominal damages. (ECF No. 10 at 63.) This alleged injury can only give the Plaintiff standing to bring his *Bivens* claims, as none of the Plaintiff's other causes

---

[19] There are some limited circumstances in which courts have permitted plaintiffs to recover prior litigation costs. For example, the Fifth Circuit and Texas state courts have recognized the "tort of another" doctrine. *See, e.g., Turner v. Turner*, 385 S.W.2d 230, 234 (Tex. 1964); *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 426 (5th Cir. 2008). This doctrine applies in "situations where the natural and proximate results and consequences of prior wrongful acts had been to involve a plaintiff . . . in litigation." *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 251 (5th Cir. 2014) (quoting *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 431 (5th Cir. 2003)). However, the Plaintiff has not invoked this principle, and his allegations regarding prior litigation costs are too sparse to support its application here.

of action forge a path to redress constitutional violations.[20]   Specifically, he claims that Jones

violated his Fifth and Fourteenth Amendment right to due process through the following actions:

> (i) influencing the assignment of bankruptcy cases so that cases involving clients
> of Defendant Jackson Walker and Freeman were heard in his court, (ii) approving
> the payment of attorneys' fees to Defendants Jackson Walker and Freeman, (iii)
> making judicial decisions based on personal relationships and self-interest rather
> than the evidence presented, (iv) failing to disclose to Plaintiff and other creditors
> his intimate relationship with an attorney (Defendant Freeman) representing the
> debtor, and (v) issuing rulings favorable to Jackson Walker and Freeman to enhance
> the status and reputation of Freeman and Jackson Walker as bankruptcy attorneys
> so as to increase demand for their services.

(ECF No. 10 at 89.)   The Plaintiff claims that these acts and omissions deprived him of "his

property without due process of law," his "right to an unbiased tribunal," his "right to know

opposing evidence," his "right to have a decision based exclusively on the evidence presented,"

his "right to equal access to courts," and his "right to equal protection under the laws."   (*Id.* at 88-

89.)   Consequently, the Plaintiff claims, he suffered "a loss of his civil rights, deprivation of equal

access to the courts, deprivation of due process, monetary losses, emotional distress, and mental

anguish."   (*Id.* at 90.)

It is well-established in the Fifth Circuit "that plaintiffs may recover nominal damages

when their constitutional rights have been violated but they are unable to prove actual injury."

*Williams v. Kaufman Cnty.*, 352 F.3d 994, 1014 (5th Cir. 2003); *see also Boyd v. Driver*, 495 F.

App'x 518, 524 (5th Cir. 2012) ("[B]oth nominal and punitive damages are recoverable in a civil

---

[20] *Bivens* and 42 U.S.C. § 1983 remain the exclusive avenues to seek money damages for
constitutional harms.   *See Lee v. Morial*, No. CIV. A. 99-2952, 2000 WL 726882, at *2 (E.D. La.
June 2, 2000) ("The primary vehicle for bringing constitutional claims against local governments
and officials is 42 U.S.C. § 1983."); *see also* Henry Rose, *The Demise of the Bivens Remedy is
Rendering Enforcement of Federal Constitutional Rights Inequitable But Congress Can Fix It*, 42
N. Ill. U. L. Rev. 229, 241 (2022) ("If a person's federal constitutional rights have been violated
by federal actors, the person will only be able to sue the government actors for damages if the
Supreme Court's precedents in *Bivens*, *Davis*, or *Carlson* apply to the case.").

rights action."). The Court will address the merits of these constitutional claims below. But so far as Article III standing is concerned, the Plaintiff has adequately alleged a particularized harm because these constitutional injuries—to the extent they are properly pleaded—are personal, individual, and distinct to him. *See Lujan*, 504 U.S. at 560.

### b. Causation

Even if the Plaintiff sufficiently alleged an injury for each of his causes of action, he still must trace that injury to the Defendants' conduct, which he has not done. *See Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). "To show traceability, a plaintiff must allege that his injury is 'connect[ed] with the conduct about which he complains.'" *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 335 (5th Cir. 2021) (alteration in original) (quoting *Trump v. Hawaii*, 585 U.S. 667, 697-98 (2018)). The Plaintiff's allegations regarding mental anguish, litigation costs, and constitutional harms are sufficiently linked to the Defendants' conduct to satisfy causation. But the primary injury he alleges—i.e. his reduced recovery from the McDermott estate—is not. Specifically, he fails to plausibly plead that this injury is traceable to the Defendants' actions.

Even if the Plaintiff had a cognizable interest in the bankruptcy estate, the Amended Complaint does not trace a reduction in that estate to the specific actions of which he complains. The Plaintiff does not allege that without Jackson Walker's and Kirkland's involvement in the McDermott bankruptcy, their attorneys' fees would have stayed with the bankruptcy estate rather than going to another law firm. And nowhere does the Plaintiff allege that Jackson Walker and Kirkland received higher fee awards than any other law firm would have secured had Kirkland and Jackson Walker never handled the case.

Additionally, even if the Plaintiff had an interest in the estate, the timeline of the McDermott bankruptcy belies the necessary causation. In framing his alleged injury, the Plaintiff relies on the attorneys' fees Jones awarded to Jackson Walker and Kirkland. (ECF No. 10 at 39.) Yet Jones approved these awards long after the Plaintiff lost his interest in McDermott—a loss which the Amended Complaint does not challenge. "[A]n effect cannot precede its cause." *L. Funder, L.L.C. v. Munoz*, 924 F.3d 753, 761 (5th Cir. 2019), *as revised* (June 6, 2019). The Defendants' fee awards could hardly have interfered with the Plaintiff's interest in the McDermott estate when that interest ceased to exist months earlier. Thus, the Plaintiff fails to trace any reduced financial recovery to the Defendants' actions.

### c. *Redressability*

The redressability element poses less of a challenge for the Plaintiff. If he could demonstrate that the Defendants caused him a cognizable financial injury, then presumably an award of money damages would make him whole. But to the extent the Plaintiff's injury merely reflects harms to the bankruptcy estate, he has no injury to redress from an Article III perspective.

Ultimately, the Plaintiff has not demonstrated a cognizable, redressable injury with a causal link to the Defendants' conduct sufficient to support his RICO and state law claims. *See Lujan*, 504 U.S. at 560-61. That is not to say that there exists no cognizable claim for him to bring.[21] But on these allegations and causes of action, the Court lacks subject matter jurisdiction to consider all but the Plaintiff's *Bivens* claims. The Court therefore grants Jackson Walker's Motion to Dismiss under Rule 12(b)(1) (ECF No. 46) as to all claims except those brought under *Bivens*.

---

[21] As always, "[o]ther cases presenting different allegations and different records may lead to different conclusions." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring).

Consequently, the Court dismisses all non-*Bivens* claims against Jackson Walker, Kirkland, Freeman, and Jones.[22]

## B. Dismissal Under Rule 12(b)(6)

The Court now turns to the Plaintiff's *Bivens* claims, which the Defendants seek to dismiss under Rule 12(b)(6). (ECF Nos. 44 at 48, 45 at 14, 46 at 24-25.) The Plaintiff asserts two *Bivens* claims: a substantive *Bivens* claim against Jones and a *Bivens* conspiracy claim against all Defendants. (ECF No. 10 at 88-92.) The Plaintiff alleges that the Defendants' scheme to rig the bankruptcy system deprived him of "his property without due process of law," his "right to an unbiased tribunal," his "right to know opposing evidence," his "right to have a decision based exclusively on the evidence presented," his "right to equal access to courts," and his "right to equal protection under the laws." (*Id.* at 88-89.) The Plaintiff further alleges that the Defendants conspired to perpetrate these constitutional wrongs, thereby giving rise to both a *Bivens* and a *Bivens* conspiracy claim. (*Id.* at 90-92.) However, these allegations fail to plausibly allege a *Bivens* claim and are therefore subject to dismissal.

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, the Supreme Court recognized an implied cause of action against federal agents who conducted an unreasonable search and seizure in violation of the Fourth Amendment. 403 U.S. 388, 397-98 (1971). Soon after *Bivens*, the Court extended its holding to also recognize causes of action in two other contexts: gender discrimination in violation of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and failure to treat a prisoner's medical condition in violation of the Eighth Amendment. *Carlson v. Green*, 446 U.S. 14, 16-18 (1980). In the four decades since this trilogy of cases,

---

[22] Because the Court only has subject matter jurisdiction over the Plaintiff's *Bivens* claims, it does not reach the Defendants' Rule 12(b)(6) arguments regarding the remaining claims. *See Ramming*, 281 F.3d at 161.

however, the Supreme Court has yet to extend *Bivens* to any new context.[23]   In fact, it has repeatedly stressed that extending *Bivens* is "a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 121 (2017) (quoting *Iqbal*, 556 U.S. at 675); *accord Hernandez v. Mesa*, 589 U.S. 93, 100-01 (2020); *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) ("[T]o put it mildly, extending *Bivens* to new contexts is a 'disfavored judicial activity.'") (quoting *Ziglar*, 582 U.S. at 135).   For this reason, "courts across the country have proceeded with extreme caution when recognizing a *Bivens* remedy." *Goodale v. Seguin*, No. SA-22-CV-00031-XR, 2022 WL 17084400, at *4 (W.D. Tex. Nov. 17, 2022).

When considering whether to imply a cause of action under *Bivens*, courts conduct a two-part analysis. *Egbert v. Boule*, 596 U.S. 482, 483 (2022).   First, the Court asks "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the [Supreme] Court has implied a damages action." *Id.* (cleaned up).   Second, if the case would extend *Bivens* to a new context, the Court asks whether any "special factors indicate that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted).   If so, then the Court must decline to authorize a new cause of action. *Id.*   "This two-step inquiry often resolves to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

---

[23] The Supreme Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020) (collecting cases); *see also Minneci v. Pollard*, 565 U.S. 118, 131 (2012); *Wilkie v. Robbins*, 551 U.S. 537, 568 (2007); *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *FDIC v. Meyer*, 510 U.S. 471, 486 (1994); *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988); *United States v. Stanley*, 483 U.S. 669, 686 (1987); *Chappell v. Wallace*, 462 U.S. 296, 305 (1983); *Bush v. Lucas*, 462 U.S. 367, 390 (1983).

26

                    i.    *New Context*

"The proper test for determining whether a case presents a new *Bivens* context is" whether it is "different in a meaningful way from previous *Bivens* cases decided by" the Supreme Court. *Ziglar*, 582 U.S. at 139. "[D]ifferences that are meaningful enough to make a given context a new one" include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 139-40. Because the existing framework of cognizable *Bivens* claims is so narrow, almost every *Bivens* case will present a new context. *See Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (explaining that outside the original *Bivens* trilogy, "[v]irtually everything else is a 'new context'") (quoting *Ziglar*, 582 U.S. at 147).

Unsurprisingly then, this case presents a new *Bivens* context. The Plaintiff's claims involve alleged Fifth and Fourteenth Amendment due process violations based on a bankruptcy judge's award of attorneys' fees without disclosing a conflict of interest. (ECF No. 10 at 88-92.) Compared to the *Bivens* trilogy, these allegations present "different conduct by different officers from a different agency." *Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019). Indeed, the only similarity between the Plaintiff's claims and the *Bivens* trilogy is that, like *Davis*, the Plaintiff alleges a Fifth Amendment violation. *Compare* (ECF No. 10 at 88), *with Davis*, 442 U.S. at 230-31. But "[n]o one thinks *Davis* . . . means the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action." *Cantu*, 933 F.3d at 422. Here, the Plaintiff invokes a different Fifth Amendment right than the one at issue in *Davis*. Whereas *Davis* involved the equal protection component of the Fifth Amendment's due process clause, 442 U.S. at 234-36, here, the

                                   27

Plaintiff's claims would fall more appropriately under its procedural due process guarantee. The Supreme Court has never recognized a *Bivens* claim under the Fifth Amendment's procedural due process component.

"[E]ven a modest extension [of *Bivens*] is still an extension," *Ziglar*, 582 U.S. at 147, and here, the Plaintiff's claims present more than a modest extension of *Bivens*. The Plaintiff's allegations "cannot be shoehorned into *Bivens*, *Davis*, or *Carlson*," and thus, they represent a new *Bivens* context. *Cantu*, 933 F.3d at 423.

ii.   *Special Factors*

Because this case concerns a new *Bivens* context, the Court must next decide whether any special factors make the judiciary less equipped than Congress to "weigh the costs and benefits of allowing a damages action to proceed." *See Ziglar*, 582 U.S. at 136. "'The only relevant threshold—that a factor 'counsels hesitation'—is remarkably low.'" *See De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc)). "[I]n all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert*, 596 U.S. at 486. Consequently, "[i]f any special factors do exist, then courts must refrain from creating an implied cause of action in that case." *Canada v. United States*, 950 F.3d 299, 309 (5th Cir. 2020) (internal quotation marks omitted). Here, at least one concern counsels against extending *Bivens* as the Plaintiff requests.

The presence of "any alternative, existing process for protecting the interest" at issue will counsel against extending *Bivens*. *Wilkie*, 551 U.S. at 550. Importantly, "it is irrelevant to a 'special factors' analysis whether the laws currently on the books afford" a particular plaintiff "an 'adequate' federal remedy for his injuries." *Stanley*, 483 U.S. at 683. *Bivens* seeks to deter unlawful conduct, not merely fill gaps for plaintiffs with no other avenue for relief. *See Malesko*,

534 U.S. at 71 (noting that *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers"); *see also Egbert*, 596 U.S. at 498 ("So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy."); *Meyer*, 510 U.S. at 485 ("[T]he purpose of *Bivens* is to deter *the officer*.") (emphasis in original); *c.f. Carlson*, 446 U.S. at 21 ("Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States."). Thus, "the focus is whether the Government has put in place safeguards to prevent constitutional violations from recurring." *Egbert*, 596 U.S. at 498 (cleaned up).

Here, there are existing safeguards to address the type of conduct alleged in this case. There are statutes governing judges' recusal. *See, e.g.*, 28 U.S.C. § 455. Parties can appeal recusal decisions, just as the Plaintiff did in his adversarial proceeding.[24] The Judicial Council of the Fifth Circuit can remove bankruptcy judges for misconduct. *See* 28 U.S.C. § 152(e). And to the extent a judge acts outside his judicial capacity, there is no reason why he cannot be held liable for claims including RICO and common law fraud. Finally, in the bankruptcy context, the United States Trustee seeks "to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders—debtors, creditors, and the public." *Program Mission*, U.S. Trustee Program (Nov. 2, 2020), https://www.justice.gov/ust/program-mission. Indeed, the U.S. Trustee is currently seeking to claw back Jackson Walker's attorneys' fees from its cases before Jones.[25] Of course,

---

[24] That recusal motion is now pending before the Fifth Circuit. *Van Deelen v. Dickson, et al.*, 23-20436 (5th Cir.).

[25] *In re Professional Fee Matters Concerning the Jackson Walker Law Firm*, No. 23-00645 (Bankr. S.D. Tex.). The U.S. Trustee has moved to withdraw the reference of these claw back proceedings from the United States Bankruptcy Court for the Southern District of Texas. *See id.* at ECF No. 1.

these mechanisms did not deter Jones's conduct in this case. But they are no less relevant for *Bivens* purposes and caution against inferring a highly novel cause of action into the Fifth and Fourteenth Amendments.

The Plaintiff's *Bivens* conspiracy claim raises another concern in that it seeks to hold private actors liable. (ECF No. 10 at 90.) "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Malesko*, 534 U.S. at 70. The Supreme Court has thus rejected *Bivens* claims brought against private sector actors. *See id.* at 71 ("[I]nferring a constitutional tort remedy against a private entity . . . is therefore foreclosed."). Consequently, "there is no implied private right of action, pursuant to *Bivens*, for damages against private entities . . . that engage in alleged constitutional deprivations while acting under color of federal law." *Marsaw v. Thompson*, 133 F. App'x 946, 948 (5th Cir. 2005). Thus, even if the Court were to extend *Bivens* to cover the Plaintiff's claims, those claims would fail as to Freeman, Kirkland, and Jackson Walker.

Courts must resist the temptation to bend existing frameworks to bring a vexing case to a palatable resolution. As the saying goes, "hard cases[] make bad law." *N. Sec. Co. v. United States*, 193 U.S. 197, 400 (1904) (Holmes, J., dissenting). And this is a hard case. Extending *Bivens* to cover the Defendants' alleged conduct—egregious as it is—would greenlight a new category of lawsuits: claims for money damages based on how judges handle potential conflicts of interest. Recusal decisions require circumspection, as a judge's "duty to sit where not disqualified . . . is equally as strong as the duty to not sit where disqualified." *Laird v. Tatum*, 409 U.S. 824, 837 (1972). Whether liability should extend to the constitutional violations the Plaintiff alleges is

---

This Motion has since been referred to the undersigned. *See* Order, *Off. of the U.S. Tr. for Region 7 v. Jackson Walker LLP*, No. 4:23-CV-4787, ECF No. 20 (S.D. Tex. Aug. 8, 2024) (Crane, C.J.).

ultimately a policy question that Congress is well equipped to answer through appropriate legislation. But "courts may not create [a cause of action], no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). Accordingly, the Court declines to extend *Bivens* to this new context. Because the Amended Complaint does not sufficiently allege a cognizable claim under *Bivens* against either Jones or the other Defendants, the Court dismisses both *Bivens* claims under Rule 12(b)(6).[26]

None of the foregoing discussion redeems Jones's misconduct. By statute, a judge "<u>shall</u> disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added). The Jones-Freeman relationship presented a glaring appearance of impropriety. Even if Jones felt that his relationship with Freeman would not actually affect his judgment, courts evaluate § 455(a) "on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994); *accord Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). Jones also violated § 455(b), which requires disqualification when a judge's "spouse, or a person within the third degree of relationship to either of them . . . is acting as a lawyer in the proceeding." *Id.* § 455(b)(5)(iii). Subsection (b) also requires disqualification where the judge "knows that he . . . or his spouse . . . has a financial interest in the subject matter in controversy." *Id.* § 455(b)(4). Although Jones and Freeman are unmarried, courts interpret § 455(b) to require disqualification whenever a conflict presents "the functional equivalent of a relationship that creates the objective

---

[26] Because the Plaintiff's *Bivens* claims already fail under Rule 12(b)(6), the Court need not address at this juncture whether those claims are time-barred or whether Jones is entitled to judicial immunity.

appearance of a § 455(b) violation." *United States v. Rechnitz*, 75 F.4th 131, 145 (2d Cir. 2023). The disqualifying conflicts outlined in § 455(b) are non-waivable. *See* 28 U.S.C. § 455(e).

When a law firm partner is related to the judge within the third degree and is counsel in a case, the Fifth Circuit has found that he "automatically has an interest that could be substantially affected by the outcome of the proceedings." *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1259 (5th Cir. 1983). Here, the Plaintiff alleges an even clearer conflict: an attorney who is romantically involved with the judge and living with him in a co-owned house. (ECF No. 10 at 8-9.) Any litigant or member of the public might reasonably question whether the fees Jones awarded to Jackson Walker may have been paying the judge's mortgage and utility bills.

Likewise, as Chief Judge Richman explained, Jones ran roughshod over several canons of the Code of Conduct for United States Judges. (ECF No. 10-1); *e.g.*, Code of Conduct for U.S. Judges, Canon 2 (2019) ("A judge should avoid impropriety and the appearance of impropriety in all activities."); *id.* at 2B ("A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment."); *id.* at 3C(1)(c) (requiring disqualification when a judge's spouse, or anyone "with whom the judge maintains both a household and an intimate relationship" has a financial interest in the case).

Whether through hubris, greed, or profound dereliction of duty, Jones flouted these statutory and ethical requirements by presiding over dozens of cases from which he was obviously disqualified. The legal deficiency of the Plaintiff's claims does not erase these failures.

### C. Kirkland's Motion for Sanctions

Kirkland has filed a Motion for Sanctions against the Plaintiff and his attorneys. (ECF No. 41.) It argues that the Amended Complaint is "legally and factually frivolous." (*Id.* at 26.) Kirkland thus seeks an award of attorneys' fees and costs it spent defending against the Amended

Complaint, including fees and costs associated with its Motion for Sanctions and Motion to Dismiss. (*Id.*)  Further, Kirkland asks that the Court order the Plaintiff to "pay a 'penalty into the court' in an amount the Court deems appropriate." (*Id.* (quoting Fed. R. Civ. P. 11(c)(4)).) As outlined below, the Court finds that sanctions are not appropriate at this juncture and denies Kirkland's request.

"Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990).  Courts may thus impose Rule 11 sanctions even when it lacks subject matter jurisdiction over the underlying action. *Willy v. Coastal Corp.*, 915 F.2d 965, 967 (5th Cir. 1990) ("[T]o effectuate the goals of Rule 11, a district court must possess the authority to impose sanctions irrespective of the existence of subject matter jurisdiction.").  Accordingly, although the Court lacks subject matter jurisdiction over most of the Plaintiff's claims, it nonetheless retains jurisdiction over Kirkland's sanctions motion. *See id.*

### a. Rule 11 Standard

Federal Rule of Civil Procedure 11 empowers courts to impose sanctions on attorneys, law firms, and parties who engage in certain unethical behaviors while litigating a case.  Rule 11(b) provides in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(1)-(b)(3). Rule 11(c) provides that, "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."[27] The Court has broad discretion in the imposition of sanctions under Rule 11. *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001).

### b. *Kirkland's Factual Allegations*

According to Kirkland, "[b]oth Plaintiff and his counsel have astounding track-records of filing meritless cases." (ECF No. 41 at 8.) The Plaintiff has filed myriad federal cases as a *pro se* litigant. *See, e.g.*, *Van Deelen v. Alamogordo Pub. Sch.*, No. CV07-171MV/LCS, 2008 WL 11417175, at *1 (D.N.M. Mar. 14, 2008) ("A quick review of the electronic databases from federal courts . . . indicates that Van Deelen has a long history of engaging in extensive litigation against judges, attorneys, police and security officers, school districts, and governmental boards, commissions, employees and employers, and of making very similar claims to the ones in the case at bar."). These courts were unimpressed with the Plaintiff's claims. *See id.*; *see also Van Deelen v. City of Kan. City*, No. 04-989-CV-W-GAF, 2006 WL 2077640, at *14 (W.D. Mo. July 24, 2006) (imposing sanctions, *sua sponte*, after finding that the Plaintiff "abused the judicial process by fabricating evidence to create a genuine issue of material fact for trial"), *aff'd*, 262 F. App'x 723 (8th Cir. 2007); *Van Deelen v. City of Eudora*, No. 96-4040-SAC, 1996 WL 707016, at *8 (D. Kan. Nov. 5, 1996) (finding that the Plaintiff had violated Rule 11).

Kirkland also highlights several statements the Plaintiff allegedly made in bankruptcy court as evidence of his history of misbehavior. (ECF No. 41 at 8-10.) The bankruptcy court record

---

[27] Moreover, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.*

indicates that the Plaintiff "called the Court a 'son of a bitch'" and made other "vulgar remarks" toward a partner at Kirkland.  (ECF No. 41 at 9.)  The Plaintiff denies making these statements. (*Id.*)

Kirkland argues that the lawyers whom the Plaintiff hired to represent him in this suit have an equally sordid history of unethical litigation tactics.  (*Id.* at 10.)  Indeed, the Bandas Law Firm is no stranger to Rule 11.  (*Id.*)  The firm has been "widely criticized by . . . courts around the country" for its "excessive and irrelevant pleadings and documents to slow down the litigation process."  *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. CV157658MASLHG, 2020 WL 7585741, at *5 (D.N.J. Dec. 21, 2020) (denying admission *pro hac vice* "given the lengthy and extremely troubling history of the Bandas Firm"); *see also Edelson PC v. Bandas L. Firm PC*, No. 16C11057, 2018 WL 723287, at *2 (N.D. Ill. Feb. 6, 2018) ("The [Bandas Firm's] conduct appears to be in bad faith, to have no genuine social value, and to be inconsistent with the ethical standards of the legal profession."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (noting that a Bandas attorney had been "excoriated by Courts for [his] conduct"); *Garber v. Off. of Comm'r of Baseball*, No. 12-CV-03704 (VEC), 2017 WL 752183, at *6 (S.D.N.Y. Feb. 27, 2017) ("This Court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off.").  Given this troubling record, Kirkland argues that the Amended Complaint is the latest in a string of meritless RICO cases filed by the Bandas Firm, and specifically Robert Clore and Mikell West.  (ECF No. 41 at 11.)

### c. *Sanctions Analysis*

Just because the Plaintiff and his lawyers have previously violated Rule 11 does not mean they have done so here.  Assuming the truth of the Plaintiff's allegations, he was a victim of a

conspiracy that deprived him of fair access to the federal courts and extinguished a valuable interest in McDermott. Although the Plaintiff fails to state a valid cause of action, his allegations, if true, show that he suffered injustice in Jones's courtroom. The Court will not punish the Plaintiff for seeking to redress his grievances in a forum in which, for once, the deck is not stacked against him. True, the Plaintiff has a history of filing meritless claims about supposed public corruption. But this time, he was right. Time and time again, the most powerful players in the bankruptcy system dismissed him as another crazed, vexatious litigant. And now, in one final twist of the knife, Kirkland seeks to punish the Plaintiff for having the audacity to sue it. The Court will not oblige. After all, it was the Plaintiff's audacity that brought this scandal to light. Had the anonymous letter arrived in anyone else's mailbox, perhaps Jones would still be on the bench, awarding millions of dollars to Kirkland and Jackson Walker.

The Court is less sympathetic towards the Plaintiff's counsel, Robert Clore and Mikell West of the Bandas Law Firm. These attorneys have considerable experience litigating complex federal cases. They, of all people, should know the limits of Article III standing. Yet across hundreds of pages of briefing, they advance a theory of the Plaintiff's injury that contradicts binding precedent and leaves this Court without jurisdiction over almost all of the Plaintiff's claims. *See supra* Part III(A). Still, this case presents some novel issues in an unusual factual context. Courts sometimes give special consideration to allegations of misconduct that target the federal judiciary. *See Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir.), *cert. denied*, 143 S. Ct. 302 (2022). As the Second Circuit concluded in *Alix*:

> [T]his case requires us to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes. Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require. The fact that this case invokes our supervisory responsibilities makes our resolution of it *sui*

36

*generis* and of little, if any, application to "ordinary" RICO cases where these responsibilities are not front and center.

*Id.* It is not unreasonable, then, for Mr. Clore and Mr. West to believe a court might give "special consideration[]" to allegations of corruption within the nation's most important bankruptcy court.[28] *Id.*

The Court is satisfied that the Plaintiff's lawyers have not litigated this case in bad faith, and thus, the Court declines to impose sanctions at this juncture. The claims advanced in the Amended Complaint are legally insufficient but not altogether frivolous. Still, the Court admonishes Mr. Clore and Mr. West to diligently review the facts and the relevant law in all future filings.

## CONCLUSION

For the reasons outlined above, Defendant Kirkland's Motion for Sanctions (ECF No. 41) is **DENIED**.

Defendant Jackson Walker's Motion to Dismiss under Rule 12(b)(1) (ECF No. 46) is **GRANTED** as to the following counts of the Amended Complaint: Counts I, II, III, IV, V, VI, VII, VIII, IX, and XII. These claims are **DISMISSED WITHOUT PREJUDICE** as to all Defendants.[29] The Court grants the Plaintiff thirty (30) days from the date of this Memorandum Opinion and Order to amend his pleading to allege facts sufficient to establish Article III standing and to remedy the other defects outlined above.

---

[28] Importantly, *Alix* concerned the narrow issue of proximate causation under RICO. *Id.* at 203-04. Here, the Amended Complaint suffers from threshold defects that exist independently of the merits of the Plaintiff's RICO claims. Thus, to the extent *Alix* informs this case, it would not remedy the standing defects the Court outlined above.

[29] "When a district court dismisses a case for lack of subject matter jurisdiction, the proper course is to dismiss the case without prejudice." *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 191 n.4 (5th Cir. 2023). "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161.

The Court finds it has subject matter jurisdiction over the Plaintiff's *Bivens* claims, and yet, because the Plaintiff fails to plausibly plead them, they are subject to dismissal under Rule 12(b)(6).  Accordingly, the Defendants' Motions to Dismiss Under Rule 12(b)(6) (ECF Nos. 39, 44, 45, and 46) are **GRANTED** as to Counts X and XI of the Amended Complaint, and the Plaintiff's *Bivens* claims are **DISMISSED WITHOUT PREJUDICE**.  The Court lacking subject matter jurisdiction to rule on the merits of the claims which it has dismissed under Rule 12(b)(1), the Defendants' Rule 12(b)(6) motions are in all other respects **DENIED AS MOOT**.

The Court takes no pleasure in this result.  The Plaintiff's allegations, if true, cast doubt on the integrity of numerous high-profile bankruptcy cases.  Litigants should not have to wonder whether the judge overseeing their case stands to gain from ruling against them; but in Jones's courtroom, they did.  Dismissing the Plaintiff's allegations at this early stage deprives him of discovery tools to further investigate his claims and potentially try this case to a jury of his peers.  Of course, the Plaintiff is not alone in investigating these allegations—the U.S. Trustee has been seeking to claw back attorneys' fees paid to Jackson Walker and, by all indications, has been vigorously investigating the Jones-Freeman relationship.  And thus, this saga continues.  But the damage has been done.  Public confidence in our courts is difficult to rebuild.  No one litigant— no matter how zealous or well-represented—can lift the specter of impropriety these allegations have cast over the courthouse in which, until recently, half of all large bankruptcy cases were decided.  This could have, and should have, been avoided.

SIGNED AND ENTERED this $\underline{16^{th}}$ day of August, 2024.

ALIA MOSES
CHIEF UNITED STATES DISTRICT JUDGE